CH

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---------------------------------------x

Mark D. Majkowski,

Plaintiff,

-v-

American International Group, Inc.

Defendant

---------------------------------------x

08CV4842
JUDGE COAR
MAGISTRATE JUDGE MASON

FILED
AUG 25 2008 TC
AUG 25 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

1. At all times hereinafter mentioned, plaintiff was and still is a resident of Chicago, Illinois, County of Cook.

2. Defendant, American International Group, Inc. ("AIG") is a corporation incorporated under the laws of Delaware and having a main office at 70 Pine Street New York New York, County of New York.

3. Non suited parties, National Union Fire Insurance Company of Pittsburgh, PA ("National Union") and Illinois National Insurance Company ("Illinois National") are constituent entities and under the control of AIG.

4. Non suited party International Radiology Group, LLC (IRG) is or was a Delaware LLC with its principal place of business in Northbrook, Illinois, as of Dec 31, 2003, prior to December 31, 2003, IRG had its principal place of business in Dallas, Texas. IRG had multiple constituent entities, together the "Company."

5. The jurisdiction of this is invoked pursuant to 28 USC 1332 based upon the diversity of American International Group, Inc. and Mark D. Majkowski.

COMPLAINT

Plaintiff, Mark D. Majkowski ("Majkowski"), upon knowledge as to himself and his own actions and upon information and belief as to all other matters, alleges for his complaint as follows:

Nature of the Action

6. This is an action pursuant to 735 ILCS 5/2-701 Illinois Declaratory Judgment, 215 ILCS 5/ Illinois Insurance Code, and (a) contractual insurance claim(s) under various policies;

Facts

7. Majkowski is or was an officer of IRG and its constituent entities first appointed at least Treasurer in January and/or February 2001;

8. Majkowski was threatened in Chicago, Illinois and then sued in Dallas, Texas ("Texas Action") on or about April 11, 2005 for actions taken by him as an officer of IRG and its constituent entities;

9. Directors and Officers Policies at Issue:

| | | | |
|---|---|---|---|
| a. | National Union | 860-80-55 | Mar 13, 2000-Sep 13, 2001 |
| b. | National Union | 874-11-85 | Sep 13, 2001-Sep 13, 2002 |
| c. | National Union | 569-77-00 | Sep 13, 2002-Sep 13, 2003 |
| d. | National Union | 348-72-82 | Sep 13, 2003-Sep 13, 2004 |
| e. | Illinois National | 715-71-62 | Sep 13, 2004-Jan 01, 2006 |
| f. | Illinois National | RunOff | Jun 27, 2005+6 years |

10. International Radiology Group, LLC ("IRG") is the Named Entity under policies;

11. These policies are MANDATORY duty to ADVANCE DEFENSE COSTS PRIOR TO FINAL DISPOSITION OF A CLAIM; specifically, at least on the DECLARATIONS page of policy 715-71-62 it says, in big bold capital letters just as follows:

> **IN ALL EVENTS, THE INSURER MUST ADVANCE DEFENSE COSTS PAYMENT PURSUANT TO THE TERMS HEREIN PRIOR TO FINAL DISPOSITION OF A CLAIM.**

Under coverage A of policy 569-77-00 in heading 9. DEFENSE COSTS...

> "Under Coverage A, except as defined hereinafter stated, the Insurer shall advance Defense Costs prior to the final disposition of the claim, unless such Defense Costs have been advanced by the Company. Such advance payments by the Insurer shall be repaid to the Insurer by the Insureds, severally according to their respective interests, in the event and to the extent that the Insureds shall not be entitled under the terms and conditions of this policy to payment of such Loss.";

12. No Defense Costs have been advanced by the Company;

13. Majkowski is an Insured under all of the Policies at Issue;

14. Majkowski has incurred Defense Costs as a result of the Texas Action brought against him by six parties;

15. These defense costs are in excess of $400,000;

16. Majkowski has made and is making an undertaking to repay advancements if it is ultimately determined he is not entitled to payments under the policy upon final disposition of the claim;

17. Majkowski upon receiving the policies filed a Claim against AIG and its various constituent entities as soon thereafter as possible on or about November 23, 2005;

18. AIG, National Union, and Illinois National have denied the Claim; this denial is unreasonable;

19. AIG, National Union, and Illinois National have denied Advancement of Defense Costs prior to final disposition of the Claim; this denial is unreasonable;

20. National Union and Illinois National have acknowledged Majkowski is an Insured and has reserved all of his rights;

21. Based upon averments by the Company prior to June 20, 2003, IRG was controlled by Petrus. After June 20, 2003, IRG's Board was controlled by Hunt;

22. Also, attached to the Texas Action on July 17, 2003 a letter from David S. Harrington says, "In the aftermath of the recently completed corporate change of control at IRG/AIM,...."

23. The right to advancement of defense costs is an established public policy and a contractual obligation of AIG and its various constituent entities;

24. In the event that Plaintiff is not entitled to defense costs pursuant to the terms of the Policy(ies) he is obligated to repay any funds so advanced;

25. Obligations of an Insurer to advance defense costs prior to final disposition of a claim is well established and objections made by an Insurer to delay advancement obligations that are to be repaid by the Insured are not countenanced in the Courts, [Please reference: *Sun-Times Media Group, Inc. v. Royal & SunAlliance Ins. Co.*, C.A. No. 06C-11-108 RRC, 2007 WL 1811266 (Del. Super. Ct. June 20, 2007).]:

> "EVEN IF IT WERE SHOWN (my emphasis) at a later time that the exclusions apply, THIS STILL DOES NOT PREVENT THE ADVANCEMENT OF DEFENSE COSTS AT THE PRESENT TIME (my emphasis) because the policy provides that the Insured must pay back money they received but were not entitled to. The policy [in SunTimes] specifically says that:
>
> > Such advanced payments by the Insurer shall be repaid to the Insurer by each and every insured or Organization, severally according to their respective interests, in the event and to the extent that any such insured or Organization shall not be entitled under this policy to payment of such Loss."

Which is the EXACT language of the instant policy(ies) with AIG at issue (see 11 above).

26. It is unreasonable and unconscionable for AIG to deny and/or delay Plaintiff advancement of defense costs and to place any barriers in front of that advancement because he is an Insured and obligated to repay the amount advanced if it is ultimately determined he is not entitled to the payments under the policy prior to final disposition of the claim;

27. There is no basis for ANY HARM that AIG can aver in advancing funds to Majkowski under the policy(ies) if he has to repay it if it is ultimately determined he is not entitled to payment of the loss;

28. AIG has acted unreasonably and unconscionably thoughout the conduct of the claims process prior to final disposition of the claim which is still not final;

29. AIG has not complied with 215 ILCS 5 and conducted at least one and likely multiple violations under 215 ILCS 5/ Sec. 154.6. Acts constituting improper claims practice.

Cause of Action

30. Plaintiff seeks Declarations for himself and others similarly situated from AIG on behalf of itself and National Union and Illinois National as follows:

a. That Majkowski is an Insured under at least policies: 860-80-55; 874-11-85; 569-77-00; 348-72-82; 715-71-62;

b. That a Transaction pursuant to section 12.2 of policies 569-77-00, 348-72-82, and 715-71-62 occurred on or about June 20, 2003;

c. What the affect on coverage of the Transaction for all Insureds under policies 569-77-00, 348-72-82, and 715-71-62 was in understandable language easily interpretable by an Insured;

d. That Majkowski is entitled to Advancement of Defense Costs prior to final disposition of the Claim under at least policy(ies) 569-77-00 and/or 715-71-62;

e. That such Advancements are subject to repayment by Majkowski if it is ultimately determined that he is not entitled to payment of loss under any of the policies;

f. That Majkowski has reserved his rights and his claim(s) are still pending, unpaid and unsettled, and prior to the final disposition;

g. That no payments or consideration or any other advancements of any kind have been paid to and accepted by Majkowski;

31. Wherefore, Mr. Majkowski respectfully requests this honorable Court to enter an order:

a. Requiring that AIG direct those under its control, including specifically but not limited to National Union and/or Illinois National to Advance Defense Costs prior to final disposition of the claim net of any retention;

b. Requiring Majkowski to repay such amounts Advanced if it is ultimately determined that he is not entitled to payment of such loss;

c. Requiring AIG and those under its control to notify others similarly situated and given them reasonable opportunity to file or refile any claims based upon the findings of this honorable Court;

d. Granting Majkowski contractual and statutory remedies and such further relief as it may deem proper.

Jury Demand:  Plaintiff makes a demand for a trial by jury

Respectfully submitted,

Mark D. Majkowski
232 E. Walton #9 West
Chicago, Illinois  60611
312 787 0062

ORIGINAL

CAUSE NO. 05-03478-F

FILED 2005 APR 11 PM 3:55

| | | |
|---|---|---|
| AMERICAN IMAGING MANAGEMENT, INC., DASH BUSINESS GROUP, INC., DAVID S. HARRINGTON, HUNT CAPITAL PARTNERS, L.P., INTERNATIONAL RADIOLOGY GROUP, L.L.C., AND A. WINSTON PUIG, | § | IN THE DISTRICT COURT |
| Plaintiff, | § | 116th JUDICIAL DISTRICT |
| v. | § | |
| MARK D. MAJKOWSKI, | § | |
| Defendant. | § | DALLAS COUNTY, TEXAS |

**PLAINTIFF'S ORIGINAL PETITION FOR DECLARATORY RELIEF**

TO THE HONORABLE JUDGE OF THE COURT:

American Imaging Management, Inc., DASH Business Group, Inc., David S. Harrington, Hunt Capital Partners, L.P., International Radiology Group, L.L.C., and A. Winston Puig (collectively the "Plaintiffs") file this Original Petition under the Texas Uniform Declaratory Judgments Act, Texas Civil Practice and Remedies Code § 37.001 *et seq.*, against Defendant Mark D. Majkowski, and in support thereof would show the Court as follows:

## I.
## DISCOVERY CONTROL PLAN

Discovery in this action is intended to be conducted under Level 3, in accordance with Tex. R. Civ. P. 190.4.

## II.
## PARTIES

1.      Plaintiff American Imaging Management, Inc. ("AIM") is an Illinois corporation, licensed to do business in the state of Texas with its principal office in Northbrook, Illinois.

2.      Plaintiff DASH Business Group, Inc. ("DASH") is an Illinois corporation, with its principal office in Evanston, Illinois.

3.      Plaintiff David S. Harrington ("Harrington") is an individual residing in Evanston, Illinois.

4.      Plaintiff Hunt Capital Partners, L.P. ("Hunt Capital") is a Texas limited partnership with its principal office in Dallas, Texas.

5.      Plaintiff International Radiology Group, L.L.C. ("IRG") is a Delaware limited liability company, licensed to do business in the state of Texas with its principal office in Dallas, Texas.

6.      Plaintiff A. Winston Puig ("Puig") is an individual residing in Dallas, Texas.

7.      Defendant Mark D. Majkowski ("Majkowski" or "Defendant") is an individual who is a nonresident of Texas. Pursuant to Texas Civil Practice and Remedies Code §17.044(b), the Secretary of State of the state of Texas, 1019 Brazos Street, Austin, Texas 78701, is his agent for service because Defendant engages in business in Texas but does not maintain a regular place of business here or a designated agent for service of process, and this suit arose out of Defendant's business in Texas. Service may be effected upon Majkowski by serving the Secretary of State of the State of Texas with duplicate copies of the petition and citation to be

mailed, by certified mail, return receipt requested, to the attention of Mark D. Majkowski at his home address of 232 E. Walton St., Chicago, Illinois 60611.

## III.
## JURISDICTION AND VENUE

8. This Court has jurisdiction over Defendant Majkowski because he has engaged in business within the State of Texas sufficient to establish personal jurisdiction. Specifically, Defendant has negotiated, entered into and performed contracts with Texas residents as well as claimed rights under Texas law.

9. Venue is proper in Dallas County under Section 15.002(a)(1) of the Texas Civil Practice and Remedies Code in that all or a substantial part of the events or omissions giving rise to Plaintiffs' causes of action occurred in Dallas County, Texas. Venue is also proper in Dallas County pursuant to Section 15.002(a)(4) of the Texas Civil Practice and Remedies Code because Defendant is a non-resident and one or more Plaintiffs reside in Dallas County.

## IV.
## INTRODUCTION

10. From October 2000 to the present, the Plaintiffs have been involved in certain business relationships. Defendant Majkowski worked with Plaintiffs in some of the relationships until July 2003, when his services were terminated. The Defendant has made demands to the Plaintiffs relating to their prior business activities as well as threats against the Plaintiffs' current business activities and prospective business opportunities. By this action, the Plaintiffs seek a declaration that the Defendant's demands and threats are unwarranted, untrue and unsupported by law and that Plaintiffs have no liability to Defendant except for severance and bonus payments which Plaintiffs have offered to pay to Defendant but he has declined to accept.

?

## V.
## FACTUAL BACKGROUND

11.    DASH, which is wholly owned and operated by Harrington, provides consulting services to business entities. In October 2000, DASH entered into a consulting arrangement with IRG and its wholly owned subsidiary AIM (collectively "IRG/AIM") to provide management services for IRG/AIM (the "Consulting Agreement"). The Consulting Agreement is terminable at will by either party upon notice and has been modified and amended several times since its inception, principally to provide for various bonuses and incentives and to lengthen the not-for-cause termination period from 60 to 90 days.

12.    To perform the Consulting Agreement, DASH entered into an oral contract with Majkowski as an independent contractor to assist Harrington in managing IRG/AIM. For his efforts, Majkowski was to be compensated with one half of the amount paid by IRG/AIM to DASH under the Consulting Agreement.

13.    In February 2001, Harrington and Majkowski were appointed officers of IRG/AIM. The appointments as officers were not for a specific term and were accordingly terminable at will.

14.    On August 12, 2002, IRG offered Harrington certain options to purchase shares in IRG in partial consideration for his work for IRG. Occasionally, Harrington exercised those options and voluntarily transferred one half of the shares he was granted through those options to Majkowski. As a result, Majkowski has become a member of IRG, owning approximately 4.085% interest.

15.    At the onset of the relationship between IRG/AIM and DASH, the IRG Board of Directors was controlled by the Petrus Fund L.P. ("Petrus") by virtue of Petrus' ownership of certain priority Class C shares in IRG. A group including Hunt Capital and Puig owned a majority of IRG's Class A shares, and under IRG's operating agreement, the approval of a majority of the Class A shares was required to effectuate a sale of IRG.

16.    On or about June 20, 2002, Petrus entered into a letter agreement with Harrington and Majkowski, in their individual capacity, that provided they could receive a commission if Petrus sold its IRG interest (the "DCS Letter"). A copy of the DCS Letter is attached hereto as **Exhibit "1."**

17.    On December 3, 2002 in Dallas, Texas, and at the instance of Petrus, the IRG Board of Directors entered into a letter agreement with Harrington and Majkowski giving them the exclusive right for 90 days to market the company and effectuate its sale (the "PSOC Agreement"). A copy of the PSOC Agreement is attached hereto as **Exhibit "2."** The PSOC Agreement provided that the IRG Board would recommend to the IRG Membership any sale of IRG/AIM for an amount not less than $21 million.

18.    From December 3, 2002, through approximately June 1, 2003, the Board of Directors of IRG/AIM received several proposals for the purchase of IRG/AIM. One proposal was contained in a February 13, 2003 Letter of Understanding (the "Letter of Understanding"). This proposal was negotiated in Dallas, Texas between, among others, Harrington, Majkowski and Hunt Capital. Under the proposed transaction, Harrington and Majkowski would join in a transaction with Hunt Capital to purchase the company for $21.97 million. The Letter of Understanding was never signed by all parties and expired under its own terms.

19. Thereafter, Harrington, Majkowski and Hunt Capital entered into further negotiations in Dallas, Texas concerning a joint proposal to purchase the company. As a result, on February 24, 2003, they submitted to the IRG Board a letter outlining a potential transaction structure for the purchase of IRG/AIM for about $22 million (the "Hunt Capital Proposal"). This proposal never matured into an agreement since it was preliminary in nature and was not accepted by all parties.

20. At least two other entities made proposals for the purchase of IRG/AIM. Waud Capital Partners, L.L.C. and Generation Partners II, L.P. each made an offer that was conditioned upon satisfactory completion of due diligence and other approvals. These proposals were not accepted by the IRG Board and each prospective buyer withdrew their proposal.

21. On or about June 19, 2003, IRG redeemed Petrus' Class C shares and removed Petrus from management of the company. Pursuant to the DCS Letter, Petrus paid $700,000 to DASH and one half of this payment was given to and accepted without reservation by Majkowski.

22. After the redemption of Petrus' interest, Hunt Capital and Puig controlled a majority of interest in IRG and have maintained control of the IRG Board of Directors from June 20, 2003 to present.

23. On July 16, 2003, dissatisfied with the performance of Majkowski, the IRG Board acted to amend the Consulting Agreement to no longer require the services of Majkowski. Thereafter Majkowski was also removed as an officer of IRG/AIM.

24. On or about July 17, 2003, Harrington, on behalf of DASH, wrote to Majkowski informing him that his services as an independent contractor for DASH were no longer required and offered him a prorated share of the 2003 bonus due to DASH and three months compensation as a severance payment (the "Severance Letter"). A copy of the Severance Letter is attached hereto as **Exhibit "3."**

25. Majkowski did not reply to the Severance Letter. However, on March 7, 2005, he caused to be sent a letter to Harrington and IRG/AIM making numerous unwarranted and untrue allegations against Plaintiffs and threatening litigation unless he was paid an exorbitant sum of money and given a larger membership interest in IRG (the "Demand Letter"). A copy of the Demand Letter is attached hereto as **Exhibit "4."**

**Majkowski's Allegations in the Demand Letter**

26. In the Demand Letter, Majkowski made several allegations against Plaintiffs. He alleged:

(A) A partnership arose between Majkowski and Harrington and/or Majkowski and DASH relating to the performance of the Consulting Agreement between DASH and IRG/AIM;

(B) Harrington failed to pay Majkowski one half of the total compensation DASH received under the Consulting Agreement;

(C) Harrington breached his fiduciary duties as a partner with Majkowski by negotiating a possible transaction for the sale of IRG/AIM not in Majkowski's interest;

(D) Harrington tortiously interfered with the "business relationship[s]" between Majkowski and IRG and Majkowski and Hunt Capital;

(E) IRG violated its duty under the PSOC Agreement by negotiating with other buyers;

(F) IRG violated a duty under the PSOC Agreement to consummate Majkowski's, Harrington's and Hunt Capital's proposals for the purchase

of IRG/AIM pursuant to the Letter of Understanding and the Hunt Capital Proposal;

(G) Harrington and IRG conspired together to pursue other alternatives for the sale of IRG without Majkowski's involvement;

(H) Majkowski suffered damages to the extent that he does not own a larger interest in IRG and was wrongfully removed from his position with IRG;

(I) IRG failed to adhere to the law relating to limited liability companies;

(J) Puig, possessing knowledge of unannounced IRG events, tried to buy out other members, including Majkowski without providing appropriate disclosures; and

(K) Hunt Capital failed in its duty under the Hunt Capital Proposal to provide a buyer for IRG.

## VI. CAUSES OF ACTION

### Declaratory Judgment

27. Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1-25 above.

28. In accordance with the Texas Uniform Declaratory Judgments Act, § 37.001 *et seq*. of the Texas Civil Practice and Remedies Code, Plaintiffs seeks to settle and afford relief from uncertainty and insecurity with respect to whatever rights, status, or other legal relations that they and Majkowski may have. Declaratory relief sought by Plaintiffs includes, without limitation, the following:

(A) A declaration that Majkowski does not have a claim for the ownership of any of Hunt Capital's or Puig's interests in IRG and that they are free to sell those interests;

(B) A declaration that Majkowski does not have a claim for the ownership of any IRG interest not already owned by him and that all of such interests are available for sale to third parties;

(C)     A declaration of rights that Puig has not engaged in any prohibited transactions;

(D)     A declaration that the Hunt Capital Proposal did not create any obligations on the part of Hunt Capital to Majkowski and that Hunt Capital did not fail in any obligations or duties to any party under the Hunt Capital Proposal;

(E)     A declaration that IRG/AIM had no duty to take any action in connection with proposals submitted by Majkowski for the purchase of IRG/AIM;

(F)     A declaration of rights that, other than the benefits he has received through DASH and his current membership interest, Majkowski is entitled to no other rights or benefits from AIM/IRG;

(G)     A declaration that Majkowski's position as an officer of IRG/AIM ended on July 16, 2003, and that he has no claim for any rights or benefits from IRG/AIM after that date;

(H)     A declaration that IRG has adhered to the law with respect to limited liability companies and has not participated in any prohibited transactions;

(I)     A declaration that Majkowski's only status with DASH was as an independent contractor, terminable at will;

(J)     A declaration that, other than previously tendered three months severance and a pro rata share of any 2003 bonus, Majkowski has no rights or entitlements from DASH after his termination in July 2003;

(K)     A declaration that there was no partnership between Harrington and Majkowski and/or DASH and Majkowski with respect to either the Consulting Agreement between DASH and IRG/AIM or any proposed transaction to purchase IRG/AIM;

(L)     A declaration that Harrington did not breach any fiduciary duty allegedly owed to Majkowski in his conduct in connection with any transactions to sell IRG/AIM;

(M)     A declaration that Harrington does not owe Majkowski any amounts whatsoever;

(N)     A declaration that Harrington has not tortiously interfered with any relationship between Majkowski and either Hunt Capital or IRG/AIM; and

(O)     A declaration that no Plaintiff has conspired to deprive Majkowski of any right or entitlement due him as an independent contractor, potential purchaser of IRG, officer of IRG, or holder of a membership interest in IRG.

## VII.
## ATTORNEY'S FEES

29.    Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1-27 above.

30.    Plaintiffs seeks recovery of their costs and reasonable attorney's fees incurred in this action pursuant to Texas Civil Practice and Remedies Code Section 37.009, and any other applicable law.

31.    All conditions precedent to recovery of attorney's fees have been met.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully pray that Defendant Majkowski be cited to appear herein and, upon the trial hereof, that Plaintiffs be awarded a judgment for the declaratory relief as set forth above, their attorney's fees and costs of court.

Respectfully submitted,

ANDREWS & KURTH L.L.P.

Dennis N. Ryan
State Bar No. 17470700
Linda R. Stahl
State Bar No. 00798525
Joseph E. Blackwell
State Bar No. 24045504

1717 Main Street, Suite 3700
Dallas, Texas 75201
Telephone - (214) 659-4400
Telecopier - (214) 659-4401

ARNSTEIN AND LEHR
Norman P. Jeddeloh
120 South Riverside Plaza
Chicago, Illinois 60606
Telephone – (312) 876-6928

**ATTORNEYS FOR PLAINTIFFS AMERICAN
IMAGING MANAGEMENT, INC., DASH
BUSINESS GROUP, INC. DAVID S.
HARRINGTON, HUNT CAPITAL
PARTNERS, L.P., INTERNATIONAL
RADIOLOGY GROUP, L.L.C., AND
A. WINSTON PUIG.**

MEMORANDUM OF UNDERSTANDING

June 20, 2002

David Harrington
Mark Majkowski
DASH Business Group, Inc.

Re: Disposition of Interests

Dear Mark and David:

My understanding is that you currently have a Consulting Agreement with International Radiology Group, LLC (IRG) that calls for the payment of a Transaction Bonus upon the sale of the company. I further understand that you are negotiating with the Board to replace the Transaction Bonus with an award of options. You have expressed concern that (1) the Class C shareholder could sell his Class C shares in IRG, and thereby affect a change in control, without triggering the payment of any consideration to management and (2) the replacement of the Transaction Bonus with an option award means that no consideration would be paid with respect to the Class C shares upon the sale of the company. The Class C shareholder would like to address your concerns and at the same time relieve the company of any obligation to pay any consideration to management with respect to the Class C shares that would otherwise be paid upon a sale of the company.

The Class C shareholder proposes a declining commission style arrangement. The commission will be paid based upon a Declining Commission Schedule ("DCS") as follows, payable as cash is actually received:

| | |
|---|---|
| Cash received by 9/30/02 | 10% |
| Cash received by 12/31/02 | 9% |
| Cash received by 3/31/03 | 8% |
| Cash received by 6/30/03 | 7% |
| Cash received by 9/30/03 | 6% |
| Cash received by 12/31/03 | 5% |
| Cash received by 3/31/04 | 4% |
| Cash received by 6/30/04 | 3% |
| Cash received by 9/30/04 | 2% |
| Cash received by 12/31/04 | 1% |

A Transaction will include any sale or other receipt of cash with respect to the Class C shares either in whole or in part from any party during the term of this agreement.

The commission will be determined as follows:

1. In the event of a cash Transaction the percentage of total cash consideration set forth in the DCS above.

2.  In the event of a stock, debt or other exchange, or any "substitution or redemption" of Class C shares for a new obligation and/or security and/or combination of securities issued by the Company, there will be no payment made except to the extent cash is received. Any later cash Transaction with respect to the securities received will be eligible for commissions to the extent provided in the DCS. For this purpose, any security received by the Class C shareholder shall be deemed to be equivalent to cash as of the first date on which such security is freely saleable by the Class C shareholder, without any material restriction, in an established public securities market. As of such date, the Class C shareholder shall transfer to you the portion of such unsold securities specified in the DCS.

3.  In the event of redemption through a stream of cash dividends, that DCS percentage applicable to the amount of dividends declared and subsequently paid, e.g., if $500,000 of Class C dividends is declared during the quarter ending September 30, 2002, $50,000 would be payable when such dividends are paid; if $250,000 is paid during the quarter ending December 31, 2002, $22,500 would be payable when such dividends are paid.

4.  In the event of a mandatory redemption, that percentage is the DCS of the mandatory redemption proceeds at the time of the mandatory redemption, so long as the total proceeds exceed $5 million plus the amount of the Commission to be paid.

5.  In the event of a combination of items 1-4, the sum of the amounts applicable from each of the items.

This agreement will continue for so long as DASH continues to generally provide executive management services to IRG/AIM. The DCS will continue to apply to any proceeds received during the six-month period following termination. Examples:

1.  If this contract is terminated on January 1, 2003, and a dividend is declared during the first quarter 2003 in the amount of $500,000, 8% or $40,000 is due from the $500,000 proceeds when paid.

2.  If this contract is terminated on November 15, 2002, and a dividend is declared during the second quarter of 2003 in the amount of $500,000, 7% ($35,000) would be payable when the dividend is actually paid only if the dividend was declared before May 16, 2003.

3.  If this contract is terminated on November 15, 2002 and a dividend is declared for the third quarter of 2003, no moneys would be paid.

If this arrangement is acceptable to you, please indicate your agreement by signing below and returning the fully executed document to me via fax at 972-788-3097.

Sincerely,

Petrus Fund, LP

By: ______________________

______________________ ______________
Accepted: Date

______________________ ______________
Accepted: Date

If this arrangement is acceptable to you, please indicate your agreement by signing below and returning the fully executed document to me via fax at 972-788-3097.

Sincerely,

Petrus Fund, LP

By: [signature] 8/12/02

[signature] 8.9.02
Accepted: Date

[signature]
Accepted: Date

December 3, 2002

International Radiology Group, LLC
Board of Managers

**Re: Potential Sale of the Company**

Gentlemen:

Consistent with the terms of our Consulting Agreement with the Company, we have, and remain engaged in, a process seeking to identify potential buyers for the Company or substantially all of the Company's and its subsidiaries' assets. To date, we have had preliminary discussions with a number of potential buyers, including Danielson Holding Corporation, Equity Group Investments, LLC, and/or entities related thereto. Based on these preliminary discussions, it is apparent to us that (1) potential buyers will likely require our continued involvement and participation as executives and owners and (2) an expression by the Company of the basic economic terms necessary to complete a transaction will expedite our ability to pursue a sale of the Company.

1. **Transaction**

Based on previous conversations with members of the Board, we understand that the Board would authorize and recommend to the Members for approval a sale of all or substantially all of the assets or equity of the Company free and clear of all liens and encumbrances for a value of not less than $21 million, of which (1) not more than $2.1 million could be "rolled over" as junior subordinated debt securities or equity securities and (2) approximately $970,000 would be applied to pay the Texas Capital Loan in full at closing (the "Transaction").

Obviously, the Transaction would be subject to a number of customary prerequisites satisfactory to the Company and the potential buyer, including: satisfactory completion of due diligence by the potential buyer; no material adverse change in the assets or operations of the Company or its market; negotiation and completion of a mutually acceptable binding purchase agreement containing customary representations, warranties, covenants and obligations, some of which shall survive closing; receipt of any necessary approvals, consents and/or waivers from any governmental authorities or third parties; receipt of financing by the potential buyer on satisfactory terms; and the continued operation of the Company in its ordinary course of business consistent with its past practices.

2. **Exclusivity**

The Company recognizes that our ability to identify and select a potential buyer will require a significant personal effort from us. In that regard and to facilitate our ability to identify and select a potential buyer, the Company agrees to negotiate in good faith with us and the potential buyer or buyers we select on an exclusive basis for 90 days

from the date of this letter (it being understood that, if during the course of our efforts to sell the Company we conclude that it is likely to occur on terms less favorable than those set forth in paragraph 1 above, we will promptly advise the Company (through the Board) and the Company may, at its option, terminate the remaining portion, if any, of an exclusivity period hereunder), subject, of course, to the Board's exercise of its fiduciary duties under Delaware law. During this time, the Company will not discuss a potential sale with anyone else and will promptly advise us if they are contacted by any person or entity interested in pursuing a possible transaction. Likewise, we will keep the Company (through the Board) informed as to status and nature of our discussions with potential buyers relative to the Transaction (it being understood that, in that context, we will be required, among other things, to (1) disclose to the Company (through the Board) in writing any and all consideration to be paid in connection with the Transaction to us at or after the closing of the Transaction, (2) upon request from the Company, disclose to the Company (through the Board) in writing any other aspects of the status or nature of such discussions or the terms of such Transaction, and (3) circulate to the Company (through the Board) drafts of definitive purchase and sale or other documents relating to the Transaction). The Company further confirm that no other potential acquisition transaction has been negotiated and no potential liability or obligation exists related thereto.

3.    **Release and Indemnity**

Our efforts in this regard inevitably expose us to potential conflicts of interest relative to our duties as officers to the Board, the Company and its equity holders. However, it is recognized that, without our involvement on this basis, a sale of the Company may not be realized on as favorable a basis. Accordingly, without limiting the generality of any rights to indemnification or contribution available to us by law, under the Consulting Agreement, or pursuant to the Company's or any of its subsidiaries' respective articles, bylaws, operating agreements or similar documents, the Company releases and forever discharges us and each of our partners, potential financing and capital sources and other representatives from any and all claims, demands, damages, actions, cross-actions, causes of action, costs and expenses (including legal expenses), whether based on law or equity, arising out of or in connection with the potential transactions contemplated hereby and our involvement therein, but excluding any such claims, demands, damages, actions, cross-actions, causes of action, costs and expenses (1) incurred by reason of the gross negligence, bad faith or willful misconduct of the person to be released or (2) in the event of the material breach of our disclosure obligations to the Company under paragraph 2 above.

Consistent with the foregoing, the Company agrees to indemnify us and our partners, potential financing and capital sources and from, and to hold each of them harmless against, any and all losses, liabilities, claims or damages (including reasonable legal fees and expenses) to which any of them may become subject, insofar as such losses, liabilities, claims or damages arise out of or result from any actual or threatened investigation, claim, litigation or other proceeding relating to or in connection with the potential transactions contemplated hereby and our involvement therein, but excluding any

Received at: 11:25AM, 12/2/2002

12/02/2002 12:38 8475546185 PAGE 03

such losses, liabilities, claims, damages or expenses (1) incurred by reason of the gross negligence, bad faith or willful misconduct of the person to be indemnified or (2) in the event of the material breach of our disclosure obligations to the Company under paragraph 2 above.

4. <u>Expenses</u>

We will prepare and submit to the Board for approval a plan and budget for pursuing a Transaction. We will submit updates to the plan and budget for Board approval as appropriate to adjust to changed circumstances. Upon request, the Company will reimburse us for any and all reasonable out-of-pocket fees and expenses incurred by us on behalf of the Company in connection with the sales process contemplated hereby and the Transaction, provided such expenses are consistent with the approved plan and budget.

5. <u>Other Agreements</u>

Notwithstanding any implication to the contrary, this letter is in furtherance of and is not intended to, or should be construed as, modifying any of the separate rights and obligations of the parties under any agreements among the same.

If you are in agreement with the foregoing, please sign and date this letter below and return to us.

Sincerely,

[signature]
David S. Harrington

[signature]
Mark D. Majkowski

Agreed to and accepted
on December 3, 2002

INTERNATIONAL RADIOLOGY GROUP, LLC

By: [signature]
Its: Chairman of the Board of Managers

**DASH Business Group**     11221 S. Champlain Avenue, suite 1
                            Chicago, IL 60649

July 17, 2003

Mark D. Majkowski, President
MDM Consulting Partners

Dear Mark:

In the aftermath of the recently completed corporate change of control at IRG/AIM, the new Board of Directors has elected to amend the DASH Business Group Consulting Agreement. Specifically, the Board has eliminated the engagement of your services as President and CFO. As a result, your services will no longer be required at IRG/AIM effective today, July 17, 2003. You have been paid through the end of July and will receive a payment of $81,120 (3 months compensation) soon after you have signed the standard AIM release form at AIM HR for administrative closure. You will be entitled to a pro-rated share of the DASH 2003 bonus to reflect your seven (7) months of service this year contingent on DASH receiving payment of the bonus. You can advise me as to when you would prefer to receive this payment, ie.. soon or when DASH is paid, presumably, as scheduled in 2004. In consideration of the allocation of the pro-rata share, I will want you to sign the attached DASH release. Also attached is an IRG Ownership list that reflects your holding of 4,712 shares of stock as of this date.

I have appreciated your efforts on DASH's behalf as have the members of IRG/AIM. May we enjoy another engagement as successful as this one.

Sincerely,

David

David S. Harrington
President

GENERAL RELEASE

In consideration of the final payments described in David Harrington's letter of July 17,2003 and for other good and valuable consideration the receipt and sufficiency is hereby acknowledged, Mark D. Majkowski hereby releases, discharges and forever holds for naught any claim, controversy, cause of action, dispute or charge any type or sort whatsoever which he has, has ever had, or ever may have against DASH Business Group, its officers, agents, and employees, including but specifically limited to David Harrington.

______________________
Mark D. Majkowski

______________________
Dated

# WINSTON & STRAWN LLP

43 RUE DU RHONE
1204 GENEVA, SWITZERLAND

CITY POINT
1 ROPEMAKER STREET
LONDON, EC2Y 9HT

333 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-1543

35 WEST WACKER DRIVE
CHICAGO, ILLINOIS 60601-9703

(312) 558-5600

FACSIMILE (312) 558-5700

www.winston.com

200 PARK AVENUE
NEW YORK, NEW YORK 10166-4193

21 AVENUE VICTOR HUGO
75116 PARIS, FRANCE

101 CALIFORNIA STREET
SAN FRANCISCO, CALIFORNIA 94111-5894

1400 L STREET, N.W.
WASHINGTON, D.C. 20005-3502

PETER F. DONATI
(312) 558-5521
pdonati@winston.com

March 7, 2005

**BY FEDERAL EXPRESS**

Mr. David S. Harrington
c/o American Imaging Management, Inc.
40 Skokie Boulevard
Northbrook, Illinois 60062

Re: Mark D. Majkowski

Dear Mr. Harrington:

Winston & Strawn LLP represents Mark D. Majkowski and MDM Consulting Partners, Inc. ("MDM Consulting"). We are writing to you in your role as President of DASH Business Group ("DASH") and Chief Executive Officer of International Radiology Group, L.L.C. ("IRG"), American Imaging Management, Inc. ("AIM"), and other related entities (collectively the "Company"), for purposes of resolving and updating the relationship between the Company and Mr. Majkowski. Accordingly, this letter is intended to enjoy the full protection from use in any subsequent proceedings usually afforded settlement documents under applicable rules of evidence and the common law. In addition, the factual allegations in this letter are based upon our initial investigation. If we are unable to reach a mutually acceptable resolution of this matter, we fully expect that discovery in any subsequent proceeding will uncover additional facts in support of Mr. Majkowski's position.

We are in receipt of and have reviewed your July 17, 2003 letter to Mr. Majkowski as well as certain other documents stemming from his services to the Company, his partnership with you, his interests in DASH and his separate agreements with the Company. In your July 17, 2003 letter you proposed that Mr. Majkowski waive any claims against the Company in return for three months of severance and a pro-rated bonus. However, you neglected to provide sufficient information in that communication for any thoughtful consideration by him, such as the actual amount of money to be paid and terms of any release.

To follow up on your proposal and so that you can gain a better understanding for Mr. Majkowski's position, we have recounted below certain facts relating to his work on behalf of and dealings with the Company. From the outset, you and Mr. Majkowski acted as partners in providing consulting services to IRG. Indeed, the terms of the initial engagement letters with IRG were drafted personally by Mr. Majkowski. You expressly acknowledged the existence of

this partnership. For instance, you sent a memorandum to Mr. Majkowski stating: "As you know we have been working together as partners since the inception of our work with International Radiology Group, LLC and American Imaging Management, Inc. All proceeds between us have been allocated on a 50/50 basis." (See Attachment A.) Similarly, in a note to Mr. Majkowski dated August 9, 2002, you wrote:

> Mark,
>
> I will be developing several structures for us going forward. As always, you will receive 50% of the proceeds from the engagements so long as we are mutually able to satisfy the customers. You can be assured that no modifications will be made without your consent. I appreciate your patience and support as we work through the details to finalize the appropriate documents and organizations.

(See Attachment B.)

On behalf of this partnership, certain agreements were entered into with IRG relating to the services to be provided by you and Mr. Majkowski, beginning with the Initial Engagement Letter of October 2000. This letter called for combined consideration of $80,000 per month for part-time work. As you know the essential elements of the service terms were established by Mr. Majkowski and were consistent with his established market rate for consulting services. In December 2000, the engagement was significantly downscoped in terms of work level, establishing a $50,000-per-month rate for a greatly reduced load.

Following substantial negotiations, you, Mr. Majkowski, and IRG then entered into the Consulting Agreement of August 10, 2001 ("the Consulting Agreement"). The Consulting Agreement specified immediate cash payments, significant deferred compensation, and additional bonuses. Furthermore, the Consulting Agreement included rights to secure a sale of the Company through any and all means and to act as principals in such a transaction. Although the Consulting Agreement runs between IRG and DASH, there is no question that Mr. Majkowski was intended to be a third-party beneficiary.

Besides these arrangements between you and Mr. Majkowski and between your partnership and IRG, it is also important to note that you and Mr. Majkowski were appointed as officers of IRG in February 2001. This action by the Board of Directors was separate and apart from any agreement with DASH and created separate obligations of the Company to you and Mr. Majkowski.

In reliance on these various agreements and appointments, Mr. Majkowski expended substantial time and effort on behalf of IRG and was a key contributor to the Company's financial turnaround in his capacities as President and CFO. For instance, Mr. Majkowski identified certain tax losses that could be used by IRG. After a thorough and time consuming investigation by Mr. Majkowski, Ernst & Young ("E&Y") reviewed and revised reported purchase accounting to properly reflect current accounting standards for the AIM acquisition. In

early 2002, E&Y successfully updated the tax condition with $25 million in usable NOL's, and an additional $10 million of non-cash tax expenses also were identified. This work on behalf of the Company entitled you and Mr. Majkowski to a special tax bonus from IRG. However, when this bonus came due, you both agreed to defer the portion that was currently payable in exchange for a stock option ownership position and an incentive payment in the form of distributions on the Class C obligations.

The work performed by you and Mr. Majkowski was so successful that IRG went from facing a potential default of its debt and contractual performance obligations to being an attractive target for a takeover or acquisition. At the request of the Board and pursuant initially to the terms of the Consulting Agreement, Mr. Majkowski began to seek a purchaser for IRG. For example, he was able to secure, through a personal contact, an initial written letter of interest from DHC and the Equity Group. He also pursued an alternative liquidity option involving the combined use of Company assets, third party debt and your and Mr. Majkowski's established equity. This was provided for in the Consulting Agreement and the Board was continuously apprised of the efforts to secure this type of transaction.

While Mr. Majkowski pursued this second alternative, he was re-contacted by DHC. DHC indicated that it preferred to work directly with Mr. Majkowski and you as management in structuring an offer. Properly and immediately at that time, Mr. Majkowski disclosed to the Board the potential conflict. It was agreed by the Board, through the use of its own independent outside advisor, to enter into the agreement of December 3, 2002, regarding the potential sale of the Company ("PSOC Agreement"). The PSOC Agreement specified the minimum economic terms under which the Board would support and recommend a transaction to the Members for approval. The PSOC Agreement also included an exclusivity provision requiring IRG to negotiate in good faith solely with you and Mr. Majkowski and any potential buyer or buyers the two of you would select for a period of 90 days.

After the PSOC Agreement was executed, Mr. Majkowski continued to pursue discussions with other interested parties, including Generation Partners and DHC. In addition, he pursued discussions with various specialty and commercial lenders to raise funds for a management acquisition. Upon receiving a term sheet from Harris Bank, you and he submitted an offer on or about December 31, 2002, which met the minimum terms of the PSOC letter. This offer was circulated to the members by the Board of Managers. Subsequently, the offer expired without substantive negotiation or response.

After this failure to negotiate, both Generation Partners and DHC prepared letters of intent consistent with the terms the Board was obligated to support and recommend. Each provided for you and Mr. Majkowski to continue as executives of IRG. You both advised the Board of these offers and requested input back from the members. Inexplicably and in contravention of the PSOC Agreement, the Board did not negotiate with you and Mr. Majkowski regarding these opportunities. Instead, you and he were contacted directly and asked to resubmit your offer. At this point, Mr. Majkowski objected to both the Board's request for a rebid and the Board's refusal to respond to DHC and Generation.

Nevertheless, in response to the Board's request, on February 13, 2003 you and Mr. Majkowski made an unconditional offer to purchase all or substantially all of the assets of the Company for $21.97 million in cash ("the Proposed Management Buyout"). This proposal exceeded the written requirements previously established by the Company for any transaction. Had the Company lived up to its obligations to act in good faith in response to the Proposed Management Buyout, we believe a transaction would have been consummated and Mr. Majkowski would at this time own one-half of IRG (forty-six percent more than the 4.085% described in the attachment to your letter to Mr. Majkowski dated July 17, 2003).

Because of IRG's refusal to stand by the previous requirements for purchase, you and Mr. Majkowski were forced to turn to Hunt Capital Partners, LP ("Hunt") to come up with an alternative proposal. On February 24, 2003, you, Hunt, and Mr. Majkowski finalized an agreement setting forth the deal structure for an acquisition of IRG ("the Hunt Deal Structure"). Under the terms of the Hunt Deal Structure, Hunt agreed it "would be solely responsible for bringing in a transaction with the Company." In addition, the parties agreed that management would have 2 of the 5 seats on the Board of Directors and would receive 44% of future cash flow distributions (the expected revenue to Mr. Majkowski under the Hunt Deal Structure must be contrasted with what he can expect to receive based on the current ownership structure of IRG).

Both you and Hunt have acknowledged that this agreement was effective. However, after executing this agreement, Hunt took absolutely no actions at all to "bring in a transaction with the Company," at least a transaction of the kind the parties had contemplated. Instead of proceeding under the terms of the Hunt Deal Structure, you and Hunt separately conspired to pursue multiple alternative partners. Specifically, this included discussions with Generation Partners and Waud Capital to acquire IRG without the involvement of Mr. Majkowski. Ultimately, without any notice to your partner, Mr. Majkowski, you ended up cutting a special deal for yourself that was substantially to Mr. Majkowski's prejudice.

Furthermore, after earlier promising that no changes to the consulting arrangement would be made without Mr. Majkowski's consent, you and IRG entered into a purported "Second Amendment to the Consulting Agreement" dated July 2003. The apparent intent of this Second Amendment was to eliminate any reference to Mr. Majkowski and to wipe out all protections afforded him by the Consulting Agreement and the First Amendment thereto.

After the alleged "Second Amendment" was signed, you terminated Mr. Majkowski from his positions as President and CFO with no notice whatsoever. To date, Mr. Majkowski has never received any evidence that his termination from these positions was appropriately authorized and acted upon by the Company. Although you apparently have continued to receive payments from IRG as part of the partnership formed with Mr. Majkowski, you have not shared any of these payments with him.

In addition, while Mr. Majkowski has over a 4% interest in IRG, he has not received any reports concerning the financial performance of IRG, anticipated member meetings, or other information normally shared with minority members of an LLC. Indeed, it appears that the LLC agreement was even amended without any notice ever being sent to him.

We believe that the above facts give rise to a number of claims against you, DASH, and IRG. To begin with, there is no doubt that you breached your contractual obligations to share revenues with Mr. Majkowski as a partner in the IRG relationship. In addition, you violated your fiduciary duties to him by secretly negotiating agreements with Hunt and IRG to pursue an alternative deal structure that was substantially to Mr. Majkowski's detriment. Moreover, you wrongfully and tortiously interfered in the business relationship that existed between Mr. Majkowski and IRG and between Mr. Majkowski and Hunt.

For its part, IRG clearly acted in contravention of its obligations under the exclusivity provision of the PSOC Agreement by negotiating with other buyers. IRG also failed to stand by its commitment to support and recommend various transactions proposed by you and Mr. Majkowski and to consummate a sale of the Company on the written terms it had earlier provided to you and Mr. Majkowski. Although IRG's actions occurred prior to your seizing control along with Hunt, IRG nevertheless remains liable for this conduct. Today, as a result of IRG's actions, instead of owning half of IRG with you or 22% with Hunt and having the opportunity to continue to serve in his capacity as President and CFO, Mr. Majkowski has been removed from all of his positions and owns a mere 4% of the Company.

After Mr. Majkowski's departure, IRG has repeatedly failed to abide by its most basic obligations under the law applicable to limited liability companies. In addition, there appears to have been efforts by Company insiders to buy out other members, including Mr. Majkowski, without providing those members with appropriate disclosures and despite apparent knowledge by those insiders of unannounced Company events.

There are right ways and wrong ways to do things. You and the Company failed to fulfill your contractual and fiduciary obligations to Mr. Majkowski. The question for you and the Company to decide is whether you will resolve matters with Mr. Majkowski on a mutually acceptable basis or whether it will be necessary for him to pursue a legal action to seek a remedy for the harm that has been caused him.

Your proposal to Mr. Majkowski at the time of his termination can be valued at approximately $257,000, depending on the size of Mr. Majkowski's bonus for 2003. Our review indicates that Mr. Majkowski has claims and rights based upon his service to the Company from February 2001, interests in the DASH contract, rights as your partner, rights under the various additional written agreements, and rights as a Member of IRG that can be fairly valued at far more than the amount you propose in settlement.

For example, at least $733,700 is due and owing to Mr. Majkowski for amounts promised to him for work he performed:

- He is owed an additional $87,500 as a result of the 2002 bonus program promised by the IRG. The total amount of this underpayment was to be $350,000, of which one half should have gone to non-DASH employees and one quarter each, or $87,500, should have gone to you Mr. Majkowski.

- He is owed a bonus for 2003 of $325,000. One half was to be paid as of December 31, 2003 close and the other half upon final audit by E&Y.

- He is owed $81,200 for the ninety day notice period which was never given but to which he was contractually entitled.

- He is owed $90,000 as a result of the adjustment for timely payment of C redemption with early distributions. Based upon the standard used by the Board to make these distributions they should have been done earlier, rather than accumulating the entire $10 million for a one time distribution, and as such additional sharing of distributions should have taken place. The figure above represents one half of the approximately $180,000 in additional sharing of distributions that should have been paid to you and to Mr. Majkowski

- You identified additional exceptional performance for the period of 2002 for which a bonus was requested by you from the Board. We estimate Mr. Majkowski's component of this exceptional performance bonus to be $150,000.

In addition, we have identified at least the following $14,350,000 in damages as a result of the breaches and other conduct by you and IRG. Keep in mind that this list is simply our initial estimate, prior to full discovery, retention of expert witnesses, and other steps that will be taken during any litigation to identify and substantiate Mr. Majkowski's damages:

- His expected earnings from IRG in the positions of President and CFO were $650,000 per year. Had he not been wrongfully removed from these positions, he would have earned a minimum of $3,250,000 over the next five years, without even considering likely increases that he would have received. Moreover, there is no reason a calculation of his future earnings should cease at only five years.

- Additional tax loss benefits were identified, in excess of $10,000,000, which if taken by the Company as it was obligated to do, would have resulted in an additional one-time bonus adjustment of $100,000 for Mr. Majkowski.

- If IRG had acted in good faith in relation to the Proposed Management Buyout, Mr. Majkowski would have received 50% percent of future profits of IRG. Moreover, if you and Hunt had not altered the Hunt Deal Structure without Mr. Majkowski's consent and to his detriment, he would have received 22% of future profits of IRG. Even if only the lower of these two figures is used and if potential IRG earnings are calculated based upon its trend to yield $10 million in annual profits over the next

five years, a conservative estimate of the amount lost by Mr. Majkowski would be $11,000,000.

- Mr. Majkowski has been entitled and continues to be entitled to one-half of the anticipated earnings from your partnership with him in connection with the work that has been and is being done for IRG. Again, a conservative estimate of these revenues over the next five years would be $3.25 million of which Mr. Majkowski's interest would be $1.625 million.

- Finally, given the malicious behavior that has been exhibited toward Mr. Majkowski and the complete disregard that has been shown for his rights, it is not unrealistic to expect that punitive damages would be awarded in conjunction with any potential claims he might bring.

These amount to cash claims of nearly $5.75 million plus ownership/future cash flow interests in IRG of 18-46 additional percentage points. Solely to avoid the time and expense of litigation, Mr. Majkowski would be willing to settle his claims against you, DASH, and IRG on the following basis: a mutual release of all claims; a cash payment of $1.5 million from you and/or IRG; an increase in his ownership interest of IRG by eight full percentage points; a mutual non-disparagement clause; reinstatement of the indemnification rights purportedly taken away by the Second Amendment to the Consulting Agreement; and such other standard terms as are normally incorporated into an agreement of this kind for an executive of Mr. Majkowski's level.

The description of Mr. Majkowski's potential claims and damages is not intended to be a threat of any kind against you or IRG. Instead, the discussion above has been provided in order to facilitate a compromise in this matter, which we believe it is in everyone's best interest to achieve. At the same time, you and IRG should understand that if you, the Company, and Mr. Majkowski are not able to reach a fair resolution, he will pursue whatever claims may be available to him.

Finally, please consider this letter a request under Section 305 of the Delaware Limited Liability Company Act for the following information concerning IRG:

(1) True and full information regarding the status of the business and financial condition of IRG, including the most recent audited income statement and balance sheet for IRG;

(2) A copy of IRG's federal, state and local income tax returns for 2003 and, as soon as they become available, for 2004;

(3) A current list of the name and last known business, residence or mailing address of each member and manager of IRG;

(4) A copy of the current limited liability company agreement for IRG and all applicable amendments thereto;

(5) A copy of any member agreements on file with the Company; and

(6) An accounting of any transactions and the terms of those transactions regarding transfers or sale of membership interests between any entity and members of the Board of Managers of IRG or entities entitled to appoint Managers to the Board, including specifically but not limited to Perot Investments, Hunt Capital, and Dr. Winston Puig.

If there is a cost associated with providing the information, please let us know. I look forward to receiving the information we have requested and hearing from you after you have had an opportunity to consider the proposal put forward.

Very truly yours,

Peter F. Donati

PFD/maf

cc: Mr. Mark D. Majkowski

# DASH BUSINESS GROUP, INC.

Mark Majkowski
232 E. Walton 9 West
Chicago, IL 60611

Re.: Grant of Options and Shares in IRG

Dear Mark:

As you know we have been working together as partners since the inception of our work with International Radiology Group, LLC and American Imaging Management, Inc. All proceeds between us have been allocated on a 50/50 basis.

We received a Grant of Options involving 9,424 Class A shares half of which are for direct benefit of David Harrington and half for you. Forty percent of those are vested or 3,770 which have been exercised and converted into Class A shares. You hold 50% of those or 1,885 and David Harrington holds the other half.

We received the following information regarding the potential personal tax implications of the Grant of Options. As we would like to make similar tax elections would you please review the materials attached regarding the 9,424 options and your interest in the 4,712 options and let me know your thoughts.

Sincerely,

[signature]
CEO

EXHIBIT "A"

8/9/00

Mark,

I will be developing several structures for us going forward. As always you will receive 50% of the proceeds from the engagements so long as we are mutually able to satisfy the customers. You can be assured that no modifications will be made without your consent. I appreciate your patience and support as we work through the details to finalize the appropriate documents and organizations.

David Harrington

EXHIBIT "B"

RE:

**Mark Majkowski**

**From:** David G. O'Brien [DOBrien@peabodyarnold.com]
**Sent:** Monday, November 19, 2007 8:54 AM
**To:** mark@mdmcp.com
**Cc:** Michael P. Duffy
**Subject:** IRG
**Importance:** High

Mr Majkowski.

This email will respond to your inquiries.

1 You are an insured under IRG Policy No 715-71-62. National Union's position as to coverage under that Policy was set forth in letters dated January 23, 2006 April 21, 2006 and August 11 2006, copies of which were sent to you by email on October 31 2007

2 We cannot determine whether there are any other National Union policies under which you may be an insured without a list of any other entities of which you are or were an officer or director If you could provide such a list, we will attempt to identify any such policies

3 See #2 above We are not refusing to provide any policies

4 We do not understand what you mean regarding a "referee"

Directors and officers usually obtain the policies from the companies with which they serve

The Dispute Resolution Process is contained in Clause 17 of Policy No 715-71-62

Regards.

David G. O'Brien, Esq
Peabody & Arnold LLP
Federal Reserve Plaza
Boston, MA 02210
(617) 951-2026
(617) 951-2125 (fax)
dobrien@peabodyarnold.com

**-----Original Message-----**
**From:** mark@mdmcp.com [mailto:mark@mdmcp.com]
**Sent:** Wednesday, November 14, 2007 12:28 PM
**To:** 'Fooksman, Alex'
**Subject:** RE:
**Importance:** High

Dear Mr. Fooksman:

This is to CONFIRM.

I am an insured under the IRG policy

You have other policies for other entities of which I am or was a prior officer

You are refusing to provide me with the additional insurance policies

You are refusing to appoint a Referee

If you deny ANY of these please respond to me in writing by close of business today

Mark Majkowski

I do not think I should be expected to know of all the D&O policies that cover an officer How usually do they get the policies? There are additional entities outside of IRG that cover me as an officer or prior officer

Are you saying AIG has NO POLICY WITH ANY ENTITY once or now associated with IRG or AIM or any affiliate or subsidiary that covers me as a prior officer or that has me as an insured as a prior officer?

Again, if you have refused a referee, please send me written confirmation that you refuse to appoint one. Also, please provide me with the administrative dispute resolution processes within AIG for filing claims against known and unknown insurers.

Mark Majkowski

To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, Peabody & Arnold LLP informs you that any tax a

The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the a

FW: International Radiology Group

**Mark Majkowski**

**From:** David G. O'Brien [DOBrien@peabodyarnold.com]
**Sent:** Monday, December 17, 2007 3:40 PM
**To:** mark@mdmcp.com
**Cc:** Michael P. Duffy; Fooksman, Alex
**Subject:** FW: International Radiology Group

1. We have sent you a copy of Policy No 715-71-62 which is the applicable policy relating to your claim for coverage We do not know which other policies you claim to be without

2. The coverage letters which were exchanged between the carrier and your counsel are attached below

3 Illinois National continues to deny coverage to you Therefore your demand for advancement of fees is also denied

Please direct all future correspondence to my attention

David G. O'Brien, Esq.
Peabody & Arnold LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA 02210
(617) 951-2026
(617) 951-2125 (fax)
dobrien@peabodyarnold.com

-----Original Message-----
From: mark@mdmcp.com [mailto mark@mdmcp com]
Sent: Friday, December 14, 2007 5:03 PM
To: 'Fooksman, Alex'
Subject: INIC: Your Selection of Counsel NFICOPP Demand for Advancement
Importance: High

Dear Mr. Fooksman,
Also, please be advised that I did not have all of the insurance policies and until recently did not even have a partial set. I think you are obligated to provide a complete and accurate set of policies.
I have asked you for a complete set. Why is it not forthcoming?
My ability to file timely claims has been directly limited by you My ability to file complete and timely claims has been limited by International Radiology Group, LLC. and anyone who is or may have controlled it.
The original letter which was sent to Chicago has representation was answered by you in New York and has a Providence Rhode Island attorney.
Can you tell me why you selected counsel from Providence Rhode Island?
This seems very unusual. Was this selection influenced by Nautic Partners, LLC or anyone under its control or influence?
Also, I need an entire case file including all letters you claim you received from me or anyone you claim was my agent and all responses from you and your representatives.
As you know, I am concerned with the handling of this case and the behavior of your chosen counsel.
Again, I reiterate demand for:
Advancement from
Illinois National Insurance Company
Mark Majkowski

<<11-23-05AbramsLtr..pdf>> <<1-23-06FooksmanLtr..pdf>> <<2-17-06AbramsLtr..pdf>> <<4-21-06P&ALtr..pdf>> <<6-6-06AbramsLtr..pdf>> <<8-11-06P&ALtr..pdf>>

To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, Peabody & Arnold LLP informs you that any tax a

The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the a

To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, Peabody & Arnold LLP informs you that any tax a

The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the a

 American International Companies®

POLICY NUMBER: 715-71-62
REPLACEMENT OF POLICY NUMBER: 348-72-82

# DIRECTORS, OFFICERS AND PRIVATE COMPANY LIABILITY INSURANCE POLICY

## Including Employment Practices and Securities Liability

*PrivateEdge℠*

- ☐ AIU Insurance Company
- ☐ American Home Assurance Company
- ☐ American International Pacific Insurance Company
- ☐ American International South Insurance Company
- ☐ Birmingham Fire Insurance Company of Penns.
- ☐ Granite State Insurance Company
- ☒ Illinois National Insurance Company
- ☐ National Union Fire Insurance Company of Pitts., Pa ®
- ☐ National Union Fire Insurance Company of Louisiana
- ☐ New Hampshire Insurance Company

(each of the above being a capital stock company)

**NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS GENERALLY LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.**

**NOTICE: THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.**

**NOTICE: THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND. HOWEVER THE INSUREDS MAY UNDER CERTAIN CONDITIONS TENDER THE DEFENSE OF A CLAIM. IN ALL EVENTS, THE INSURER MUST ADVANCE DEFENSE COSTS PAYMENTS PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM.**

## DECLARATIONS

ITEM 1. NAMED ENTITY: INTERNATIONAL RADIOLOGY GROUP, L.L.C.

MAILING ADDRESS: 40 SKOKIE BLVD. SUITE 500
NORTHBROOK, IL 60062

STATE OF INCORPORATION OR STATE OF FORMATION OF THE NAMED ENTITY: Delaware

ITEM 2. SUBSIDIARY COVERAGE: any past, present or future Subsidiary of the Named Entity

ITEM 3. POLICY PERIOD: From: September 13, 2004 To: January 1, 2006
(12:01 A.M. standard time at the address stated in Item 1.)

ITEM 4. LIMIT OF LIABILITY: $3,000,000
aggregate for all Loss combined (including Defense Costs)

337161

SB
Schwartz Brothers Insurance
One South Wacker Drive, 36th Floor
Chicago, IL 60606-4614

ITEM 5. RETENTION:

Judgments, Settlements and Defense Costs (non-indemnifiable Loss) — None

Employment Practices Claims
Judgments, Settlements and Defense Costs (Company and Indemnifiable Loss) — $50,000 ✓

for Loss arising from Claims alleging the same Wrongful Act or Related Wrongful Acts (waivable under Clause 6 in certain circumstances)

Security Claims (other than private placements)
Judgments, Settlements and Defense Costs (Company and Indemnifiable Loss) — $50,000 ✓

for Loss arising from Claims alleging the same Wrongful Act or Related Wrongful Acts (waivable under Clause 6 in certain circumstances)

All Other Claims (including private placements)
Judgments, Settlements and Defense Costs (Company and Indemnifiable Loss) — $50,000 ✓

for Loss arising from Claims alleging the same Wrongful Act or Related Wrongful Acts (waivable under Clause 6 in certain circumstances)

ITEM 6. CONTINUITY DATES:

A. Coverages A and B(ii): March 13, 1998 ✓

B. Coverage B(i): September 3, 1998 ✓

C. Outside Entity Coverage: Per Outside Entity, see endorsement # 8

ITEM 7. PREMIUM: $78,450 ✓

Premium for Certified Acts of Terrorism Coverage under Terrorism Risk Insurance Act 2002: $777 included in policy premium.
Any coverage provided for losses caused by an act of terrorism as defined by TRIA (TRIA Losses) may be partially reimbursed by the United States under a formula established by TRIA as follows: 90% of TRIA Losses in excess of the insurer deductible mandated by TRIA, the deductible to be based on a percentage of the insurer's direct earned premiums for the year preceding the act of terrorism.
A copy of the TRIA disclosure sent with the original quote is attached hereto.

337161

ADDITIONAL PREMIUM FOR PUNITIVE, EXEMPLARY AND MULTIPLIED DAMAGES: (included in above)
(No punitive damages coverage provided: X )

ITEM 8. NAME AND ADDRESS OF INSURER (hereinafter "Insurer"):
(This policy is issued only by the insurance company indicated below.)

Illinois National Insurance Company

300 South Riverside Plaza

Chicago, IL 60606-6613

337161

**IN WITNESS WHEREOF**, the Insurer has caused this policy to be signed on the Declarations page by its President, a Secretary and a duly authorized representative of the Insurer.

Elizabeth M. Tuck
SECRETARY

PRESIDENT

AUTHORIZED REPRESENTATIVE

COUNTERSIGNATURE DATE

COUNTERSIGNED AT

ARC EXCESS & SURPLUS LLC
1122 FRANKLIN AVENUE
GARDEN CITY, NY 11530

337161

 # AMERICAN INTERNATIONAL COMPANIES®

## DIRECTORS, OFFICERS AND PRIVATE COMPANY LIABILITY INSURANCE POLICY

**Including Employment Practices and Securities Liability**

*PrivateEdge*[SM]

In consideration of the payment of the premium, and in reliance upon the statements made to the Insurer by application forming a part hereof and its attachments and the material incorporated therein, the Insurance company designated in Item 8 of the Declarations, herein called the Insurer, agrees as follows:

1. **INSURING AGREEMENTS**

**COVERAGE A: INDIVIDUAL INSURED INSURANCE**

This policy shall pay the Loss of each and every Director, Officer or Employee of the Company arising from a Claim first made against such Insureds during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act in their respective capacities as Directors, Officers or Employees of the Company except when and to the extent that the Company has indemnified such Insureds. The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition.

**COVERAGE B: PRIVATE COMPANY INSURANCE**

This policy shall pay the Loss of the Company arising from a:

(i) Claim first made against the Company, or

(ii) Claim first made against an Individual Insured,

during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act, but, in the case of (ii) above, only when and to the extent that the Company has indemnified the Individual Insured for such Loss pursuant to law, common or statutory, or contract, or the Charter or By-laws of the Company duly effective under such law which determines and defines such rights of indemnity. The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition.

**DEFENSE PROVISIONS**

The Insurer does not assume any duty to defend, provided, however, the Named Entity may at its sole option tender to the Insurer the defense of a Claim for which coverage is provided by this policy to the Insurer in accordance with Clause 8 of the policy. Regardless of whether the defense is so tendered, the Insurer shall advance Defense Costs (excess of the applicable retention amount) of such Claim prior to its final disposition. Selection of counsel to defend a "Designated Claim" shall be made in accordance with Clause 9 of the policy.

2. **DEFINITIONS**

(a) "Affiliate" means: (i) any person or entity that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is in common control with, another person or entity; or (ii) any person or entity that directly, or indirectly through one or more intermediaries, is a successor in interest to another person or entity.

(b)  "Claim" means:

  (1)  a written demand for monetary or non-monetary relief (including any request to toll or waive any statute of limitations); or

  (2)  a civil, criminal, administrative, regulatory or arbitration proceeding for monetary or non-monetary relief which is commenced by:

    (i)  service of a complaint or similar pleading; or

    (ii)  return of an indictment (in the case of a criminal proceeding); or

    (iii)  receipt or filing of a notice of charges.

  (3)  an administrative or regulatory investigation when conducted by the Equal Employment Opportunity Commission ("EEOC") (or similar state, local or foreign agency) which is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to the Insured. However, in no event shall the term "Claim" include any labor or grievance proceeding which is subject to a collective bargaining agreement.

The term "Claim" shall include an Employment Practices Claim and a Securities Claim.

(c)  "Company" means the Named Entity and any Subsidiary thereof.

(d)  "Continuity Date" means the date set forth in:

  (1)  Item 6A of the Declarations with respect to Coverages A and B(ii); or

  (2)  Item 6B of the Declarations with respect to Coverage B(i);

  (3)  Item 6C of the Declarations with respect to a Claim made against an individual Insured(s) arising out of such Insured's service as a director, officer, trustee or governor of an Outside Entity.

(e)  "Defense Costs" means reasonable and necessary fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and appeal of a Claim against the Insureds, but excluding salaries of officers or Employees of the Company.

(f)  "Employee(s)" means any past, present or future employee, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any part-time, seasonal and temporary employee in his or her capacity as such. An individual who is leased to the Company shall also be an Employee, but only if the Company provides indemnification to such leased individual in the same manner as is provided to the Company's employees. Any other individual who is contracted to perform work for the Company, or who is an independent contractor for the Company shall also be an Employee, but only if the Company provides indemnification to such individual in the same manner as that provided to the Company's employees, and such individual is scheduled by written endorsement attached hereto and the Company pays any additional premium required by the Insurer relating to such individual.

(g)  "Employment Practices Claim" means a Claim alleging an Employment Practices Violation.

(h)  "Employment Practices Violation(s)" means any actual or alleged:

  (1)  wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of an implied contract;

(2) harassment (including sexual harassment whether "quid pro quo", hostile work environment or otherwise);

(3) discrimination, (including but not limited to discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy, or disability);

(4) Retaliation (including lockouts);

(5) employment-related misrepresentation(s) to an Employee or applicant for employment with the Company;

(6) employment-related libel, slander, humiliation, defamation, invasion of privacy;

(7) wrongful failure to employ or promote;

(8) wrongful deprivation of career opportunity, wrongful demotion or negligent employee evaluation, including the giving of negative or defamatory statements in connection with an employee reference;

(9) wrongful discipline;

(10) failure to grant tenure;

(11) failure to provide or enforce adequate or consistent corporate policies and procedure relating to any Employment Practices Violation;

(12) violation of an individual's civil rights relating to any of the above,

but only if the Employment Practices Violation relates to an Employee(s), or applicant for employment with the Company or an Outside Entity, whether direct, indirect, intentional or unintentional.

With respect to any customer or client of the Company, whether individually or as a class or group, Employment Practices Violation shall mean only any actual or alleged discrimination, sexual harassment or violation of an individual's civil rights relating to such discrimination or sexual harassment, whether direct, indirect, intentional or unintentional.

(l) "Individual Insured(s)" means:

(1) any past, present or future duly elected or appointed directors, officers, management committee members or members of the Board of Managers of the Company, but only in their capacities as such. Coverage will automatically apply to all new directors, officers, management committee members or members of the Board of Managers of the Company after the inception date of this policy;

(2) any past, present or future duly elected or appointed directors, officers, management committee members or members of the Board of Managers of the Company serving in the capacity as director, officer, trustee or governor of an Outside Entity, but only if such service is at the specific written request or direction of the Company;

(3) in the event the Company operates outside the United States, then the terms director, officer, management committee member or member of the Board of Managers shall also mean those titles, positions or capacities in such foreign Company which are equivalent to such positions in an organization incorporated or formed within the United States; and

(4) any Employee(s) of the Company.

(j)    "Insured(s)" means:

    (1)    an Individual Insured; and

    (2)    the Company.

(k)    "Loss" means damages (including back pay and front pay), judgments, settlements, pre- and post-judgment interest, and Defense Costs; however, Loss shall not include: (1) civil or criminal fines or penalties imposed by law; (2) taxes; (3) any amount for which the Insureds are not financially liable or which are without legal recourse to the Insureds; (4) employment-related benefits, stock options, perquisites, deferred compensation or any other type of compensation other than salary, wages or bonus compensation; (5) any liability or costs incurred by any Insured to modify any building or property in order to make said building or property more accessible or accommodating to any disabled person, or any liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar relating to an Employment Practices Claim; or (6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

If an additional premium is stated in Item 7 of the Declarations page, then Loss shall specifically include, (subject to the policy's other terms, conditions and exclusions, including but not limited to exclusions relating to personal profit or advantage, deliberate fraud, criminal acts or willful violation of any statute, rule or regulation) punitive, exemplary and multiple damages (including the multiple or liquidated damages awards under the Age Discrimination in Employment Act and the Equal Pay Act). It is further understood and agreed that the enforceability of the foregoing coverage shall be governed by such applicable law which most favors coverage for punitive, exemplary and multiple damages. If an additional premium is not stated in Item 7 of the Declarations then Loss shall not include punitive, exemplary damages or the multiplied portion of multiple damages.

(l)    "Named Entity" means the organization stated in Item 1 of the Declarations whether a corporation, association, limited liability company or other type of business organization.

(m)    "No Liability" means: (1) a final judgment of no liability obtained prior to trial, in favor of all Insureds, by reason of a motion to dismiss or a motion for summary judgment, after the exhaustion of all appeals; or (2) a final judgment of no liability obtained after trial, in favor of all Insureds, after the exhaustion of all appeals. In no event shall the term "No Liability" apply to a Claim made against an Insured for which a settlement has occurred.

(n)    "Outside Entity" means:

    (1)    a not-for-profit organization under section 501(c)(3) of the Internal Revenue Code of 1986 (as amended); or

    (2)    any other corporation, partnership, joint venture or other organization listed by endorsement to this policy.

(o)    "Policy Period" means the period of time from the inception date shown in Item 3 of the Declarations to the earlier of the expiration date shown in Item 3 of the Declarations or the effective date of cancellation of this policy.

(p)    "Related Wrongful Acts" shall mean Wrongful Acts which are the same, related or continuous, or Wrongful Acts which arise from a common nucleus of facts. Claims can allege Related Wrongful Acts regardless of whether such Claims involve the same or different claimants, Insureds or legal causes of action.

(q)    "Retaliation" means a Wrongful Act of an Insured relating to or alleged to be in response to any of the following activities: (1) the disclosure or threat of disclosure by an Employee to a superior or to any governmental agency of any act by an Insured which act is alleged to be a violation of any federal, state, local or foreign

law, common or statutory, or any rule or regulation promulgated thereunder; (2) the actual or attempted exercise by an Employee of any right that such Employee has under law, including rights under worker's compensation laws, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to employee rights; (3) the filing of any claim under the Federal False Claims Act or any other federal, state, local or foreign "whistle-blower" law; or (4) Employee strikes.

(r) "Securities Claim" means a Claim (including a civil lawsuit or criminal proceeding brought by the Securities & Exchange Commission) made against an Insured anywhere in the world alleging a violation of any law, regulation or rule, whether statutory or common law, which is:

(1) brought by any person or entity alleging, arising out of, based upon or attributable to, in part or in whole, the purchase or sale, or offer or solicitation of an offer to purchase or sell, any securities of the Company, or

(2) brought by a securities holder of the Company, whether directly, by class action, or derivatively on the behalf of the Company, or otherwise, alleging any Wrongful Act of an Insured.

(s) "Subsidiary" means:

(1) any for-profit organization which, on or before the inception of the Policy Period, is more than 50% owned by the Named Entity, either directly, or indirectly through one or more of its Subsidiaries;

(2) automatically any for-profit organization whose securities are not publicly traded and whose assets total less than 25% of the total consolidated assets of the Company as of the inception date of this policy which becomes a Subsidiary during the Policy Period. The Named Entity shall provide the Insurer with full particulars of the new Subsidiary before the end of the Policy Period; or

(3) an organization which becomes a Subsidiary during the Policy Period (other than a for-profit organization described in paragraph (2) above), but only upon the condition that within 90 days of its becoming a Subsidiary, the Named Entity shall have provided the Insurer with full particulars of the new Subsidiary and agreed to any additional premium or amendment of the provisions of this policy required by the Insurer relating to such new Subsidiary. Further, coverage as shall be afforded to the new Subsidiary is conditioned upon the Named Entity paying when due any additional premium required by the Insurer relating to such new Subsidiary.

An organization becomes a Subsidiary when the Named Entity owns more than a 50% ownership interest in such Subsidiary, either directly, or indirectly through one or more of its Subsidiaries. An organization ceases to be a Subsidiary when the Named Entity ceases to own more than a 50% ownership in such Subsidiary, either directly, or indirectly through one or more of its Subsidiaries.

In all events, coverage as is afforded under this policy with respect to a Claim made against Individual Insureds or a Claim made against any Subsidiary, shall only apply to Claims for Wrongful Acts committed or allegedly committed after the effective time that such Subsidiary became a Subsidiary and prior to the time that such Subsidiary ceased to be a Subsidiary.

(t) "Wrongful Act" means:

(1) with respect to Individual Insureds, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by such Insureds in their respective capacities as such, or any matter claimed against such Insured solely by reason of their status as directors, officers or Employees of the Company;

(2) with respect to the Company, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Company;

(3) with respect to service on an Outside Entity, any matter claimed against an Individual Insured as defined in definition (i)(2) arising out of his or her serving as a director, officer, trustee or governor of an Outside Entity in such capacity, but only if such service is at the specific written request or direction of the Company.

With respect to an Employment Practices Claim, the term "Wrongful Act" shall include any Employment Practices Violation.

**3. EXTENSIONS**

Subject otherwise to the terms hereof, this policy shall cover Loss arising from any Claims made against the estates, heirs, or legal representatives of deceased Individual Insureds, and the legal representatives of Individual Insureds in the event of incompetency, insolvency or bankruptcy, who were Individual Insureds at the time the Wrongful Act upon which such Claims are based were committed.

Subject otherwise to the terms hereof, this policy shall cover Loss arising from all Claims made against the lawful spouse (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world) of an Individual Insured for all Claims arising solely out of his or her status as the spouse of an Individual Insured, including a Claim that seeks damages recoverable from marital community property, property jointly held by the Individual Insured and the spouse, or property transferred from the Individual Insured to the spouse; provided, however, that this extension shall not afford coverage for any Claim for any actual or alleged Wrongful Act of the spouse, but shall apply only to Claims arising out of any actual or alleged Wrongful Acts of an Individual Insured, subject to the policy's terms, conditions and exclusions.

**4. EXCLUSIONS**

The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against an Insured:

(a) arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which an Insured was not legally entitled;

(b) arising out of, based upon or attributable to: (1) profits in fact made from the purchase or sale by an Insured of securities of the Company within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any state statutory law; or (2) payments to an Insured of any remuneration without the previous approval of the stockholders of the Company, which payment without such previous approval shall be held to have been illegal;

(c) arising out of, based upon or attributable to the committing in fact of any criminal, fraudulent or dishonest act, or any willful violation of any statute, rule or law;

[The Wrongful Act of an Insured shall not be imputed to any other Insured for the purpose of determining the applicability of the foregoing exclusions 4(a) through 4(c).]

(d) alleging, arising out of, based upon or attributable to the facts alleged, or to the same or Related Wrongful Act alleged or contained in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(e) alleging, arising out of, based upon or attributable to as of the Continuity Date, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an Insured had notice, or alleging any Wrongful Act which is the same or Related Wrongful Act to that alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

(f) alleging, arising out of, based upon or attributable to any actual or alleged act or omission of an Insured serving in any capacity, other than a director, officer, management committee member, member of the Board of Managers or Employee of the Company, or as a director, officer, trustee or governor of an Outside Entity;

(g) for any Wrongful Act arising out of an Individual Insured serving in a capacity as a director, officer, trustee or governor of an Outside Entity if such Claim is brought by the Outside Entity or a director, officer, trustee or governor thereof;

(h) alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or any other Insured under any express contract or agreement; provided, however, that with respect to Employment Practice Claims, this exclusion shall not apply to the extent any liability does not arise under such express employment contract or agreement;

(i) which is brought by any Insured or by the Company; or which is brought by any security holder of the Company, whether directly or derivatively, unless such security holder's Claim is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any Insured; provided, however, this exclusion shall not apply to:

  (1) any Claim brought by an Individual Insured where such Claim is in the form of a cross-claim or third-party claim for contribution or indemnity which is part of and results directly from a Claim which is not otherwise excluded by the terms of this policy; or

  (2) an Employment Practices Claim brought by an Employee of the Company other than an Employee who is or was a director, member of the Board of Managers or management committee member of the Named Entity;

(j) alleging, arising out of, based upon or attributable to any public offering of securities by the Company, an Outside Entity or an Affiliate or alleging a purchase or sale of such securities subsequent to such public offering;

provided, however, that this exclusion will not apply to:

(1) any purchase or sale of securities exempted pursuant to section 3(b) of the Securities Act of 1933. Coverage for such purchase or sale transaction shall not be conditioned upon payment of any additional premium; however, the Named Entity shall give the Insurer written notice of any public offering exempted pursuant to section 3(b), together with full particulars and as soon as practicable, but not later than 30 days after the effective date of the public offering;

(2) to any public offering of securities (other than a public offering described in paragraph (1) above), as well as any purchase or sale of such securities subsequent to such public offering, in the event that within 30 days prior to the effective time of such public offering: (i) the Named Entity shall give the

insurer written notice of such public offering together with full particulars and underwriting information required thereto and (ii) the Named Entity accepts such terms, conditions and additional premium required by the Insurer for such coverage. Such coverage is also subject to the Named Entity paying when due any such additional premium. In the event the Company gives written notice with full particulars and underwriting information pursuant to (i) above, then the Insurer must offer a quote for coverage under this paragraph;

(k) alleging, arising out of, based upon or attributable to the purchase by the Company of securities of a "publicly traded entity" in a transaction which resulted, or would result, in such entity becoming an Affiliate or Subsidiary of the Company; provided, however, this exclusion shall not apply in the event that within 30 days prior to it becoming an Affiliate or Subsidiary, the Named Entity gives written notice of the transaction to the Insurer together with full particulars and underwriting information required and agrees to any additional premium or amendment of the provisions of this policy required by the Insurer relating to the transaction. Further, coverage as shall be afforded to the transaction is conditioned upon the Named Entity paying when due any additional premium required by the Insurer relating to the transaction. An entity is a "publicly traded entity" if any securities of such entity have previously been subject to a public offering;

(l) alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof; provided, however, that this exclusion shall not apply to Securities Claims;

(m) for emotional distress, or for injury from libel or slander, or defamation or disparagement, or for injury from a violation of a person's right of privacy; provided, however, this exclusion shall not apply to any Securities Claim or Employment Practices Claim;

(n) for any actual, alleged or threatened discharge, dispersal, release or escape of pollutants; or for any direction or request to test, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants; provided, however, this exclusion shall not apply to any Claim brought by a securities holder of the Company in its capacity as such or to any Employment Practices Claim;

(o) for violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar provisions of any federal, state, local or foreign statutory law or common law; provided, however, that this exclusion shall not apply to Loss arising from a Claim for Retaliation;

(p) alleging, arising out of, based upon or attributable to any obligation pursuant to any worker's compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law; provided, however, this exclusion shall not apply to Loss arising from a Claim for Retaliation;

(q) with respect to Coverage B(i) only:

(1) for any actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, trademark, trade secret or any other intellectual property rights;

(2) for any actual or alleged violation of any law, whether statutory, regulatory or common law, respecting any of the following activities: anti-trust, business competition, unfair trade practices or tortious interference in another's business or contractual relationships;

(3) for the rendering or failure to render any service to a customer or client of the Insured; provided, however, that this exclusion shall not apply to any:

(i) Claim solely alleging Employment Practices Violations;

(ii) Securities Claim; or

(iii) Claim for the rendering or failure to render any professional service to the extent such professional services errors and omissions coverage has been added to this policy by written endorsement attached hereto;

(4) seeking fines or penalties or non-monetary relief against the Company; provided, however, that this exclusion shall not apply to any Securities Claim or Employment Practices Claim.

**5. LIMIT OF LIABILITY and REINSTATED LIMIT OF LIABILITY (FOR ALL LOSS – INCLUDING DEFENSE COSTS)**

**Defense Costs are not payable by the Insurer in addition to the limit of liability. Defense Costs are part of Loss and as such are subject to the applicable Limit of Liability for Loss.**

**A. General Terms**

The Limit of Liability stated in Item 4 of the Declarations is the limit of the Insurer's liability for all Loss, under Coverage A and Coverage B combined, arising out of all Claims first made against the Insureds during the Policy Period and the Discovery Period (if applicable); however, the Limit of Liability for the Discovery Period shall be part of, and not in addition to, the Limit of Liability for the Policy Period, or the Reinstated Limit as described below (if elected). Further, a Claim which is made subsequent to the Policy Period or Discovery Period (if applicable) which pursuant to Clause 7(b) or 7(c) is considered made during the Policy Period or Discovery Period shall also be subject to the one applicable aggregate Limit of Liability stated in Item 4 of the Declarations, or subject to the one aggregate Reinstated Limit if such Reinstated Limit is applicable to such Claim.

**B. Reinstated Limit of Liability**

In the event of a Claim under this policy, the Named Entity shall have the right to purchase a Reinstated Limit equal to the Limit of Liability stated in Item 4 of the Declarations. The Reinstated Limit shall be subject to the following conditions:

1. The right to elect the Reinstated Limit commences on the date a Claim is reported to the Insurer and expires on the last day of the Policy Period; provided, that in all events, only one reinstatement is permitted under this policy. The effective date of the reinstatement shall be the date on which the Insurer acknowledges receipt of the written notice of the Insured's election to exercise the reinstatement.

2. If the Policy Period of this policy is more than one year, then the additional premium to elect the Reinstated Limit at any time after one year from the inception date of this policy shall be fixed at 150% of the premium set forth in Item 7 of the Declarations. Regardless of the length of the Policy Period of this policy, the additional premium to elect the Reinstated Limit within one year from the inception date of this policy shall be an amount determined by the Insurer at the time of the election of the Reinstated Limit unless otherwise indicated by written endorsement to this policy.

3. The Reinstated Limit shall only apply to Claims made against an Insured after the effective date of the reinstatement and prior to the end of the Policy

Period or the Discovery Period, if applicable, ("Reinstatement Claims"); provided, however, that the Reinstated Limit shall not apply to Claims which allege a Related Wrongful Act to Claim(s) reported to the Insurer prior to the effective date of the reinstatement.

4. The Reinstated Limit shall be the maximum liability of the Insurer for all Reinstatement Claims. The Limit of Liability described in Clause 5A as applicable to Claims made against the Insureds prior to the effective date of the reinstatement shall not apply to any Reinstatement Claim.

5. Upon exercise of the Reinstated Limit, the entire premium set forth in Item 7 of the Declarations shall be deemed fully earned; the Insureds shall not be entitled to any return premium as a result of the exercise of the Reinstated Limit nor shall any of the premium paid for the policy be credited toward the additional premium required to exercise the Reinstated Limit.

6. In no event shall the right to a reinstatement apply if prior to the effective date of the reinstatement, this policy has been cancelled, is otherwise not in effect, or the Discovery Period has been elected.

7. Other then as stated above, coverage for Reinstatement Claims shall be subject to the same terms, conditions and exclusions of the policy applicable to other Claims under this policy. The Insurer cannot otherwise modify any terms, conditions or exclusions of this policy as a condition of providing the reinstatement.

6. RETENTION CLAUSE

The Insurer shall only be liable for the amount of Loss arising from a Claim which is in excess of the Retention amount stated in Item 5 of the Declarations, such Retention amount to be borne by the Company or the Insureds and shall remain uninsured, with regard to all Loss under: (1) Coverage A or B(ii) for which the Company has indemnified or is permitted or required to indemnify the Individual Insured(s) ("Indemnifiable Loss"), or (2) Coverage B(i). A single Retention amount shall apply to Loss arising from all Claims alleging the same Wrongful Act or Related Wrongful Act.

Subject to the above paragraph, the Retention amounts stated in Item 5 of the Declarations shall apply. In the event a Claim triggers more than one amount stated in Item 5 of the Declarations, only the highest such amount shall apply, which amount shall apply to all Loss under such Claim.

The Retention amount shall be reduced in the event that an Insured consents to the first "Settlement Opportunity", as defined in Clause 8, by the percentage described in Clause 8, subject to the conditions described in Clause 8.

No Retention shall apply to a Claim which is in the form of a civil action for monetary relief and the Insurer shall thereupon reimburse the Defense Costs paid by the Insured, in the event of:

(1) a determination of No Liability of all Insureds; or

(2) a dismissal or a stipulation to dismiss the civil litigation Claim without prejudice and without the payment of any consideration by any Insured;

provided, however, that in the case of (2) above, such reimbursement shall occur ninety (90) days after the date of dismissal or stipulation as long as the Claim is not re-brought (or any other Claim which is subject to the same single retention by virtue of Clause 6 is not brought) within that time, and further subject to an undertaking by the Company in a form acceptable to the Insurer that such reimbursement shall be paid back by the Company to the Insurer in the event the Claim (or any other Claim which is subject to the same single retention by virtue of Clause 6) is brought after such 90 day period and before the expiration of the statute of limitations for such Claim.

7.  **NOTICE/CLAIM REPORTING PROVISIONS**

Notice hereunder shall be given in writing to the Insurer named in Item 8 of the Declarations at the address indicated in Item 8 of the Declarations.

If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice. A Claim shall be considered to have been first made against an Insured when written notice of such Claim is received by any Insured, by the Company on the behalf of any Insured or by the Insurer, whichever comes first.

(a)  The Company or the Insureds shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of any Claim made against an Insured as soon as practicable and either:

   (1)  anytime during the Policy Period or during the Discovery Period (if applicable); or

   (2)  within 30 days after the end of the Policy Period or the Discovery Period (if applicable), as long as such Claim is reported no later than 30 days after the date such Claim was first made against an Insured.

(b)  If written notice of a Claim has been given to the Insurer pursuant to Clause 7(a) above, then any Claim which is subsequently made against the Insureds and reported to the Insurer alleging a Related Wrongful Act to the Claim for which such notice has been given shall be considered made at the time such notice was given.

(c)  If during the Policy Period or during the Discovery Period (if applicable) the Company or the Insureds shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against the Insureds and shall give written notice to the Insurer of the circumstances and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, then any Claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Related Wrongful Act to such circumstances, shall be considered made at the time such notice of such circumstances was given.

8.  **DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)**

The Insurer does not assume any duty to defend. The Insureds shall defend and contest any Claim made against them.

Notwithstanding the foregoing, the Insureds shall have the right to tender the defense of the Claim to the Insurer, which right shall be exercised in writing by the Named Entity on behalf of all Insureds to the Insurer pursuant to the notice provisions of Clause 7 of this policy. This right shall terminate if not exercised within 30 days of the date the Claim is first made against an Insured, pursuant to Clause 7 of the policy. Further, from the date the Claim is first made against the Insureds to the date when the Insurer accepts the tender of the defense of such Claim, the Insureds shall take no action, or fail to take any required action, that prejudices the rights of the Insureds or the Insurer with respect to such Claim. Provided that the Insureds have complied with the foregoing, the Insurer shall be obligated to assume the defense of the Claim, even if such Claim is groundless, false or fraudulent. The assumption of the defense of the Claim shall be effective upon written confirmation sent thereof by the Insurer to the Named Entity. Once the defense has been so tendered, the Insured shall have the right to effectively associate with the Insurer in the defense and the negotiation of any settlement of any Claim, subject to the provisions of this Clause 8. However, the Insurer shall not be obligated to defend such Claim after the

Limit of Liability has been exhausted, or after an Insured's rejection of a Settlement Opportunity as defined in this Clause 8.

When the Insurer has not assumed the defense of a Claim pursuant to this Clause 8, the Insurer shall advance nevertheless, at the written request of the Insured, Defense Costs prior to the final disposition of a Claim. Such advanced payments by the Insurer shall be repaid to the Insurer by the Insureds or the Company, severally according to their respective interests, in the event and to the extent that the Insureds or the Company shall not be entitled under the terms and conditions of this policy to payment of such Loss.

**The Insureds shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defense Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy. The Insurer's consent shall not be unreasonably withheld, provided that the Insurer, when it has not assumed the defense of a Claim pursuant to this Clause 8, shall be entitled to effectively associate in the defense and the negotiation of any settlement of any Claim, and provided further that in all events the Insurer may withhold consent to any settlement, stipulated judgment or Defense Costs, or any portion thereof, to the extent such Loss is not covered under the terms of this policy.**

The Insurer shall have the right to effectively associate with the Company in the defense of any Claim that appears reasonably likely to involve the Insurer, including but not limited to negotiating a settlement. The Company and the Insureds shall give the Insurer full cooperation and such information as it may reasonably require.

If the Insurer recommends a settlement within the policy's applicable Limit of Liability which is acceptable to the claimant (a "Settlement Opportunity"), and the Insureds consent to such settlement, then the Insured's applicable retention amount shall be retroactively reduced by ten percent (10%) for such Loss. It shall be a condition to such reduction that the Insureds must consent to such settlement within thirty (30) days of the date the Insureds are first made aware of the Settlement Opportunity, or in the case of a Settlement Opportunity which arises from a settlement offer by the claimant, then within the time permitted by the claimant to accept such settlement offer, but in all events no later than thirty (30) days after the settlement offer was made.

However, if a Settlement Opportunity arises and the Insureds do not consent to the settlement within the time prescribed above, the retention amount shall remain the applicable amount set forth in Item 5 of the Declarations even if consent is given to a subsequent Settlement Opportunity.

Furthermore, in the event the Insureds do not consent to the first Settlement Opportunity within the time prescribed, then, subject to the applicable limit of liability, the Insurer's liability for all Loss on account of such Claim shall not exceed: (1) the amount for which the Insurer could have settled such Claim plus Defense Costs incurred as of the date such settlement was proposed in writing by the Insurer, ("Settlement Opportunity Amount") plus (2) 50% of covered Loss in excess of such Settlement Opportunity Amount, it being a condition of this insurance that the remaining 50% of such Loss excess of the Settlement Opportunity Amount shall be carried by the Company and the Insureds at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the Settlement Opportunity Amount exceeds the Retention amount stated in Item 5 of the Declarations.

**9. PRE-AUTHORIZED DEFENSE ATTORNEYS FOR DESIGNATED CLAIMS**

This clause applies only to an Employment Practices Claim or a Securities Claim (each of the foregoing hereinafter referred to as a "Designated Claim").

Affixed as Appendix A hereto and made a part of this policy is a list or lists of Panel Counsel law firms ("Panel Counsel Firms") from which a selection of legal counsel shall be made to conduct the defense of any Designated Claim against an Insured pursuant to the terms set forth below.

In the event the Insurer has assumed the defense pursuant to Clause 8 of this policy, then the Insurer shall select a Panel Counsel Firm to defend the Insureds. In the event the Insureds are already defending a Designated Claim, then the Insureds shall select a Panel Counsel Firm to defend the Insureds.

The selection of the Panel Counsel Firm, whether done by the Insurer or the Insureds, shall be from the list of Panel Counsel Firms designated for the type of Claim and be from the jurisdiction in which the Designated Claim is brought. In the event a Designated Claim is brought in a jurisdiction not included on the appropriate list, the selection shall be made from a listed jurisdiction which is the nearest geographic jurisdiction to either where the Designated Claim is maintained or where the corporate headquarters or state of formation of the Named Entity is located. In such instance, however, the Insurer shall, at the written request of the Named Entity, assign a non-Panel Counsel Firm of the Insurer's choice in the jurisdiction in which the Designated Claim is brought to function as "local counsel" on the Designated Claim to assist the Panel Counsel Firm which will function as "lead counsel" in conducting the defense of the Designated Claim.

With the express prior written consent of the Insurer, an Insured may select (in the case of the Insured defending the Claim), or cause the Insurer to select (in the case of the Insurer defending the Claim), a Panel Counsel Firm different from that selected by other Insured defendants if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The list of Panel Counsel Firms may be amended from time to time by the Insurer. However, no change shall be made to the specific list attached to this policy during the Policy Period without the consent of the Named Entity.

**10. DISCOVERY CLAUSE**

Except as indicated below, if the Named Entity shall cancel or the Named Entity or the Insurer shall refuse to renew this policy, the Named Entity shall have the right to a period of either one, two or three years following the effective date of such cancellation or nonrenewal upon payment of the respective "Additional Premium Amount" described below (herein referred to as the "Discovery Period") in which to give to the Insurer written notice of Claims first made against the Insureds during said Discovery Period for any Wrongful Act occurring prior to the end of the Policy Period and otherwise covered by this policy. The rights contained in this paragraph shall terminate, however, unless written notice of such election together with the additional premium due is received by the Insurer within 30 days of the effective date of cancellation or nonrenewal. The Additional Premium for the Discovery Period shall be fully earned at the inception of the Discovery Period. The Discovery Period is not cancelable. This clause and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

The Additional Premium Amount for: (1) one year shall be 75% of the "full annual premium"; (2) two years shall be 150% of the "full annual premium"; (3) three years shall be a reasonable premium amount to be mutually agreed upon by the Insured and the Insurer. As used herein, "full annual premium" means the premium level in effect immediately prior to the end of the Policy Period.

In the event of a Transaction, as defined in Clause 12, the Named Entity shall have the right, within 30 days before the end of the Policy Period, to request an offer from the Insurer of a Discovery Period (with respect to Wrongful Acts occurring prior to the effective time of the Transaction) for a period of no less than three years or for such

longer or shorter period as the Named Entity may request. The Insurer shall offer such Discovery Period pursuant to such terms, conditions and premium as the Insurer may reasonably decide. In the event of a Transaction, the right to a Discovery Period shall not otherwise exist except as indicated in this paragraph.

11. **CANCELLATION CLAUSE**

This policy may be canceled by the Named Entity at any time only by mailing written prior notice to the Insurer or by surrender of this policy to the Insurer or its authorized agent.

This policy may be canceled by or on the behalf of the Insurer only in the event of nonpayment of premium by the Named Entity. In the event of non-payment of premium by the Named Entity, the Insurer may cancel this policy by delivering to the Named Entity or by mailing to the Named Entity, by registered, certified, or other first class mail, at the Named Entity's address as shown in Item 1 of the Declarations, written notice stating when, not less than 30 days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The Policy Period terminates at the date and hour specified in such notice, or at the date and time of surrender. The Insurer shall have the right to the premium amount for the portion of the Policy Period during which the policy was in effect.

If this policy shall be canceled by the Named Entity, the Insurer shall retain the customary short rate proportion of the premium herein.

If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

12. **CHANGE IN CONTROL OF NAMED ENTITY**

If during the Policy Period:

a. the Named Entity shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

b. any person or entity or group of persons or entities acting in concert shall acquire an amount of the outstanding securities representing more than 50% of the voting power for the election of directors of the Named Entity, or acquires the voting rights of such an amount of such securities;

(either of the above events herein referred to as the "Transaction"),

then this policy shall continue in full force and effect as to Wrongful Acts occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged Wrongful Act occurring after the effective time of the Transaction. This policy may not be canceled after the effective time of the Transaction and the entire premium for this policy shall be deemed earned as of such time. The Named Entity shall also have the right to an offer by the Insurer of a Discovery Period described in Clause 10 of the policy.

The Named Entity shall give the Insurer written notice of the Transaction as soon as practicable, but not later than 30 days after the effective date of the Transaction.

13. **SUBROGATION**

In the event of any payment under this policy, the Insurer shall be subrogated to the extent of such payment to all the Company's and the Insureds' rights of recovery thereof, and the Company and the Insureds shall execute all papers required and shall do every-thing that may be necessary to secure such rights, including the execution of such documents necessary to enable the Insurer to effectively bring suit in the name of the

Company or the Insureds. In no event, however, shall the Insurer exercise its rights of subrogation against an Insured under this policy unless such Insured has been convicted of a criminal act, or been determined to have committed a dishonest, fraudulent act or willful violation of any statute, rule or law, or obtained any profit or advantage to which such Insured was not legally entitled.

14. OTHER INSURANCE AND INDEMNIFICATION

Such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance. This policy specifically shall be excess of any other policy pursuant to which any other insurer has a duty to defend a Claim for which this policy may be obligated to pay Loss.

In the event of a Claim against an Insured arising out of his or her service as a director, officer, trustee or governor of an Outside Entity or an Employment Practices Claim against a leased Employee as described in definition (f) of Clause 2, coverage as is afforded by this policy shall be specifically excess of indemnification provided by such Outside Entity or such leasing company and any insurance provided to such Outside Entity or such leasing company.

Further, in the event other insurance is provided to the Outside Entity or leasing company referenced in the above paragraph, or is provided under any pension trust or employee benefit plan fiduciary liability insurance policy, and such other insurance is provided by the Insurer or any member company of American International Group, Inc. (AIG) (or would be provided but for the application of the retention amount, exhaustion of the limit of liability or failure to submit a notice of a Claim) then the Insurer's maximum aggregate Limit of Liability for all Losses combined in connection with a Claim covered, in part or in whole, by this policy and such other insurance policy issued by AIG shall not exceed the greater of the Limit of Liability of this policy or the limit of liability of such other AIG insurance policy.

15. NOTICE AND AUTHORITY

It is agreed that the Named Entity shall act on behalf of the Subsidiaries and all Insureds with respect to the giving of notice of a Claim, the giving and receiving of notice of cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy, the exercising or declining of the right to tender the defense of a Claim to the Insurer and the exercising or declining of any right to a Discovery Period or Reinstated Limit.

16. ASSIGNMENT

This policy and any and all rights hereunder are not assignable without the written consent of the Insurer.

17. DISPUTE RESOLUTION PROCESS

The Insured shall have the option, in its sole discretion, to submit all disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of Loss, to the alternative dispute resolution process ("ADR") set forth in this clause.

The Insureds may elect the type of ADR discussed below. The Insurer agrees to submit to the ADR process chosen by the Insured. Once elected, the ADR cannot be terminated prior to a determination without the consent of the Insured and the Insurer.

There shall be two choices of ADR: (1) non-binding mediation administered by the American Arbitration Association, in which the Insurer and Insureds shall try in good faith to settle the dispute by mediation under or in accordance with its then-prevailing Commercial Mediation Rules; or (2) arbitration submitted to the American Arbitration Association under or in accordance with its then-prevailing Commercial Arbitration Rules, in which the arbitration panel shall be composed of three disinterested individuals. In either mediation or arbitration, the mediator(s) or arbitrators shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute. The mediator(s) or arbitrators shall also give due consideration to the general principles of the law of the state where the Named Entity is incorporated or formed in the construction or interpretation of the provisions of this policy; provided, however, that the terms, conditions, provisions and exclusions of this policy are to be construed in an even-handed fashion in the manner most consistent with the relevant terms, conditions, provisions or exclusions of the policy. In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the arbitrators' award shall not include attorneys fees or other costs. In the event of mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until the mediation shall have been terminated and at least 120 days shall have elapsed from the date of the termination of the mediation. In all events, each party shall share equally the expenses of the ADR.

Either choice of ADR may be commenced in New York, New York; Atlanta, Georgia; Chicago, Illinois; Denver, Colorado; or in the state indicated in Item 1 of the Declarations page as the mailing address for the Named Entity. The Named Entity shall act on behalf of all Insureds in deciding to proceed with ADR under this clause.

**18. ACTION AGAINST INSURER**

Except as provided in Clause 17 of the policy, no action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the Insureds' obligation to pay shall have been finally determined either by judgment against the Insureds after actual trial or by written agreement of the Insureds, the claimant and the Insurer.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the Insurer as a party to any action against the Insureds or the Company to determine the Insureds' liability, nor shall the Insurer be impleaded by the Insureds or the Company or their legal representatives. Bankruptcy or insolvency of the Company or the Insureds or of their estates shall not relieve the Insurer of any of its obligations hereunder.

**19. REPRESENTATIONS AND SEVERABILITY**

In granting coverage under this Policy, it is agreed that the Insurer has relied upon the statements and representations contained in the application for this policy (including materials submitted thereto and, if this is a renewal application, all such previous policy applications for which this policy is a renewal) as being accurate and complete. All such statements and representations shall be deemed to be material to the risk assumed by the Insurer, are the basis of this policy and are to be considered as incorporated into this policy.

With respect to such statements and representations, no knowledge or information possessed by any Individual Insured, except for those person or persons who executed the application, shall be imputed to any other Individual Insured. If any person who executed the application knew that such statement or representation was inaccurate or incomplete,

then this policy will be void as to all Insureds other than Individual Insureds who are "non-employee Directors" of the Company and who did not personally know the statement or representation to be inaccurate or incomplete. (The term "non-employee Director" shall have the meaning described in Securities & Exchange Commission rules or regulations promulgated pursuant to Section 16 of the Securities Exchange Act of 1934).

**20. WORLDWIDE TERRITORY**

This policy shall apply to Claims made against an Insured anywhere in the world.

**21. HEADINGS**

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

**ENDORSEMENT# 2**

This endorsement, effective *12:01 a.m. September 13, 2004* forms a part of policy number *715-71-62*
issued to *INTERNATIONAL RADIOLOGY GROUP, L.L.C.*

by *Illinois National Insurance Company*

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**DIRECTORS, OFFICERS AND PRIVATE COMPANY**

**ILLINOIS AMENDATORY ENDORSEMENT**

The Policy is hereby amended as follows:

Clause 2. **DEFINITIONS**, Item (e) "Defense Costs" is deleted in its entirety and replaced with the following:

(e) "Defense Costs" means reasonable and necessary fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and appeal of a Claim against the Insureds, but excluding salaries of officers or Employees of the Company or the Insurer.

Clause 2. **DEFINITIONS**, Item (k) "Loss" is deleted in its entirety and replaced with the following:

(k) "Loss" means damages (including back pay and front pay), judgments, settlements, post-judgment interest, and Defense Costs; however, Loss shall not include: (1) civil or criminal fines or penalties imposed by law; (2) taxes; (3) any amount for which the Insureds are not financially liable or which are without legal recourse to the Insureds; (4) employment-related benefits, stock options, perquisites, deferred compensation or any other type of compensation other than salary, wages or bonus compensation; (5) any liability or costs incurred by any Insured to modify any building or property in order to make said building or property more accessible or accommodating to any disabled person, or any liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar relating to an Employment Practices Claim; or (6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

If an additional premium is stated in Item 7 of the Declarations page, then Loss shall specifically include, (subject to the policy's other terms, conditions and exclusions, including but not limited to exclusions relating to personal profit or advantage, deliberate fraud, criminal acts or willful violation of any statute, rule or regulation) punitive, exemplary and multiple damages (including the multiple or liquidated damages awards under the Age Discrimination in Employment Act and the Equal Pay Act). It is further understood and agreed that the enforceability of the foregoing coverage shall be governed by such applicable law which most favors coverage for punitive, exemplary and multiple damages. If an additional premium is not stated in Item 7 of the Declarations then Loss shall not include punitive, exemplary damages or the multiplied portion of multiple damages.

**END 002**

05/10/2005 08:45 18475596900 AMERICAN IMAGING MGT PAGE 04/29

**ENDORSEMENT# 2** (continued)

Clause 10. **DISCOVERY CLAUSE**, is deleted in its entirety and replaced with the following:

**10. DISCOVERY CLAUSE**

Except as indicated below, if the Named Entity or the Insurer shall cancel or the Named Entity or the Insurer shall refuse to renew this policy, the Named Entity shall have the right to a period of either one, two or three years following the effective date of such cancellation, or nonrenewal upon payment of the respective "Additional Premium Amount" described below (herein referred to as the "Discovery Period") in which to give to the Insurer written notice of Claims first made against the Insureds during said Discovery Period for any Wrongful Act occurring prior to the end of the Policy Period and otherwise covered by this policy. The rights contained in this paragraph shall terminate, however, unless written notice of such election together with the additional premium due is received by the Insurer within 30 (thirty) days of the effective date of cancellation or nonrenewal. The Additional Premium for the Discovery Period shall be fully earned at the inception of the Discovery Period. The Discovery Period is not cancelable.

The Additional Premium Amount for: one (1) year shall be 75% of the "full annual premium"; two (2) years shall be 150% of the "full annual premium"; three (3) years shall be a reasonable premium amount to be mutually agreed upon by the Insured and the Insurer. As used herein, "full annual premium" means the premium level in effect immediately prior to the end of the Policy Period.

In the event of a Transaction, as defined in Clause 12, the Named Entity shall have the right, within thirty (30) days after the end of the Policy Period, to request an offer from the Insurer of a Discovery Period (with respect to Wrongful Acts occurring prior to the effective time of the Transaction) for a period of no less than three years or for such longer or shorter period as the Named Entity may request. The Insurer shall offer such Discovery Period pursuant to such terms, conditions and premium as the Insurer may reasonably decide. In the event of a Transaction, the right to a Discovery Period shall not otherwise exist except as indicated in this paragraph.

In the event of cancellation or nonrenewal by the Insurer for the nonpayment of premium, any monies received by the Insurer as payment for Discovery Period shall be first applied to such premium owing for the policy. The Discovery Period will not take effect until the premium owing for the policy is paid in full and unless the premium owing Discovery Period is paid promptly when due.

Clause 14. **OTHER INSURANCE AND INDEMNIFICATION**, is deleted in its entirety and replaced with the following:

**14. OTHER INSURANCE AND INDEMNIFICATION**

If there is any valid and collectible insurance which applies to any Loss covered by this policy, the Insurer shall not be liable for a greater proportion of such Loss than the applicable Limit of Liability under this policy for such loss bears to the total applicable Limit of Liability of all valid and collectible insurance against them unless such other insurance is written only as specific excess insurance over the Limit of Liability provided by this policy.

In the event of a Claim against an Insured arising out of his or her service as a director, officer, trustee or governor of an Outside Entity or an Employment Practices Claim against a leased Employee as described in definition (f) of Clause 2,

05/10/2005 08:45 18475596900 AMERICAN IMAGING MGT PAGE 05/29

**ENDORSEMENT# 2** (continued)

coverage as is afforded by this policy shall be specifically excess of indemnification provided by such Outside Entity or such leasing company and any insurance provided to such Outside Entity or such leasing company.

Further, in the event other insurance is provided to the Outside Entity or leasing company referenced in the above paragraph, or is provided under any pension trust or employee benefit plan fiduciary liability insurance policy, and such other insurance is provided by the Insurer or any member company of American International Group, Inc. (AIG) (or would be provided but for the application of the retention amount, exhaustion of the limit of liability or failure to submit a notice of a Claim) then the Insurer's maximum aggregate Limit of Liability for all Losses combined in connection with a Claim covered, in part or in whole, by this policy and such other insurance policy issued by AIG shall not exceed the greater of the Limit of Liability of this policy or the limit of liability of such other AIG insurance policy.

Clause 17. **DISPUTE RESOLUTION PROCESS**, is deleted in its entirety and replaced with the following:

**17. DISPUTE RESOLUTION PROCESS**

The Insured shall have the option, in its sole discretion, to submit all disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of Loss, to the alternative dispute resolution process ("ADR") set forth in this clause.

The Insurer agrees to submit to the ADR process chosen by the Insured. Once elected, the ADR cannot be terminated prior to a determination without the consent of the Insured and the Insurer.

There shall be non-binding mediation administered by the American Arbitration Association, in which the Insurer and Insureds shall try in good faith to settle the dispute by mediation under or in accordance with its then-prevailing Commercial Mediation Rules. The mediator(s) shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute. The mediator(s) shall also give due consideration to the general principles of the law of the state where the Named Entity is incorporated or formed in the construction or interpretation of the provisions of this policy; provided, however, that the terms, conditions, provisions and exclusions of this policy are to be construed in an even-handed fashion in the manner most consistent with the relevant terms, conditions, provisions or exclusions of the policy. In the event of mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until the mediation shall have been terminated and at least 120 days shall have elapsed from the date of the termination of the mediation. In all events, each party shall share equally the expenses of the ADR.

ADR may be commenced in New York, New York; Atlanta, Georgia; Chicago, Illinois; Denver, Colorado; or in the state indicated in Item 1 of the Declarations page as the mailing address for the Named Entity. The Named Entity shall act on behalf of all Insureds in deciding to proceed with ADR under this clause.

**ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS SHALL REMAIN THE SAME.**

AUTHORIZED REPRESENTATIVE

**ENDORSEMENT# 3**

This endorsement, effective 12:01 a.m. September 13, 2004 forms a part of policy number 715-71-62
issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by Illinois National Insurance Company

**CAPTIVE INSURANCE COMPANY EXCLUSION**

In consideration of the premium charged, it is hereby understood and agreed that the insurer shall not be liable to make any payments for Loss in connection with any Claim(s) made against any Insured(s) alleging, arising out of, based upon, or attributable to the ownership, management, maintenance, operation and/or control by the Company of any captive insurance company or entity, including but not limited to Claim(s) alleging the insolvency or bankruptcy of the Named Entity as a result of such ownership, operation, management and control.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

**ENDORSEMENT# 4**

This endorsement, effective *12:01 a.m. September 13, 2004* forms a part of policy number *715-71-62* issued to *INTERNATIONAL RADIOLOGY GROUP, L.L.C.*

by *Illinois National Insurance Company*

**COMMISSIONS EXCLUSION**

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any claim made against the Directors and Officers, alleging, arising out of, based upon or attributable to:

(I) Payments, commissions, gratuities, benefits or any other favors to or for the benefit of any full or part-time domestic or foreign governmental or armed services officials, agents, representatives, employees or any members of their family or any entity with which they are affiliated; or

(II) Payments, commissions, gratuities, benefits or any other favors to or for the benefit of any full or part-time officials, directors, agents, partners, representatives, principal shareholders, or owners or employees, or affiliates (as that term is defined in The Securities Exchange Act of 1934, including any of their officers, directors, agents, owners, partners, representatives, principal shareholders or employees) of any customers of the company or any members of their family or any entity with which they are affiliated; or

(III) Political contributions, whether domestic or foreign.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

**ENDORSEMENT# 5**

This endorsement, effective 12:01 a.m. September 13, 2004 forms a part of policy number 715-71-62
issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by Illinois National Insurance Company

**MAJOR SHAREHOLDER EXCLUSION**

In consideration of the premium charged it is hereby understood and agreed that the Insurer shall not be liable for any Loss in connection with any Claim(s) made against any Insured(s) which are brought by any individual(s) or entity(ies) that own or control (whether beneficially, directly or indirectly) 5 % or more of the outstanding voting stock (hereinafter "Major Shareholder"); or by any security holder of the Company whether directly or derivatively, unless such security holder's Claim(s) is instigated and continued totally independent of, and totally without the solicitation of, or assistance of any Major Shareholder.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

**ENDORSEMENT# 6**

This endorsement, effective 12:01 a.m. September 13, 2004 forms a part of policy number 715-71-62
issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by Illinois National Insurance Company

**MEDICAL MALPRACTICE EXCLUSION**

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any Claim(s) made against any Insured(s) alleging, arising out of, based upon or attributable to medical or professional malpractice including, but not limited to, the rendering or failure to render of medical or professional service or treatment.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

**ENDORSEMENT# 7**

This endorsement, effective 12:01 a.m. September 13, 2004 forms a part of policy number 715-71-62
issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by Illinois National Insurance Company

**NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT**
**(BROAD FORM)**

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any Claim(s) made against any Insured(s):

A. alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly the hazardous properties of nuclear material, including but not limited to:

(1) nuclear material located at any nuclear facility owned by, or operated by or on behalf of, the Company, or discharged or dispersed therefrom; or

(2) nuclear material contained in spent fuel or waste which was or is at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of the Company; or

(3) the furnishing by an Insured or the Company of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility; or

(4) claims for damages to the company or its shareholders which alleges, arises from, is based upon, is attributed to or in any way involves, directly or indirectly, the hazardous properties of nuclear material.

B. (1) which is insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability underwriters, or Nuclear Insurance Association of Canada, or would be insured under any such policy but for its termination or exhaustion of its Limit of Liability; or,

(2) with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the Insured is, or had this policy not been issued would be entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into the United States of America, or any agency thereof, with any person or organization.

As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or byproduct material;

END 007

**ENDORSEMENT# 7**    (continued)

"source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means:

(a)    any nuclear reactor,

(b)    any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)    any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d)    any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

*END 007*

**ENDORSEMENT# 8**

This endorsement, effective 12:01 a.m. September 13, 2004 forms a part of policy number 715-71-62 issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by Illinois National Insurance Company

**OUTSIDE ENTITY ENDORSEMENT**

In consideration of the premium charged, it is hereby understood and agreed that the following entities shall be deemed an "Outside Entity" with respect to its corresponding Continuity Date below:

| OUTSIDE ENTITY | CONTINUITY DATE |
|---|---|
| 1) any not-for-profit organization; | March 13, 1998 ✓ |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

**ENDORSEMENT# 9**

This endorsement, effective 12:01 a.m. September 13, 2004 forms a part of policy number 716-71-62
issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by Illinois National Insurance Company

**"NO LIABILITY" PROVISION DELETED**

In consideration of the premium charged, it is hereby understood and agreed that the policy is hereby amended as follows:

(1) The Definition of "No Liability" is hereby deleted in its entirety; and

(2) The last paragraph of Clause 6. RETENTION CLAUSE is hereby deleted in its entirety.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

**ENDORSEMENT# 10**

This endorsement, effective 12:01 a.m. September 19, 2004 forms a part of policy number 715-71-62
issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by Illinois National Insurance Company

**PRIOR ACTS EXCLUSION – FOR LISTED SUBSIDIARY**

In consideration of the premium charged, it is hereby understood and agreed that the term Company, is amended to include the following subsidiaries, but only for any Wrongful Act(s) which occur subsequent to the acquisition or creation date thereof as listed on the schedule below. Losses arising from the same or related Wrongful Act(s) shall be deemed to arise from the first such same or related Wrongful Act(s).

| NAMED SUBSIDIARY | DATE |
|---|---|
| American Imaging Management Inc. | March 31, 2000 |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

**ENDORSEMENT# 11**

This endorsement, effective 12:01 a.m. September 13, 2004 forms a part of policy number 716-71-62
issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by Illinois National Insurance Company

**PRESUMPTIVE INDEMNIFICATION**

In consideration of the premium charged, it is hereby understood and agreed that, for the purposes of the applicability of this policy to Loss, the Company will be conclusively deemed to have indemnified the Individual Insureds to the maximum extent that the Company is permitted or required to grant such indemnification pursuant to law, common or statutory, or contract or by the charter or by-laws of the Company (which are hereby deemed to adopt the broadest provisions of the law which determines or defines such rights of indemnity). The Company hereby agrees to indemnify the Individual Insureds to the fullest extent permitted by law including the making in good faith of any required application for court approval.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

**ENDORSEMENT# 12**

This endorsement, effective 12:01 a.m. September 13, 2004 forms a part of policy number 715-71-62
issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by Illinois National Insurance Company

**ORDER OF PAYMENTS ENDORSEMENT**

In consideration of the premium charged, it is hereby understood and agreed that:

1. In the event of Loss arising from any Claim(s) for which payment is due under the provisions of this policy but which Loss, in the aggregate, exceeds the remaining available Limit of Liability of this policy, then this policy shall:

    (i) first pay such Loss for which coverage is provided under Coverage A of the policy, then with respect to whatever remaining amount of the Limit of Liability is available after payment of such Loss,

    (ii) then pay such Loss for which coverage is provided by Coverage B of the policy.

2. In the event of Loss arising from a Claim(s) for which payment is due under the provisions of this policy (including those circumstances described in part 1 of this endorsement), the Insurer shall at the written request of the Named Entity:

    (i) first pay such Loss for which coverage is provided under Coverage A of the policy, then

    (ii) either pay or hold payment for such Loss for which coverage is provided by Coverage B of the policy.

    In the event that the Insurer withholds payment under Coverage B of the policy pursuant to the above request, then the Insurer shall at any time in the future, at the request of the Company, release such Loss payment to the Company, or make such Loss payment directly to an individual director or officer in the event of covered Loss under any Claim(s) covered under this policy pursuant to Coverage A of the policy.

3. Nothing in this endorsement shall be construed to increase the Limit of Liability of the Insurer under this policy which such Limit of Liability shall remain the maximum liability of the Insurer under all Claims under all Coverage under this policy combined.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

**ENDORSEMENT# 13**

This endorsement, effective 12:01 a.m. September 13, 2004 forms a part of policy number 715-71-62
issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by Illinois National Insurance Company

**ARC PRIVATE EDGE℠ AMENDATORY ENDORSEMENT**

In consideration of the premium charged, it is understood and agreed that unless modified by another endorsement to this policy, coverage as is afforded by this policy is amended as follows:

1. **Automatic new acquisitions coverage**

Definition of "Subsidiary", paragraph (2) is amended to read as follows:

(2) automatically any for-profit organization, whose securities are not publicly traded and which becomes a Subsidiary during the Policy Period but only if:

(i) its assets total less than 25% of the total consolidated assets of the Company as of the inception date of this policy; or

(ii) its Employees total less than the lesser of: (A) 20% of the total Employees of the Company as of the inception date of this policy; or (B) two thousand (2000); or

(iii) such for-profit organization, whose securities are not publicly traded, becomes a Subsidiary during the last ninety (90) days of the Policy Period;

The Definition of "Subsidiary," is further amended by adding the following new paragraph at the end thereof:

Notwithstanding the above, solely with respect to coverage afforded under this policy for Employment Practices Claims, this policy shall apply to Employment Practices Violations committed or allegedly committed prior to the time it was a Subsidiary as defined in paragraph (2)(ii) with respect to a Claim made against any such Subsidiary or made against any Individual Insured of such Subsidiary for which such Subsidiary has indemnified with respect to the Claim; provided, however, that the foregoing shall not apply if such Subsidiary or any Director or executive Officer of the Company or such Subsidiary knew of the Employment Practices Violation.

2. **Definitions of Insured and Employee amended; Director and Officer added**

Definition of "Employee" is hereby deleted in its entirety and replaced with the following:

"Employee(s)" mean any past, present or future employee, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any part-time, seasonal and temporary Employee in his or her capacity as such. An individual who is leased to the Company or is a volunteer for the Company shall also be an Employee. Any other individual who is contracted to perform work for the Company, or who is an independent contractor for the Company shall also be an Employee.

**ENDORSEMENT# 13** (continued)

Subparagraph (4) of the Definition of "Individual Insured(s)" is hereby deleted in its entirety and replaced with the following:

(4) any Insured Employee of the Company.

The following Definition of "Insured Employee" is hereby added to the policy:

"Insured Employee" means any past, present or future employee, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any part-time, seasonal and temporary Employee in his or her capacity as such. An individual who is leased to the Company or is a volunteer for the Company shall also be an Employee, but only if the Company provides indemnification to such leased individual in the same manner as is provided to the Company's Employees. Any other individual who is contracted to perform work for the Company, or who is an independent contractor for the Company shall also be an Employee, but only if the Company provides indemnification to such individual in the same manner as that provided to the Company's Employees.

Solely for the purposes of the coverage afforded hereunder, the term "Director or Officer" means an Individual Insured as defined in Definition (l)(1), (2) and (3).

3. **Punitive, Exemplary and Multiple Damages Coverage**

The Definition of "Loss" is amended as follows:

Subparagraph (6) is hereby deleted in its entirety and replaced with the following:

(6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed. It is further understood and agreed that a determination as to whether or not matters are "deemed uninsurable" for the purposes of this subparagraph (6) shall be governed by such applicable law which most favors the insured.

The final paragraph thereof is deleted in its entirety and replaced with the following:

Notwithstanding the foregoing, Loss shall specifically include (subject to the policy's other terms, conditions and exclusions) punitive, exemplary and multiple damages (including the multiple or liquidated damages' awards under the Age Discrimination in Employment Act and the Equal Pay Act). It is further understood and agreed that the enforceability of the foregoing coverage shall be governed by such applicable law which most favors coverage for punitive, exemplary and multiple damages.

4. **Third Party Sexual Harassment and Discrimination Coverage**

The Definition of "Employment Practices Violation", is amended by deleting the last paragraph thereof in its entirety and replacing it with the following:

With respect to any customer(s), client(s), supplier(s), distributor(s), or any other individual or group of individuals, Employment Practices Violation shall mean any actual or alleged discrimination, sexual harassment or violation of an individual's civil rights relating to such discrimination or sexual harassment, whether direct, indirect, intentional or unintentional.

5. **Definition of Employment Practices Violation**

***END***

**ENDORSEMENT# 13** (continued)

Definition of "Employment Practices Violation" is amended to read as follows:

(2) harassment (including sexual harassment, whether "quid pro quo", hostile work environment or otherwise, including "same sex" sexual harassment);

6. **Limitations to Exclusions**

Conduct Exclusions

(1) Exclusion (a) is deleted in its entirety and replaced with the following:

(a) arising out of, based upon or attributable to the gaining of any profit or advantage to which a final adjudication adverse to the Insured(s) or an alternative dispute resolution proceeding establishes the Insured(s) were not legally entitled; provided however that the foregoing exclusion shall not apply to Employment Practices Claims;

(2) Exclusion (c) is hereby deleted in its entirety and replaced with the following:

(c) arising out of, based upon or attributable to the committing of any deliberate criminal, deliberate fraudulent or dishonest act, or any willful violation of any statute, rule or law, if a final adjudication adverse to the Insured(s) or an alternative dispute resolution proceeding establishes that such deliberate criminal, deliberate fraudulent or dishonest act or any willful violation of any statute, rule or law occurred;

Bodily Injury

Exclusion (l) is deleted in its entirety and replaced with the following:

(l) with respect to Coverages A and B(ii) only: for bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof; and with respect to Coverage B(i): alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof. Provided, however, that this Exclusion (l) shall not apply to Securities Claims; and with respect to coverage afforded to Employment Practices Claims, shall only apply to Employment Practices Claims alleging, arising out of, or in any way involving directly or indirectly, sexual abuse, sexual assault or battery;

Insured v. Insured

Exclusion (i)(2) is deleted in its entirety and replaced with the following:

(2) an Employment Practices Claim;

Retaliation

Notwithstanding Exclusions (o) and (p), this policy shall provide coverage (subject to the policy's other terms, conditions and exclusions) for Loss arising from a Claim for Retaliation against an Employee in response to such Employee's attempt to exercise his or her rights under law including any of the following laws or benefit rights:

(i) Employee Retirement Income Security Act of 1974 (ERISA), specifically including Claims against an Insured brought under Section 510 of ERISA.

**ENDORSEMENT# 13** (continued)

(ii) Fair Labor Standards Act (except the Equal Pay Act),
(iii) National Labor Relations Act (NLRA),
(iv) Worker Adjustment and Retraining Notification Act (WARN),
(v) Consolidated Omnibus Budget Reconciliation Act (COBRA),
(vi) Occupational Safety and Health Act (OSHA),
(vii) worker's compensation,
(viii) disability benefits,
(ix) unemployment compensation,
(x) unemployment insurance,
(xi) retirement benefits or social security benefits, or
(xii) any rules or regulations of the foregoing promulgated the reunder.

Breach of Contract

Exclusion (h) is deleted in its entirety and replaced with the following:

(h) alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or any other Insured under any express contract or agreement; provided, however, that this exclusion shall not apply to:

(1) the extent any liability does not arise under such express contract or agreement; or

(2) a Director or Officer, provided that this exception for Directors or Officers shall not apply to a Claim alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or any other Insured under any express employment contract or agreement.

Provided further however, that solely with respect to coverage afforded by this policy for Employment Practices Claims, this exclusion shall not apply to:

(i) Loss constituting Defense Costs;

(ii) Loss arises out of mental anguish or emotional distress; or

(iii) the extent any liability does not arise under such express contract or agreement; or

(iv) liability of the Insured which has been assumed under an indemnification provision with a leasing company or temporary help employment agency, but only if such liability arises from an Employment Practices Violation by an Employee leased or hired by such company or agency, and does not arise from any act, error or omission solely by the leasing company or temporary help agency;

alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or any other Insured under any written or expressed employment contract or agreement;

It is further understood and agreed that with respect to (A) Defense Costs jointly incurred by, (B) any joint settlement made by and/or (C) any judgment of joint and several liability against the Company and any Individual Insured in connection with a Claim, the Company and the Individual Insured and the Insurer agree to use their best efforts to determine a fair and proper allocation of the amounts as between the Company and the Individual Insureds and the Insurer, taking into account the relative legal and financial exposures, and the relative benefits obtained by the Individual Insureds and the Company.

***END 013***

**ENDORSEMENT#** 13 (continued)

7. **Notice Provisions**

Clause 7(a) is deleted in its entirety and replaced with the following:

(a) The Company or the Insureds shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of a Claim as soon as practicable after the Claim is reported to or first becomes known by the human resources department or office of general counsel (or if no such office or department exists, than the equivalent office or department) and upon the earliest occurrence of the following:

(1) The Claim is or is sought to be certified as a class action; or

(2) The Claim is brought by more than one claimant or is sought to be consolidated with another Claim brought by another claimant; or

(3) The Claim alleges sexual harassment by a duly elected or appointed corporate Director or Officer of the Company; or

(4) Total Loss (including Defense Costs) of the Claim is reasonably estimated by the human resources department or office of general counsel (or if no such office or department exists, than the equivalent office or department) to exceed 50% of the applicable Retention amount stated in Item 5. of the Declarations;

but in all events no later than:

(i) anytime during the Policy Period or during the Discovery Period (if applicable); or

(ii) within thirty (30) days after the end of the Policy Period or the Discovery Period (if applicable), as long as such Claim is reported no later than thirty (30) days after the date such Claim was first made against an Insured.

It is further understood and agreed that at the Named Entity's option, the Insureds may submit to the Insurer a quarterly bordereau of Claims to which coverage under this policy may apply, including any documentation and all relevant pleadings, letters and other information descriptive of such Claims, such Claims shall be subject to all of the terms and conditions of this policy including but not limited to Clause 7(c).

8. **Defense Provisions**

Clause 8 of the policy is amended as follows:

Settlements within Retention Amount (inclusive of Defense Costs): Insurer waives consent

Notwithstanding the above, if all Insured defendants are able to dispose of all Claims, which are subject to one Retention amount for an amount (inclusive of Defense Costs) not exceeding such Retention amount, then the Insurer's consent shall not be required for such Claims.

Choice of Counsel/Duty to Defend: Mutual Consent Provisions

Subject to the provisions of Clause 8, the Named Entity may choose on behalf of all Insureds whether to defend a Claim themselves or tender the Claim over to the Insurer to defend.

Settlement Clause

The last paragraph of Clause 8 is deleted in its entirety and replaced with the following:

***END***

**ENDORSEMENT#** 13 (continued)

Furthermore, in the event the Insureds do not consent to the first Settlement Opportunity within the time prescribed, then, subject to the applicable limit of liability, the Insurer's liability for all Loss on account of such Claim shall not exceed: (1) the amount for which the Insurer could have settled such Claim plus Defense Costs incurred as of the date such settlement was proposed in writing by the Insurer, ("Settlement Opportunity Amount") plus (2) 80% of covered Loss in excess of such Settlement Opportunity Amount, it being a condition of this insurance that the remaining 20% of such Loss excess of the Settlement Opportunity Amount shall be carried by the Company and the Insureds at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the Settlement Opportunity Amount exceeds the Retention amount stated in Item 5. of the Declarations.

9. **Clause 9 Panel Counsel Amendment applicable to certain Employment Practices Claims**

Clause 9 is hereby amended by adding the following at the end thereof:

Notwithstanding the foregoing, solely with respect to an Employment Practices Claim, other than a Claim described in paragraph (4) below, Clause 9 shall not apply to a single plaintiff action Employment Practices Claim alleging discrimination or sexual harassment against an Insured if the total Loss (including Defense Costs) of such Claim does not exceed, or is not reasonably estimated by the human resources department or office of general counsel (or if no such office or department exists, than the equivalent office or department) to exceed, 300% of the applicable Retention amount stated in Item 5. of the Declarations (hereinafter "Non-Designated Claim"), subject to the following conditions.

(1) The Insured or the Company shall select either a Panel Counsel Firm, pursuant to the terms and conditions of Clause 9, or a law firm listed below ("Non-Panel Counsel Firm") to conduct the defense of such Non-Designated Claims. A Non-Panel Counsel Firm may only be selected for a Non-Designated Claim brought in the jurisdiction indicated below. In the event a Non-Designated Claim is brought in a jurisdiction not indicated below, then the Insured shall select a Panel Counsel Firm, pursuant to the terms and conditions of Clause 9, to conduct the defense of such Claim.

(2) If at any time either: (i) the total Loss (including Defense Costs) of such Non-Designated Claim exceeds, or becomes reasonably estimated by the Human Resources Department or Office of General Counsel to exceed, 300% of the applicable Retention amount stated in Item 5. of the Declarations, or (ii) the Defense Costs incurred in the defense of such Non-Designated Claim exceeds $100,000, then a Panel Counsel Firm shall be selected by the Insurer, pursuant to the terms and conditions of Clause 9, to conduct the defense of such Non-Designated Claim as lead counsel. In such an event, however, the Insurer may, at its sole discretion, maintain the Non-Panel Counsel Firm in the jurisdiction in which the Non-Designated Claim is brought to function as "local counsel" on the Non-Designated Claim to assist the Panel Counsel Firm which will function as "lead counsel" in such Claim.

(3) In all events, Defense Costs may not be incurred by or at the direction of any Non-Panel Counsel Firm for any Non-Designated Claim without the prior written consent of the Insurer, such consent not to be unreasonably withheld, subject to all the terms and conditions of Clause 8.

***END***

**ENDORSEMENT# 13** (continued)

(4). This exception to Clause 9 herein does not, in any way, apply to a Claim: (i) for which the Insurer has assumed the defense pursuant to Clause 8 of this policy; (ii) alleging Retaliation; (iii) brought in the form of a class action or multiple plaintiff action; or (iv) alleging discrimination or sexual harassment conduct by a duly elected or appointed Director or Officer of the Company.

| ADDITIONAL FIRM | JURISDICTION |
| --- | --- |

**10. Extended Reporting Provision**

Subject to Clause 10. DISCOVERY CLAUSE, the Named Entity may elect a Discovery Period of one, two or three years. The Additional Premium Amount for:

(1) one year shall be 75% of the "full annual premium";

(2) two years shall be 150% of the "full annual premium"; and

(3) three years shall be 200% of the "full annual premium".

As used herein, "full annual premium" means the premium level in effect immediately prior to the end of the Policy Period.

**11. Alternative Dispute Resolution ("ADR")**

Clause 17. DISPUTE RESOLUTION PROCESS, is amended by adding the following at the end thereof:

Either choice of ADR may be commenced in any of the following locations which relate to the Named Entity:

(1) the state of incorporation of the Named Entity; or

(2) the state indicated in Item 1. of the Declarations page as the mailing address for the Named Entity;

OR any of the following locations (regardless of whether they relate to the Named Entity):

(3) New York, New York;

(4) Boston, Massachusetts;

(5) Atlanta, Georgia;

(6) Chicago, Illinois;

(7) Denver, Colorado.

The Named Entity shall act on behalf of all Insureds in deciding to proceed with ADR under this clause.

**12. Named Parent Coverage**

The term Company shall include the Named Parent of the Named Entity, subject to the following terms and conditions.

Coverage as is afforded under this policy solely with respect to Employment Practices Claims made against the Named Parent or any Individual Insured thereof shall only apply if: (1) such Claim relates to an Employment Practices Violation committed by an Insured (other than the Named Parent or an Individual Insured thereof); and (2) an Insured (other than the Named Parent or an Individual Insured thereof) is and remains a defendant in the action along with such Named Parent or any Individual Insured thereof.

***END***

**ENDORSEMENT# 13** (continued)

In all events coverage as is afforded under this policy with respect to an Employment Practices Claim made against the Named Parent or any Individual Insured thereof shall only apply to Employment Practices Violations committed or allegedly committed after the time that such Named Parent became a Named Parent and prior to the time such Named Parent ceases to be a Named Parent.

The term Named Parent means any organization incorporated outside the United States, its territories or possessions that owns more than a 50% ownership interest in the Named Entity, either directly, or indirectly through one or more of its subsidiaries.

A foreign organization becomes the Named Parent when it owns more than a 50% ownership interest in the Named Entity, either directly, or indirectly through one or more of its subsidiaries. Such organization ceases to be the Named Parent when the organization ceases to own more than a 50% ownership in the Named Entity, either directly, or indirectly through one or more of its subsidiaries.

13. **Liberalization Clause**

In the event that the Insurer shall announce either: (1) a new Private Company Directors and Officers and Employment Practices Insurance policy form; or (2) an enhancement of coverage endorsement to this policy form, which is to be made available to all Insureds and for which no additional premium is required, then the Named Entity shall have the right to such new policy or such new coverage enhancement endorsement subject to all underwriting information or particulars as the Insurer may require for such new policy or enhanced coverage.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS UNCHANGED.

AUTHORIZED REPRESENTATIVE

**ENDORSEMENT# 14**

This endorsement, effective 12:01 a.m. September 13, 2004 forms a part of policy number 715-71-62 issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by Illinois National Insurance Company

**FAILURE TO MAINTAIN INSURANCE EXCLUSION**

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable for any Loss in connection with any Claim(s) made against any Insured alleging, arising out of, based upon, attributable to any failure or omission on the part of the Insureds or the Company to effect or maintain adequate insurance.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

END 14

**ENDORSEMENT# 15**

This endorsement, effective 12:01 a.m. September 13, 2004 forms a part of policy number 715-71-62 issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by Illinois National Insurance Company

**DISCOVERY AMENDED**

**BILATERAL - PREMIUM TBD**

In consideration of the premium charged, it is hereby understood and agreed that the policy (and any endorsement amending Clause 10. DISCOVERY CLAUSE) is hereby amended to the extent necessary for the policy to provide the following:

Clause 10. DISCOVERY CLAUSE, is deleted in its entirety and replaced with the following:

**10. DISCOVERY CLAUSE**

Except as indicated below, if the Named Entity shall cancel or the Named Entity or the Insurer shall refuse to renew this policy, the Named Entity shall have the right to a period of either one, two or three years following the effective date of such cancellation or nonrenewal (herein referred to as the "Discovery Period") upon payment of an additional premium amount as shall be determined by the Insurer in its sole and absolute discretion (the "Additional Premium Amount") in which to give to the Insurer written notice of Claims first made against the Insureds during said Discovery Period for any Wrongful Act occurring prior to the end of the Policy Period and otherwise covered by this policy. The rights contained in this paragraph shall terminate, however, unless written notice of such election together with the additional premium due is received by the Insurer within 30 days of the effective date of cancellation or nonrenewal. The Additional Premium Amount for the Discovery Period shall be fully earned at the inception of the Discovery Period. The Discovery Period is not cancelable. This clause and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

In the event of a Transaction, as defined in Clause 12, the Named Entity shall have the right, within 30 days before the end of the Policy Period, to request an offer from the Insurer of a Discovery Period (with respect to Wrongful Acts occurring prior to the effective time of the Transaction) for a period of no less than three years or for such longer or shorter period as the Named Entity may request. The Insurer shall offer such Discovery Period pursuant to such terms, conditions and premium as the Insurer may reasonably decide. In the event of a Transaction, the right to a Discovery Period shall not otherwise exist except as indicated in this paragraph.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

82472 (6/03)

AUTHORIZED REPRESENTATIVE

**ENDORSEMENT# 16**

This endorsement, effective 12:01 a.m. September 13, 2004 forms a part of policy number 716-71-62
issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by Illinois National Insurance Company

**EXCLUSION (o) AMENDED**
**(FAIR LABOR STANDARDS ACT)**

In consideration of the premium charged, it is hereby understood and agreed that notwithstanding any other provision of this policy (including any endorsement attached hereto whether such endorsement precedes or follows this endorsement in time or sequence), Clause 4. EXCLUSIONS, is hereby amended by deleting Exclusion (o) in its entirety and replacing it with the following:

(o) for violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a Claim for Retaliation; provided, further, however, there is no coverage provided under this policy for any Claim related to, arising out of, based upon, or attributable to the refusal, failure or inability of any Insured(s) to pay wages or overtime pay for services rendered (hereinafter, "earned Wages") (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any Insured(s) from any Employee(s) or purported employee(s), including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay Earned Wages, or (ii) any Claim seeking earned Wages because any Employee(s) or purported employee(s) was improperly classified or mislabeled as "exempt;"

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

POLICYHOLDER DISCLOSURE STATEMENT
UNDER
TERRORISM RISK INSURANCE ACT OF 2002

You are hereby notified that under the federal Terrorism Risk Insurance Act of 2002 (the "Act") effective November 26, 2002, you now have a right to purchase insurance coverage for losses arising out of an Act of Terrorism, which is defined in the Act as an act certified by the Secretary of the Treasury (i) to be an act of terrorism, (ii) to be a violent act or an act that is dangerous to (A) human life; (B) property or (C) infrastructure, (iii) to have resulted in damage within the United States, or outside of the United States in case of an air carrier or vessel or the premises of a U.S. mission and (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. You should read the Act for a complete description of its coverage. The Secretary's decision to certify or not to certify an event as an Act of Terrorism and thus covered by this law is final and not subject to review. There is a $100 billion dollar annual cap on all losses resulting from Acts of Terrorism above which no coverage will be provided under this policy and under the Act unless Congress makes some other determination.

For your information, coverage provided by this policy for losses caused by an Act of Terrorism may be partially reimbursed by the United States under a formula established by the Act. Under this formula the United States pays 90% of terrorism losses covered by this law exceeding a statutorily established deductible that must be met by the insurer, and which deductible is based on a percentage of the insurer's direct earned premiums for the year preceding the Act of Terrorism.

**COPY OF DISCLOSURE SENT WITH ORIGINAL QUOTE**

Insured Name: INTERNATIONAL RADIOLOGY GROUP, L.L.C.

Policy Number: 715-71-62
Policy Period Effective Date From: September 13, 2004 To: January 1, 2006



# NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.

A CAPITAL STOCK COMPANY

ADMINISTRATIVE OFFICES:
175 WATER STREET, NEW YORK, N.Y. 10038

POLICY NUMBER:
*569-77-00*

RENEWAL OF:
*874-11-86*

## DIRECTORS AND OFFICERS INSURANCE AND COMPANY REIMBURSEMENT POLICY

**NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS LIMITED GENERALLY TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE INSURER DURING THE POLICY PERIOD. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.**

**NOTICE: THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.**

**NOTICE: THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND; HOWEVER, THE INSURER MAY, AND IN CERTAIN CIRCUMSTANCES MUST, ADVANCE DEFENSE COSTS PAYMENTS PRIOR TO THE FINAL DISPOSITION OF A CLAIM.**

## DECLARATIONS

ITEM 1. NAMED CORPORATION: *INTERNATIONAL RADIOLOGY GROUP, L.L.C.*

MAILING ADDRESS: *1909 Hi Line Drive*
*Dallas, TX 75207*

DAILY

STATE OF INCORPORATION OF THE NAMED CORPORATION:
*Delaware*

ITEM 2. SUBSIDIARY COVERAGE: any past, present or future Subsidiary of the Named Corporation

ITEM 3. POLICY PERIOD: From *September 13, 2002* to *September 13, 2003*
(12:01 A.M. Standard Time at the address stated in Item 1)

ITEM 4. LIMIT OF LIABILITY: *$3,000,000* aggregate for Coverages A and B combined (including Defense Costs)

ITEM 5. RETENTION:

Company Reimbursement and Indemnifiable Loss: *$50,000* for Loss arising from claims alleging the same Wrongful Act or related Wrongful Acts.

ITEM 6. PREMIUM: *$59,597*

*ARC EXCESS & SURPLUS LLC*
*1122 Franklin Ave., 3rd Floor*
*PO Box 9240*
*Garden City, NY 11530*
*337181*

*Sep 23, 2002*
Authorized Representative
Vice President - National Union

Countersignature Date

Countersigned At

47352 (8/88) COPY

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.®

# DIRECTORS AND OFFICERS INSURANCE AND COMPANY REIMBURSEMENT POLICY

In consideration of the payment of the premium, and in reliance upon the statements made to the Insurer by application forming a part hereof and its attachments and the material incorporated therein, National Union Fire Insurance Company of Pittsburgh, Pa.® herein called the "Insurer", agrees as follows:

## 1. INSURING AGREEMENTS

### COVERAGE A: DIRECTORS AND OFFICERS INSURANCE

This policy shall pay the Loss of each and every Director or Officer of the Company arising from any claim or claims first made against the Directors or Officers and reported to the Insurer during the Policy Period or the Discovery Period (if applicable) for any alleged Wrongful Act in their respective capacities as Directors or Officers of the Company, except for and to the extent that the Company has indemnified the Directors or Officers. The Insurer shall, in accordance with and subject to Clause 9, advance to each and every Director and Officer the Defense Costs of such claim or claims prior to their final disposition.

### COVERAGE B: COMPANY REIMBURSEMENT INSURANCE

This policy shall reimburse the Company for Loss arising from any claim or claims which are first made against the Directors or Officers and reported to the Insurer during the Policy Period or the Discovery Period (if applicable) for any alleged Wrongful Act in their respective capacities as Directors or Officers of the Company, but only when and to the extent that the Company has indemnified the Directors or Officers for such Loss pursuant to law, common or statutory, or contract, or the Charter or By-laws of the Company duly effective under such law which determines and defines such rights of indemnity.

## 2. DEFINITIONS

(a) The "Company" means the Named Corporation designated in Item 1 of the Declarations and any Subsidiary thereof.

(b) "Defense Costs" means reasonable and necessary fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and appeal of any claim against the Insureds, but excluding salaries of Officers or employees of the Company.

(c) "Insured(s)", or "Director(s) or Officer(s)", means any past, present or future duly elected or appointed Directors or Officers of the Company. Coverage will automatically apply to all new Directors or Officers after the inception date of this policy.

(d) "Loss" means damages, judgments, settlements and Defense Costs; however, Loss shall not include civil or criminal fines or penalties imposed by law, punitive or exemplary damages, the multiplied portion of multiplied damages, taxes, any amount for which the Insureds are not financially liable or which are without legal recourse to the Insureds, or matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

(e) "Policy Period" means the period of time from the inception date shown in Item 3 of the Declarations to the earlier of the expiration date shown in Item 3 of the Declarations or the effective date of cancellation of this policy; however, to the extent that coverage under this policy replaces coverage in other policies terminating at noon standard time on the inception date of such coverage hereunder, then such coverage as is provided by this policy shall not become effective until such other coverage has terminated.

(f) "Subsidiary" means a corporation of which the Named Corporation owns on or before the inception of the Policy Period more than 50% of the issued and outstanding voting stock either directly or indirectly through one or more of its Subsidiaries.

"Subsidiary" also means any corporation which becomes a Subsidiary during the Policy Period but only upon the condition that within 90 days of its becoming a Subsidiary, the Named Corporation shall have provided the Insurer with full particulars of the new Subsidiary and agreed to any additional premium and/or amendment of the provisions of this policy required by the Insurer relating to such new Subsidiary. Further, coverage as shall be afforded to the new Subsidiary is conditioned upon the Named Corporation paying when due any additional premium required by the Insurer relating to such new Subsidiary. A corporation becomes a Subsidiary when the Named Corporation owns more than 50% of the issued and outstanding voting stock either directly or indirectly through one or more of its Subsidiaries.

(g) "Wrongful Act" means any breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Directors or Officers of the Company in their respective capacities as such, or any matter claimed against them solely by reason of their status as Directors or Officers of the Company.

3. **EXTENSIONS**

Subject otherwise to the terms hereof, this policy shall cover Loss arising from any claims made against the estates, heirs, or legal representatives of deceased Directors or Officers, and the legal representatives of Directors or Officers in the event of their incompetency, insolvency or bankruptcy, who were Directors or Officers at the time the Wrongful Acts upon which such claims are based were committed.

4. **EXCLUSIONS**

The Insurer shall not be liable to make any payment for Loss in connection with any claim or claims made against the Directors or Officers:

(a) arising out of, based upon or attributable to the gaining in fact of any personal profit or advantage to which they were not legally entitled;

(b) arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraudulent act;

(c) arising out of, based upon or attributable to the payment to the Insureds of any remuneration without the previous approval of the stockholders of the Company, which payment without such previous approval shall be held to have been illegal;

(d) arising out of, based upon or attributable to profits in fact made from the purchase or sale by the Insureds of securities of the Company within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any state statutory law;

(The Wrongful Act of any Director or Officer shall not be imputed to any other Director or Officer for the purpose of determining the applicability of the foregoing exclusions 4(a) through 4(d) )

(e) alleging, arising out of, based upon or attributable to any attempt, whether successful or unsuccessful, by any person or entity to acquire securities of the Company against the opposition of the Board of Directors of the Company ("Board"), or any action, whether successful or unsuccessful, by the Company or the Board to resist such attempts; however, this exclusion shall not apply if, before taking any such resistive action, the Company or the Board has obtained a written opinion (1) from independent legal counsel that such resistive action is a lawful exercise of the Board's business judgment and (2)

from an independent investment banking firm that the price of such acquisition of securities is inadequate, and that any financial transaction approved by the Board which is resistive of such acquisition is fair to the Company and its shareholders;

(f) alleging, arising out of, based upon or attributable to any failure or omission on the part of the Insureds or the Company to effect and maintain insurance;

(g) alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related Wrongful Acts alleged or contained, in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(h) alleging, arising out of, based upon or attributable to any pending or prior litigation as of the inception date of this policy, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation;

(i) which are brought by any Insured or the Company; or which are brought by any security holder of the Company, whether directly or derivatively, unless such claim(s) is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any Insured or the Company; provided, however, this exclusion shall not apply to wrongful termination of employment claims brought by a former employee other than a former employee who is or was a Director of the Company;

(j) alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly:

(1) the actual, alleged or threatened discharge, dispersal, release or escape of pollutants, or

(2) any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants,

including but not limited to claims alleging damage to the Company or its shareholders.

Pollutants includes (but is not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed;

(k) alleging, arising out of, based upon or attributable to any act or omission in their capacities as directors or officers of any other entity other than the Company, or by reason of their status as a director or officer of such other entity;

(l) for violation(s) of any of the responsibilities, obligations or duties imposed upon fiduciaries by the Employee Retirement Income Security Act of 1974 or amendments thereto or any similar provisions of state statutory law or common law;

(m) for bodily injury, sickness, disease, death or emotional distress of any person, or damage to or destruction of any tangible property, including the loss of use thereof, or for injury from oral or written publication of a libel or slander or of other defamatory or disparaging material or of material that violates a person's right of privacy;

(n) of any Subsidiary for any alleged Wrongful Act occurring at any time when the Named Corporation did not own more than 50% of the issued and outstanding voting stock of such Subsidiary either directly or indirectly through one or more of its Subsidiaries.

5. **LIMIT OF LIABILITY-(FOR ALL LOSS-INCLUDING DEFENSE COSTS)**

The limit of liability stated in Item 4 of the Declarations is the limit of the Insurer's liability for all Loss, under Coverage A and Coverage B combined, arising out of all claims first made against the Insureds and reported to the Insurer during the Policy Period and the Discovery Period (if applicable); however, the limit of liability for the Discovery Period shall be part of, and not in addition to, the limit of liability for the Policy Period. Further, any claim which is made subsequent to the Policy Period or Discovery Period (if applicable) which pursuant to Clause 8(b) or 8(c) is considered made during the Policy Period or Discovery Period shall also be subject to the one aggregate limit of liability stated in Item 4 of the Declarations.

Defense Costs are not payable by the Insurer in addition to the limit of liability. Defense costs are part of Loss and as such are subject to the limit of liability for Loss.

6. **RETENTION-INDEMNIFIED OR INDEMNIFIABLE LOSS**

The Insurer shall only be liable for the amount of Loss arising from a claim which is in excess of the retention amount stated in Item 5 of the Declarations, such retention amount to be borne by the Company and/or the Insureds and shall remain uninsured, with regards to all Loss under Coverage A or B for which the Company has indemnified or is permitted or required to indemnify the Insured(s). A single retention amount shall apply to Loss arising from all claims alleging the same Wrongful Act or related Wrongful Acts.

7. **COINSURANCE CLAUSE**

The Insurer shall be liable to pay 95% of Loss excess of the retention amount described in Clause 6 up to the Limit of Liability described in Clause 5, it being a condition of this insurance that the remaining 5% of each and every Loss shall be carried by the Company and the Insureds at their own risk and be uninsured.

8. **NOTICE/CLAIM REPORTING PROVISIONS**

**Notice hereunder shall be given in writing to National Union Fire Insurance Company of Pittsburg, Pa.® Financial Services Claims Department, 175 Water Street, New York, N.Y. 10038. If mailed, the date of mailing of such notice shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.**

(a) The Company or the Insureds shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer as soon as practicable during the Policy Period, or during the Discovery Period (if applicable), of any claim made against the Insureds.

(b) If during the Policy Period or during the Discovery Period (if applicable) written notice of a claim has been given to the Insurer pursuant to Clause 8(a) above, then any claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the claim of which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the claim of which such notice has been given, shall be considered made at the time such notice was given.

(c) If during the Policy Period or during the Discovery Period (if applicable) the Company or the Insureds shall become aware of any circumstances which may reasonably be expected to give rise to a claim being made against the Insureds and shall give written notice to the Insurer of the circumstances and the reasons for anticipating such a claim, with full particulars as to dates and persons involved, then any claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or

related to any Wrongful Act alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

**9. DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)**

Under Coverage A, except as hereinafter stated, the Insurer shall advance Defense Costs prior to the final disposition of the claim, unless such Defense Costs have been advanced by the Company. Such advance payments by the Insurer shall be repaid to the Insurer by the Insureds, severally according to their respective interests, in the event and to the extent that the Insureds shall not be entitled under the terms and conditions of this policy to payment of such Loss. Nothwithstanding the foregoing, if the Company is required or permitted to advance such Defense Costs in accordance with the fullest application of law, common or statutory, or contract, or the Charter or By-laws of the Company, then the Insurer assumes no duty to advance Defense Costs prior to the final disposition of the claim and the retention amount as stated in Item 5 of the Declarations shall apply to such Loss. In such case, however, the Insurer may, in its absolute discretion, advance all or any part of such Defense Costs prior to the final disposition of the claim and in such event the advance payments by the Insurer shall be repaid to the Insurer by the Company or the Insureds, severally according to their respective interests, in the event and to the extent that the Company or the Insureds shall not be entitled under the terms and conditions of this policy to payment of such Loss.

Under Coverage B, the Insurer assumes no duty to reimburse Defense Costs prior to the final disposition of the claim. The Insurer may, in its absolute discretion, reimburse all or any part of such Defense Costs prior to the final disposition of the claim. In such event, however, such advance payments by the Insurer shall be repaid to the Insurer by the Company or the Insureds, severally according to their respective interests, in the event and to the extent that the Company or the Insureds shall not be entitled under the terms and conditions of this policy to payment of such Loss.

**The Insurer does not, however, under this policy, assume any duty to defend. The Insureds shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment or incur any Defense Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defense Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy. The Insurer's consent shall not be unreasonably withheld, provided that the Insurer shall be entitled to effectively associate in the defense and the negotiation of any settlement of any claim in order to reach a decision as to reasonableness.**

The Insurer shall have the right to effectively associate with the Company and the Insureds in the defense and settlement of any claim that appears reasonably likely to involve the Insurer, including but not limited to effectively associating in the negotiation of a settlement. The Insureds shall defend and contest any such claim. The Company and the Insureds shall give the Insurer full cooperation and such information as it may reasonably require.

With respect to the Defense Costs and any joint settlement of any claim made against the Company and the Insureds, such Defense Costs and joint settlement having been consented to by the Insurer, the Company and the Insureds and the Insurer agree to use their best efforts to determine a fair and proper allocation of the amounts as between the Company and the Insureds and the Insurer.

**10. DISCOVERY CLAUSE**

If the Insurer shall cancel or refuse to renew this policy the Named Corporation shall have the right, upon payment of an additional premium of 75% of the full annual premium, to a period of one year following the effective date of such cancellation or nonrenewal (herein referred to as the Discovery Period) in which to give written notice to the Insurer of claims first made against the Insureds during said one year period for any Wrongful Act occurring prior to the end of the

Policy Period and otherwise covered by this policy. As used herein, "full annual premium" means the premium level in effect immediately prior to the end of the Policy Period.

The rights contained in this clause shall terminate, however, unless written notice of such election together with the additional premium due is received by the Insurer within ten (10) days of the effective date of cancellation or non-renewal. The additional premium for the Discovery Period shall be fully earned at the inception of the Discovery Period. The Discovery Period is not cancellable. This clause and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

The offer by the Insurer of renewal terms, conditions, limits of liability and/or premiums different from those of the expiring policy shall not constitute refusal to renew.

**11. CANCELLATION CLAUSE**

This policy may be cancelled by the Named Corporation at any time only by mailing written prior notice to the Insurer or by surrender of this policy to the Insurer or its authorized agent. This policy may also be cancelled by or on behalf of the Insurer by delivering to the Named Corporation or by mailing to the Named Corporation, by registered, certified, or other first class mail, at the Named Corporation's address as shown in Item 1 of the Declarations, written notice stating when, not less than thirty (30) days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The Policy Period terminates at the date and hour specified in such notice, or at the date and time of surrender.

If this policy shall be cancelled by the Named Corporation, the Insurer shall retain the customary short rate proportion of the premium hereon.

If this policy shall be cancelled by the Insurer, the Insurer shall retain the pro rata proportion of the premium hereon.

Payment or tender of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation but such payment shall be made as soon as practicable.

If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

**12. TERMINATION OF COVERAGE FOR SUBSEQUENT WRONGFUL ACTS AFTER CERTAIN TRANSACTIONS**

If during the Policy Period:

1. the Named Corporation shall consolidate with or merge into, or sell all or substantially all of its assets to, any other person or entity or group or persons and/or entities acting in concert; or

2. any person or entity or group of persons and/or entities acting in concert shall acquire an amount of the outstanding securities representing more than 50% of the voting power for the election of Directors of the Named Corporation, or acquires the voting rights of such an amount of such securities;

(either of the above events herein referred to as the "Transaction")

then, there shall be no coverage afforded by any provision of this policy (including but not limited to Clause 10 Discovery Clause) for any alleged Wrongful Act occurring after the effective date of Transaction.

The Named Corporation shall give the Insurer written notice of the Transaction as soon as practicable, but not later than 30 days after the effective date of the Transaction.

**13. SUBROGATION**

In the event of any payment under this policy, the Insurer shall be subrogated to the extent of such payment to all the Company's and the Insureds' rights of recovery therefor, and the Company and the Insureds shall execute all papers required and shall do everything that may be necessary to secure such rights including the execution of such documents necessary to enable the Insurer effectively to bring suit in the name of the Company and/or the Insureds.

**14. OTHER INSURANCE**

Such Insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance.

**15. NOTICE AND AUTHORITY**

It is agreed that the Named Corporation shall act on behalf of its Subsidiaries and all Insureds with respect to the giving and receiving of notice of claim or cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy and the exercising or declining to exercise any right to a Discovery Period.

**16. ASSIGNMENT**

This policy and any and all rights hereunder are not assignable without the written consent of the Insurer.

**17. ACTION AGAINST INSURER**

No action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the Insureds' obligation to pay shall have been finally determined either by judgment against the Insureds after actual trial or by written agreement of the Insureds, the claimant and the Insurer.

Any person or Organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or Organization shall have any right under this policy to join the Insurer as a party to any action against the Insureds or the Company to determine the Insureds' liability, nor shall the Insurer be impleaded by the Insureds or the Company or their legal representatives. Bankruptcy or insolvency of the Company or the Insureds or of their estates shall not relieve the Insurer of any of its obligations hereunder.

**IN WITNESS WHEREOF,** the Insurer has caused this policy to be signed by its President and a Secretary and countersigned on the Declarations Page by a duly authorized representative of the Insurer.

Elizabeth M. Tuck

**SECRETARY**

**PRESIDENT**

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

**ALASKA**

DAVIS WRIGHT TREMAINE
701 W. Eighth Avenue, Suite 800,
Anchorage, AK 99501-3468
Tel: (907) 257-5300
Contact: David W. Oesting

FOSTER PEPPER & SHEFELMAN
1007 W. Third Ave., Ste. 100,
Anchorage, AK 99501
Tel: (907) 222-7100
Contact: Peter S. Erlichman / Steliman Keehnel / Tim Filer

**CALIFORNIA**

BINGHAM MCCUTCHEN LLP
1900 University Avenue,
East Palo Alto, CA 94303-1212
Tel: (650) 849-4914
Contact: Mary T. Huser

BINGHAM MCCUTCHEN LLP
3 Embarcadero Center,
San Francisco, CA 94111
Tel: (415) 393-2626
Contact: Karen L. Kennard

BINGHAM MCCUTCHEN LLP
355 South Grand Avenue, Suite 4400,
Los Angeles, CA 90071-1560
Tel: (213) 680-6416
Contact: John C. Morrissey

BINGHAM MCCUTCHEN LLP
3 Embarcadero Center,
San Francisco, CA 94111
Tel: (415) 393-2170
Contact: David M. Balabanian

BROBECK, PHLEGER & HARRISON LLP
One Market, Spear St. Tower,
San Francisco, CA 94105
Tel: (415) 442-0900
Contact: Meredith N. Landy / David M. Furbush

BROBECK, PHLEGER & HARRISON LLP
Two Embarcadero Place, 2200 Geng Road
Palo Alto, CA 94303
Tel: (650) 424-0160
Contact: David M. Furbush / Meredith N. Landy

BROBECK, PHLEGER & HARRISON LLP
550 South Hope Street,
Los Angeles, CA 90071
Tel: (213) 489-4060
Contact: Howard M. Privette

BROBECK, PHLEGER & HARRISON LLP
12390 El Camino Real,
San Diego, CA 92130
Tel: (858) 720-2500
Contact: Christopher H. McGrath / William F. Sullivan

CLIFFORD CHANCE ROGERS & WELLS LLP
One Market Steuart Tower, Suite 400,
San Francisco, CA 94105
Tel: (415) 778-4700
Contact: Tower C. Snow / Michael D. Torpey

CLIFFORD CHANCE ROGERS & WELLS LLP
601 South Figueroa Street,
Los Angeles, CA 90017
Tel: (213) 312-9400
Contact: Daniel J. Tyukody

COOLEY GODWARD, LLP
One Maritime Plaza, 20th Floor,
San Francisco, CA 94111
Tel: (415) 693-2073
Contact: Paul A. Renne

COOLEY GODWARD, LLP
One Maritime Plaza, 20th Floor,
San Francisco, CA 94111
Tel: (415) 693-2092
Contact: Benjamin K. Riley

COOLEY GODWARD, LLP
4401 Eastgate Mall,
San Diego, CA 92121-1909
Tel: (858) 550-6050
Contact: William E. Grauer

COOLEY GODWARD, LLP
Five Palo Alto Square,
3000 El Camino Real,
Palo Alto, CA 94306
Tel: (650) 843-5182
Contact: Stephen C. Neal

COOLEY GODWARD, LLP
Five Palo Alto Square,
3000 El Camino Real,
Palo Alto, CA 94306
Tel: (650) 843-5037
Contact: William S. Freeman

**APPENDIX A**
**SECURITIES CLAIMS PANEL COUNSEL LIST**

DAVIS WRIGHT TREMAINE
One Embarcadero Center, Suite 600,
San Francisco, CA 94111-3834
Tel: (415) 276-6500
Contact: Martin Fineman

GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue,
Los Angeles, CA 90071-3197
Tel: (213) 229-7543
Contact: Phillip L. Bosl

GIBSON, DUNN & CRUTCHER LLP
1530 Page Mill Road,
Palo Alto, CA 94304
Tel: (650) 849-5300
Contact: John C. Dickey

GIBSON, DUNN & CRUTCHER LLP
Jamboree Center, 4 Park Plaza,
Irvine, CA 92614-8557
Tel: (949) 451-4108
Contact: Wayne W. Smith

IRELL & MANELLA LLP
1800 Ave. of the Stars, Suite 900,
Los Angeles, CA 90067
Tel: (310) 277-1010
Contact: David Schwartz / David Gindler / David Siegel / James F. Elliot / Jim Adler / Richard H. Borow

MORRISON & FOERSTER LLP
425 Market Street,
San Francisco, CA 94105
Tel: (415) 268-7000
Contact: Melvin R. Goldman / Paul T. Friedman

MORRISON & FOERSTER LLP
555 West 5th Street, Suite 3500,
Los Angeles, CA 90013
Tel: (213) 892-5200
Contact: B. Scott Silverman / Robert S. Stern

MUNGER, TOLLES & OLSON
355 South Grand Avenue, 35th Floor,
Los Angeles, CA 90071-1560
Tel: (213) 683-9264
Contact: Dennis L. Kinnaird

MUNGER, TOLLES & OLSON
355 South Grand Avenue, 35th Floor,
Los Angeles, CA 90071-1560
Tel: (213) 683-9152
Contact: John W. Spiegel

MUNGER, TOLLES & OLSON
355 South Grand Avenue, 35th Floor,
Los Angeles, CA 90071-1560
Tel: (213) 683-9153
Contact: George M. Garvey

O'MELVENY & MYERS LLP
400 South Hope St., 15th Floor,
Los Angeles, CA 90071
Tel: (213) 430-6000
Contact: Robert Vanderet / Seth Aronson

O'MELVENY & MYERS LLP
610 Newport Center, 17th Floor,
Newport Beach, CA 92660
Tel: (714) 760-9600
Contact: Brett J. Williamson / Michael G. Yoder / Phillip Kaplan

O'MELVENY & MYERS LLP
275 Battery Street,
San Francisco, CA 94111
Tel: (415) 984-8700
Contact: Daniel Bookin / Richard Warmer

ORRICK HERRINGTON & SUTCLIFFE LLP
Old Federal Reserve Bank Building,
400 Sansome Street,
San Francisco, CA 94111
Tel: (415) 773-5469
Contact: John H. Kanberg

ORRICK HERRINGTON & SUTCLIFFE LLP
Old Federal Reserve Bank Building,
400 Sansome Street,
San Francisco, CA 94111
Tel: (415) 773-5944
Contact: William F. Alderman

ORRICK HERRINGTON & SUTCLIFFE LLP
1020 Marsh Road,
Menlo Park, CA 94025
Tel: (650) 614-7440
Contact: W. Reece Bader

PAUL, HASTINGS, JANOFSKY & WALKER LLP
555 S. Flower Street, Twenty-Third Floor,
Los Angeles, CA 90071-2371
Tel: (213) 683-6000
Contact: J. Allen Maines

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

PILLSBURY WINTHROP LLP
Pacific Bell Building, 101 W. Broadway, Suite 1800,
San Diego, CA 92101-8219
Tel: (619) 234-5000
Contact: Richard M. Segal

PILLSBURY WINTHROP LLP
2550 Hanover Street,
Palo Alto, CA 94304-1115
Tel: (650) 233-4500
Contact: Walter J. Robinson

PILLSBURY WINTHROP LLP
725 South Figueroa Street, Suite 2800,
Los Angeles, CA 90017-5443
Tel: (213) 488-7100
Contact: Kenneth R. Chiate

PILLSBURY WINTHROP LLP
50 Fremont Street,
San Francisco, CA 94105-2228
Tel: (415) 983-1000
Contact: Bruce A. Ericson / William O. Fisher

SIMPSON THACHER & BARTLETT
3373 Hillview Avenue,
Palo Alto, CA 94304
Tel: (650) 251-5000
Contact: Charles E. Koob / George M. Newcombe / James G. Kreissman

SIMPSON THACHER & BARTLETT
10 Universal City Plaza, Suite 1850,
Los Angeles, CA 91608
Tel: (818) 755-7000
Contact: Seth A. Ribner

SULLIVAN & CROMWELL
1888 Century Park East,
Los Angeles, CA 90067-1725
Tel: (310) 712-6600
Contact: Robert A. Sacks

WILSON, SONSINI, GOODRICH & ROSATI
650 Page Mill Road,
Palo Alto, CA 94304-1050
Tel: (650) 493-9300
Contact: Bruce G. Vanyo / Boris Feldman / Steven M. Schatz

COLORADO

COOLEY GODWARD, LLP
380 Interlocken Crescent, Suite 900,
Broomfield, CO 80021-8023
Tel: (720) 566-4000
Contact: James E. Nesland

DISTRICT OF COLUMBIA

ARNOLD & PORTER
555 Twelfth Street, NW,
Washington, DC 20004-1202
Tel: (202) 942-5672
Contact: Scott B. Schreiber

CAHILL GORDON & REINDEL
1990 K Street, N.W., Suite 950,
Washington, DC 20006
Tel: (202) 862-8900
Contact: Donald J. Mulvihill

GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.,
Washington, DC 20036-5306
Tel: (202) 887-3609
Contact: F. Joseph Warin

GREENBERG TRAURIG
800 Connecticut Avenue, N.W., Suite 500,
Washington, DC 20036
Tel: (202) 331-3100
Contact: C. Allen Foster / Eric C. Rowe / Joe R. Reeder

PATTON BOGGS LLP
2550 M Street, N.W.,
Washington, DC 20037
Tel: (202) 457-6000
Contact: Eric A. Kuwana / Lanny J. Davis / Ronald S. Liebman

SULLIVAN & CROMWELL
1701 Pennsylvania Avenue, N.W.,
Washington, DC 20006-5805
Tel: (202) 956-7500
Contact: Daryl A. Libow / Margaret K. Pfeiffer

WILLKIE FARR & GALLAGHER
Three Lafayette Centre,
1155 21st Street, NW
Washington, DC 20036-3384
Tel: (202) 328-8000
Contact: Kevin B. Clark

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

WILMER, CUTLER & PICKERING
2445 M Street, N.W.,
Washington, DC 20037
Tel: (202) 663-6000
Contact: Charles A. Davidow / David P. Donovan

**DELAWARE**

BLANK ROME COMISKY & MCCAULEY LLP
1201 Market Street, 21st Floor,
Wilmington, DE 19801
Tel: (302) 425-6400
Contact: Alan J. Hoffman / Cathy L. Reese / Ian Comisky

WOLF, BLOCK, SCHORR AND SOLIS-COHEN LLP
One Rodney Square, Suite 300,
920 King Street,
Wilmington, DE 19801-3319
Tel: (302) 777-5860
Contact: David J. Margules

**FLORIDA**

AKERMAN SENTERFITT & EIDSON, P.A.
Citrus Center, 17th Floor,
255 South Orange Avenue,
Orlando, FL 32801
Tel: (407) 843-7860
Contact: J. Thomas Cardwell

AKERMAN SENTERFITT & EIDSON, P.A.
SunTrust International Center, 28th Floor,
Miami, FL 33131
Tel: (305) 374-5600
Contact: Stanley H. Wakshlag

CARLTON FIELDS
4000 International Place,
100 S.E. Second Street,
Miami, FL 33131-9101
Tel: (303) 530-0050
Contact: Steven J. Brodie

CARLTON FIELDS
One Harbour Place,
Tampa, FL 33602-5790
Tel: (813) 223-7000
Contact: Richard A. Denmon

GREENBERG TRAURIG
1221 Brickell Avenue,
Miami, FL 33131
Tel: (305) 579-0500
Contact: Hilarie Bass

GREENBERG TRAURIG
777 South Flagler Drive,
West Palm Beach, FL 33401
Tel: (561) 650-7900
Contact: Mark F Bideau

GREENBERG TRAURIG
111 North Orange Avenue,
Orlando, FL 32801
Tel: (407) 420-1000
Contact: Tucker H Byrd

GREENBERG TRAURIG
101 East College Avenue,
Post Office Drawer 1838
Tallahassee, FL 32302
Tel: (850) 222-6891
Contact: Barry Richard

HOLLAND & KNIGHT LLP
315 South Calhoun Street, Suite 600,
P.O. Drawer 810 (Zip 32302),
Tallahassee, FL 32301
Tel: (850) 224-7000
Contact: Robert R. Feagin / Elizabeth Bevington

HOLLAND & KNIGHT LLP
625 North Flagler Drive, Suite 700,
West Palm Beach, FL 33401
Tel: (561) 833-2000
Contact: D. Culver (Skip) Smith

HOLLAND & KNIGHT LLP
200 South Orange Avenue, Suite 2600,
P.O. Box 1526 (Zip 32802),
Orlando, FL 32801
Tel: (407) 244-1115
Contact: William Wilson

HOLLAND & KNIGHT LLP
701 Brickell Avenue - Suite 3000,
P.O. Box 015441 (Zip 33101),
Miami, FL 33131
Tel: (305) 374-8500
Contact: Greg Baldwin / Tracy A. Nichols

HOLLAND & KNIGHT LLP
400 North Ashley Drive, Suite 2300,
Tampa, FL 33602
Tel: (813) 227-8500
Contact: Francis Curran / Frederick S. Schrils / G. Calvin Hayes

**APPENDIX A**
**SECURITIES CLAIMS PANEL COUNSEL LIST**

HOLLAND & KNIGHT LLP
50 North Laura Street, Suite 3900,
P.O. Box 52687 (Zip 32201),
Jacksonville, FL 32202
Tel: (904) 353-2000
Contact: Fred Lotterhos / George E Schulz Jr / Michael G. Tanner

MCGUIREWOODS LLP
Bank of America Tower,
50 North Laura Street, Suite 3300,
Jacksonville, FL 32202-3661
Tel: (904) 798-2693
Contact: David M. Wells

STEEL HECTOR & DAVIS LLP
200 South Biscayne Boulevard,
Miami, FL 33131-2398
Tel: (305) 577-2957
Contact: Lewis F. Murphy, P.A. / Wendy Leavitt

STROOCK & STROOCK & LAVAN LLP
200 South Biscayne Boulevard, Suite,
Miami, FL 33131-2385
Tel: (305) 358-9900
Contact: Richard B. Simring / Robert W. Turken

**GEORGIA**

ALSTON & BIRD
One Atlantic Center,
1201 W. Peachtree Street,
Atlanta, GA 30309-3424
Tel: (404) 881-7343
Contact: Peter Q. Bassett

ALSTON & BIRD
One Atlantic Center,
1201 W. Peachtree St.,
Atlanta, GA 30309
Tel: (404) 881-7000
Contact: John Goselin / Mary Gill / Todd R. David

KING & SPALDING
191 Peachtree Street,
Atlanta, GA 30303-1763
Tel: (404) 572-4600
Contact: M. Robert Thornton / Michael R. Smith

PAUL, HASTINGS, JANOFSKY & WALKER LLP
600 Peachtree Street, N.W., Suite 2400,
Atlanta, GA 30308-2222
Tel: (404) 815-2500
Contact: J. Allen Maines

SMITH, GAMBRELL & RUSSELL, LLP
Suite 3100, Promenade II,
1230 Peachtree Rd., N.E.,
Atlanta, GA 30309-3592
Tel: (404) 815-3730
Contact: John G. Despriet

**ILLINOIS**

KATTEN MUCHIN ZAVIS ROSENMAN
525 W. Monroe Street, Suite 1600,
Chicago, IL 60661-3693
Tel: (312) 902-5452
Contact: David H. Kistenbroker

KATTEN MUCHIN ZAVIS ROSENMAN
525 W. Monroe Street, Suite 1600,
Chicago, IL 60661-3693
Tel: (312) 902-5200
Contact: Pamela G. Smith / Leah J. Domitrovic / Steven L. Bashwiner / Mary Ellen Hennessy / Bonita L. Stone

KIRKLAND & ELLIS
200 East Randolph Drive,
Chicago, IL 60601
Tel: (312) 861-2000
Contact: Garrett B. Johnson / Robert J. Kopecky

SIDLEY AUSTIN BROWN & WOOD LLP
Bank One Plaza,
10 South Dearborn Street,
Chicago, IL 60603
Tel: (312) 853-7850
Contact: Hillie R. Sheppard

SIDLEY AUSTIN BROWN & WOOD LLP
Bank One Plaza,
10 South Dearborn Street,
Chicago, IL 60603
Tel: (312) 853-7279
Contact: Eugene A. Schoon

SIDLEY AUSTIN BROWN & WOOD LLP
Bank One Plaza,
10 South Dearborn Street,
Chicago, IL 60603
Tel: (312) 853-7734
Contact: Walter C. Carlson

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

SONNENSCHEIN NATH & ROSENTHAL
8000 Sears Tower,
Chicago, IL 60606
Tel: (312) 876-8224
Contact: Christopher Q. King

SONNENSCHEIN NATH & ROSENTHAL
8000 Sears Tower,
Chicago, IL 60606
Tel: (312) 876-7483
Contact: David L. Schiavone

**LOUISIANA**

LOCKE LIDDELL & SAPP LLP
601 Poydras Street, Suite 2400,
New Orleans, LA 70130-6036
Tel: (504) 558-5100
Contact: Brad Foster / John McElhaney / Morris Harrell / Peter Flynn

**MASSACHUSETTS**

HALE & DORR LLP
60 State Street,
Boston, MA 02109
Tel: (617) 526-6000
Contact: James W. Prendergast / Jeffrey B. Rudman / John F. Batter

HUTCHINS, WHEELER & DITTMAR P.C.
101 Federal Street,
Boston, MA 02110
Tel: (617) 951-6824
Contact: David S. Rosenthal / John Hughes

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.
One Financial Center,
Boston, MA 02111
Tel: (617) 542-6000
Contact: Patrick J. Sharkey / Peter M. Saparoff

ROPES & GRAY
One International Place,
Boston, MA 02110-2624
Tel: (617) 951-7566
Contact: John D. Donovan

TESTA, HURWITZ & THIBEAULT, LLP
125 High Street,
Boston, MA 02110
Tel: (617) 248-7363
Contact: Jordan D. Hershman

TESTA, HURWITZ & THIBEAULT, LLP
125 High Street,
Boston, MA 02110
Tel: (617) 248-7253
Contact: Brian E. Pastuszenski

**MINNESOTA**

DORSEY & WHITNEY LLP
Pillsbury Center South,
220 South Sixth Street,
Minneapolis, MN 55402
Tel: (612) 340-2600
Contact: Brian E. Palmer / Edward J. Pluimer / J. Jackson / Peter W. Carter / Roger J. Magnuson

FAEGRE & BENSON LLP
90 South Seventh Street,
Minneapolis, MN 55402-3901
Tel: (612) 336-3000
Contact: Robert L. Schnell / Thomas L. Kimer

WINTHROP & WEINSTINE, PA
3000 Dain Rauscher Plaza,
60 South Sixth Street,
Minneapolis, MN 55402
Tel: (612) 347-0700
Contact: David P. Pearson / Steven C. Tourek / Thomas H. Boyd

**NEW YORK**

ARNOLD & PORTER
399 Park Avenue,
New York, NY 10022-4690
Tel: (212) 715-1000
Contact: Kent A. Yalowitz / Scott B. Schreiber

BLANK ROME TENZER GREENBLATT LLP
The Chrysler Building,
405 Lexington Avenue,
New York, NY 10174
Tel: (212) 885-5000
Contact: Robert J. Mittman / Harris N. Cogan

BROBECK, PHLEGER & HARRISON LLP
1633 Broadway, 47th Floor,
New York, NY 10019
Tel: (212) 581-1600
Contact: Francis S. Chlapowski / Gregory A. Markel

**APPENDIX A**

**SECURITIES CLAIMS PANEL COUNSEL LIST**

CADWALADER, WICKERSHAM & TAFT
100 Maiden Lane,
New York, NY 10038
Tel: (212) 504-6000
Contact: Dennis J. Block / Howard R. Hawkins / Jeffrey Q. Smith / Jonathan M. Hoff

CAHILL GORDON & REINDEL
Eighty Pine Street,
New York, NY 10005
Tel: (212) 701-3000
Contact: Charles A. Gilman / Immanuel Kohn / Thomas J. Kavaler

CLIFFORD CHANCE ROGERS & WELLS LLP
200 Park Avenue,
New York, NY 10166
Tel: (212) 878-8000
Contact: James B. Weidner / James N. Benedict / John K. Carroll / Mark Pomerantz / Mark Holland

CRAVATH, SWAINE & MOORE
Worldwide Plaza,
825 Eighth Avenue,
New York, NY 10019-7475
Tel: (212) 474-1000
Contact: Evan R. Chesler / Francis P. Barron / Julie A. North / Keith R. Hummel / Paul C. Saunders / Peter T. Barbur / Richard W. Clary / Robert H. Baron / Ronald S. Rolfe / Rory O. Millson / Thomas G. Rafferty

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON
One New York Plaza,
New York, NY 10004
Tel: (212) 859-8000
Contact: John A. Borek / Sheldon Raab

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue,
New York, NY 10166-0193
Tel: (212) 351-4000
Contact: David Grais / Wesley G. Howell / Peter Beshar

GREENBERG TRAURIG
MetLife Building 200 Park Avenue,
New York, NY 10166
Tel: (212) 801-9200
Contact: Alan Mansfield / Marshall H. Fishman

KATTEN MUCHIN ZAVIS ROSENMAN
575 Madison Avenue,
New York, NY 10022
Tel: (212) 940-8800
Contact: David Kistenbroker, Robert W. Gottlieb and Joel W. Sternman.

KAYE, SCHOLER, FIERMAN, HAYS & HANDLER
425 Park Avenue,
New York, NY 10022
Tel: (212) 836-8663
Contact: Fredric W. Yerman

KIRKLAND & ELLIS
Citicorp Center, 153 East 53rd Street,
New York, NY 10022-4675
Tel: (212) 446-4800
Contact: Frank M. Holozubiec / Yosef J. Riemer

KRAMER LEVIN NAFTALIS & FRANKEL LLP
919 Third Avenue,
New York, NY 10022
Tel: (212) 715-9100
Contact: Gary P. Naftalis / Alan Friedman

MAYER, BROWN ROWE & MAW
1675 Broadway,
New York, NY 10019
Tel: (212) 506-2500
Contact: Dennis P. Orr / Richard A. Spehr / Steven Wolowitz

MILBANK, TWEED, HADLEY & MCCLOY
1 Chase Manhattan Plaza,
New York, NY 10005
Tel: (212) 530-5832
Contact: Michael L. Hirschfeld

MILBANK, TWEED, HADLEY & MCCLOY
1 Chase Manhattan Plaza,
New York, NY 10005
Tel: (212) 530-5149
Contact: Scott A. Edelman

MORRISON & FOERSTER LLP
1290 Avenue of the Americas,
New York, NY 10104
Tel: (212) 468-8000
Contact: Anthony M. Radice / Jack C. Auspitz

PAUL, HASTINGS, JANOFSKY & WALKER LLP
399 Park Avenue, Thirty-First Floor,
New York, NY 10022-4697
Tel: (212) 318-6000
Contact: J. Allen Maines

**APPENDIX A**
**SECURITIES CLAIMS PANEL COUNSEL LIST**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON
1285 Avenue of the Americas,
New York, NY 10019-6064
Tel: (212) 373-3000
Contact: Daniel J. Beller / Martin Flumenbaum / Claudia Hammerman / Brad S. Karp / Mark F. Pomerantz / Daniel J. Kramer / Richard A. Rosen

SCHULTE ROTH & ZABEL LLP
900 Third Avenue,
New York, NY 10022
Tel: (212) 756-2000
Contact: Betty Santangelo / Howard O. Godnick / Irwin J. Sugarman / Michael S. Feldberg / Robert M. Abrahams

SIMPSON THACHER & BARTLETT
425 Lexington Avenue,
New York, NY 10017
Tel: (212) 455-2000
Contact: Bruce D. Angiolillo / George M. Newcombe / Michael J. Chepiga / Paul C. Curnin / Peter Kazanoff / Roy L. Reardon

STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane,
New York, NY 10038
Tel: (212) 806-5400
Contact: Laurence Greenwald / Melvin A. Brosterman / Robert Lewin

SULLIVAN & CROMWELL
125 Broad Street,
New York, NY 10004-2498
Tel: (212) 558-4000
Contact: D. Stuart Meiklejohn / Gandolfo V. DiBlasi / John L. Hardiman / John L. Warden / Philip L. Graham, Jr. / Richard H. Klapper

WACHTELL, LIPTON, ROSEN & KATZ
51 W. 52nd Street, 29th Floor,
New York, NY 10019
Tel: (212) 403-1235
Contact: John F. Savarese

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue,
New York, NY 10153
Tel: (212) 310-8000
Contact: Greg A. Danilow / Irwin H. Warren / Joseph Allerhand

WILLKIE FARR & GALLAGHER
787 Seventh Avenue,
New York, NY 10019-6099
Tel: (212) 728-8000
Contact: David L. Foster / Michael R. Young / Richard L. Posen

WILMER, CUTLER & PICKERING
520 Madison Ave.,
New York, NY 10022
Tel: (212) 230-8800
Contact: Peter Vigeland / Robert B. McCaw

**OHIO**

JONES, DAY, REAVIS & POGUE
North Point, 901 Lakeside Avenue,
Cleveland, OH 44114
Tel: (216) 586-3939
Contact: John M. Newman / John W. Edwards

**OREGON**

DAVIS WRIGHT TREMAINE
2300 First Interstate Tower,
1300 S.W. Fifth Avenue,
Portland, OR 97201
Tel: (503) 241-2300
Contact: John F. McGrory

FOSTER PEPPER & SHEFELMAN
101 S.W. Main Street, 15th Floor,
Portland, OR 97204-3223
Tel: (503) 221-0607
Contact: Peter S. Ehrlichman / Stellman Keehnel / Tim Filer

LANE POWELL SPEARS LUBERSKY LLP
601 S.W. Second Avenue, Suite 2100,
Portland, OR 97204
Tel: (503) 778-2100
Contact: D. Meredith Wilson / Milo Petranovich / Robert E. Maloney

**PENNSYLVANIA**

BLANK ROME COMISKY & MCCAULEY LLP
One Logan Square,
Philadelphia, PA 19103-6998
Tel: (215) 569-5500
Contact: Alan J. Hoffman / Alan M. Lieberman / Alexander D. Bono / Ian Comisky / Laurence S. Shtasel / Matthew J. Siembieda / Richard P. McElroy

APPENDIX A
SECURITIES CLAIMS PANEL COUNSEL LIST

BUCHANAN INGERSOLL, PC
One Oxford Centre, 20th Floor,
301 Grant Street,
Pittsburgh, PA 15219-8800
Tel: (412) 562-1880
Contact: John R. Leathers

MORGAN, LEWIS & BOCKIUS
1701 Market Street,
Philadelphia, PA 19103-2921
Tel: (215) 963-5000
Contact: Marc J. Sonnenfeld / Elizabeth Hoop Fay / Lisa Klein Wager / The Hon. Alfred J. (Jim) Lechner / Stuart Sarnoff / Keith Olin

PEPPER HAMILTON LLP
3000 Two Logan Square, Eighteenth and Arch Streets,
Philadelphia, PA 19103-2799
Tel: (215) 981-4000
Contact: Barbara W. Mather / Jon A. Baughman / Laurence Z. Shiekman / M. Duncan Grant / Robert L. Hickok / Thomas E. Zemaitis

WOLF, BLOCK, SCHORR and SOLIS-COHEN LLP
1650 Arch Street, 22nd Floor,
Philadelphia, PA 19103-2097
Tel: (215) 977-2058
Contact: Ian A.L. Strogatz / Jay A. Dubow / Jerome J. Shestack / M. Norman Goldberger / Mark L. Alderman

TEXAS

AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.
Pennzoil Place - South Tower, 711 Louisiana Street, Suite 1900,
Houston, TX 77002
Tel: (713) 220-5800
Contact: Charlie Moore / Paula Hinton

AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.
1700 Pacific Avenue, Suite 4100,
Dallas, TX 75201-4675
Tel: (214) 969-2800
Contact: Edward S. Koppman / Mike Lowenberg

BROBECK, PHLEGER & HARRISON LLP
4801 Plaza on the Lake,
Austin, TX 78746
Tel: (512) 330-4070
Contact: Paul R. Bessette

FULBRIGHT & JAWORSKI L.L.P
1301 McKinney, Suite 5100,
Houston, TX 77010
Tel: (713) 651-5151
Contact: Frank G. Jones / Richard N. Carrell / Robert Harrell

FULBRIGHT & JAWORSKI L.L.P
2200 Ross Avenue, Suite 2800,
Dallas, TX 75201
Tel: (214) 855-8000
Contact: Karl G. Dial

JENKENS & GILCHRIST, P.C.
1100 Louisiana, Suite 1800,
Houston, TX 77002
Tel: (713) 951-3300
Contact: John Gilliam

JENKENS & GILCHRIST, P.C.
1445 Ross Avenue Suite 3200,
Dallas, TX 75202
Tel: (214) 855-4308
Contact: John Gilliam

LOCKE LIDDELL & SAPP LLP
100 Congress Avenue, Suite 300,
Austin, TX 78701-4042
Tel: (512) 305-4700
Contact: Brad Foster / John McElhaney / Morris Harrell / Peter Flynn

LOCKE LIDDELL & SAPP LLP
2200 Ross Avenue, Suite 2200,
Dallas, TX 75201-6776
Tel: (214) 740-8000
Contact: Brad Foster / John McElhaney / Morris Harrell / Peter Flynn

LOCKE LIDDELL & SAPP LLP
600 Travis, 3400 Chase Tower,
Houston, TX 77002
Tel: (713) 226-1200
Contact: Brad Foster / John McElhaney / Morris Harrell / Peter Flynn

**APPENDIX A**

**SECURITIES CLAIMS PANEL COUNSEL LIST**

THOMPSON & KNIGHT, PC
Burnett Plaza, Suite 1600,
801 Cherry Street, Unit #1,
Fort Worth, TX 76102-6881
Tel: (817) 347-1700
Contact: Timothy R. McCormick

THOMPSON & KNIGHT, PC
1200 Smith Street, Suite 3600,
Houston, TX 77002
Tel: (713) 654-8111
Contact: Timothy R. McCormick

THOMPSON & KNIGHT, PC
1700 Pacific Avenue, Suite 3300,
Dallas, TX 75201
Tel: (214) 969-1103
Contact: Timothy R. McCormick

THOMPSON & KNIGHT, PC
98 San Jacinto Boulevard, Suite 1200,
Austin, TX 78701
Tel: (512) 469-6100
Contact: Timothy R. McCormick

WILSON, SONSINI, GOODRICH & ROSATI
8911 Capital of Texas Highway, North
Westech 360, Suite 3350,
Austin, TX 78759-7247
Tel: (512) 338-5499
Contact: Bruce G. Vanyo / Paul Tobias

**VIRGINIA**

COOLEY GODWARD, LLP
One Freedom Square, Reston Town
Center, 11951 Freedom Drive,
Reston, VA 20190-5601
Tel: (703) 456-8082
Contact: Robert R. Vieth

GREENBERG TRAURIG
1750 Tysons Boulevard 12th Fl.,
McLean, VA 22102
Tel: (703) 749-1300
Contact: Harry M. Glazer / Joseph T.
Casey, Jr.

MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800,
McLean, VA 22102-4215
Tel: (703) 712-5371
Contact: Warren E. Zirkle

MCGUIREWOODS LLP
One James Center, 901 East Cary Street,
Richmond, VA 23219-4030
Tel: (804) 775-1000
Contact: Stephen D. Busch / Anne Marie
Whittemore

WILMER, CUTLER & PICKERING
1600 Tysons Boulevard, 10th Floor,
Tysons Corner, VA 22102
Tel: (703) 251-9700
Contact: David P. Donovan

WILSON, SONSINI, GOODRICH & ROSATI
7927 Jones Branch Drive, Suite 400,
McLean, VA 22102
Tel: (703) 734-3100
Contact: Michele E. Rose / Laurie B.
Smilan

**WASHINGTON**

DAVIS WRIGHT TREMAINE
2600 Century Square, 1501 Fourth Avenue,
Seattle, WA 98101-1688
Tel: (206) 622-3150
Contact: Stephen M. Rummage

DAVIS WRIGHT TREMAINE
2600 Century Square, 1501 Fourth Avenue,
Seattle, WA 98101-1688
Tel: (206) 622-3150
Contact: Ladd B. Leavens

FOSTER PEPPER & SHEFELMAN
1111 Third Avenue, Suite 3400,
Seattle, WA 98101-3299
Tel: (206) 447-8998
Contact: Peter S. Ehrlichman / Stellman
Keehnel / Tim Filer

LANE POWELL SPEARS LUBERSKY LLP
1420 Fifth Avenue, Suite 4100,
Seattle, WA 98101-2338
Tel: (206) 223-7000
Contact: Christopher B. Wells / James B.
Stoetzer / James L. Robart / Larry S.
Gangnes / Rudy A. Englund

PERKINS COIE LLP
1201 Third Avenue, Ste. 4800,
Seattle, WA 98101-3099
Tel: (206) 583-8888
Contact: Barry M. Kaplan / Harry H.
Schneider / Ronald L. Berenstain

# APPENDIX A
# EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

**ALABAMA**

LLOYD GRAY & WHITEHEAD
Two Perimeter Park South
Suite 100
Birmingham, AL 35423
Tel: (205) 967-8822
Contact: Steven E. Whitehead, Esq.
**Class Action Approved*

LUTHER OLDENBURG & RAINEY
63 S. Royal Street
Mobile, AL
Tel: (334) 433-8088
Contact: Rudene C. Oldenburg, Esq.

**ALASKA**

LANE POWELL SPEARS LUBERSKY LLP
420 L Street
Suite 300
Anchorage, AK 99501-1937
Tel: (206) 223-7019
Contact: James B. Stoetzer, Esq.
**Class Action Approved*

**ARIZONA**

GOODWIN RAUP PC
One Columbus Plaza
Suite 1200
Phoenix, AZ 85012-1942
Tel: (602) 650-2000
Contact: Calvin Raup
**Class Action Approved*

CAMPBELL YOST
234 North Central Avenue
Suite 600
Phoenix, AZ 85004
Tel: (602) 322-1600
Contact: Martin P. Clare, Esq.
**Class Action Approved*

**ARKANSAS**

HUCKABAY MUNSON ROWLETT & TILLEY
1900 West Capital Avenue
Suite 1900
Little Rock, AR 72201
Tel: (501) 374-6535
Contact: Bruce Munson, Esq.
**Class Action Approved*

**CALIFORNIA**

EPSTEIN BECKER & GREEN PC
Two Embarcadero Center
Suite 1650
San Francisco, CA 94111
Tel: (415) 398-3500
Contact: Ron Souza, Esq
**Class Action Approved*

IRELL & MANELLA
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067-4276
Tel: (310) 277-1010
Contact: James F. Elliot, Esq.
**Class Action Approved*

JACKSON LEWIS SCHNITZLER & KRUPMAN
1888 Century Park East
Suite 1600
Los Angeles, CA 90067
Tel: (310) 203-0200
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
**Class Action Approved-All Locations*

1215 K Street, Suite 1800
Sacramento, CA 95814
Tel: (916) 341-0404
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.

199 Freemont Street, 10th Floor
San Francisco, CA 94105
Tel: (415) 394-9400
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.

KUTAK ROCK
117 E. Colorado Avenue
Suite 210
Pasadena, CA 91105
Tel: (626) 432-1630
Contact: Gregory Hurley, Esq.

LEWIS D'AMATO BRISBOIS & BISGAARD LLP
221 N. Figueroa Street, Suite 1200
Los Angeles, CA 90012
Tel: (213) 500-1800
Contact: Robert F. Lewis, Esq. & Gary S. Rattet, Esq.

# APPENDIX A
# EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

One Sansome Street, Suite 1900
San Francisco, CA 94104
Tel: (415) 362-2580
Contact: Duane C. Musfelt, Esq.

550 West C Street, Suite 800
San Diego, CA 92101
Tel: (619) 233-1006
Contact: R. Gaylord Smith, Esq.

650 Town Center Drive, Suite 1400
Costa Mesa, CA 92626
Tel: (714) 545-9200
Contact: Mercedes Cruz, Esq.

Suite 600, 650 East Hospitality La
Tel: (909) 387-1130
Contact: Joseph Arias, Esq.

2500 Venture Oaks Way, Suite 200
Sacramento, CA 95833

**COLORADO**

KUTAK ROCK
717 Seventeenth Street
Suite 2800
Denver, CO 80202
Tel: (303) 297-2400
Tel: (626) 432-1630
Contact: Gregory Hurley, Esq.

SHERMAN & HOWARD
633 17th Street
Suite 3000
Denver, CO 80202
Tel: (303) 297-2900
Contact: Andrew Bolin, Esq.

PATTON BOGGS
1660 Lincoln Street
Suite 1900
Denver, CO 80264

Contact: David L. Cohen, Esq

O'MELVENY & MYERS LLP
610 Newport Center Driver
Newport Beach, CA 92660
Tel: (714) 760-9600
Contact: Stephen P. Page, Esq.
*Class Action Approved-All Locations*

Embarcadero Center West
275 Battery Street
San Francisco, CA 94111-3305
Tel: (415) 984-8700
Contact: Douglas Dexter, Esq.

400 South Hope Street
15th Floor
Los Angeles, CA 90071-2899
Tel: (213) 430-6000
Contact: Gordon E. Krischer, Esq.

WILSON ELSER MOSKOWITZ
EDELMAN & DICKER
1055 West Seventh Street
Los Angeles, CA 90017

Contact: Timothy D. Kraus,

**CONNECTICUT**

EPSTEIN BECKER & GREEN
One Landmark Plaza
Suite 1800
Stamford, CT 06901-2601
Tel: (212) 351-4500
Contact: Howard Pianko, Es
*Class Action Approved*

JACKSON LEWIS SCHNITZLE
KRUPMAN
55 Farmington Avenue
Suite 1200
Hartford, CT 06105
Tel: (860) 522-0404
Tel: (914) 328-0404
Contact: Steven Baderian, E
*Class Action Approved-All Loc*

177 Broad Street
Post Office Box 251
Stamford, CT 06904-0251

CASE NO. 08 cv 4842

ATTACHMENT NO. 1

EXHIBIT

TAB (DESCRIPTION)

# APPENDIX A
# EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

## DELAWARE

WOLF BLOCK SCHORR & SOLIS-COHEN
One Rodney Square
10th & King Street
Wilmington, DE 19801
Tel: (302) 777-5860
Contact: Barry M. Klayman, Esq.
*Class Action Approved*

GREENBERG TRAURIG
The Brandy Wine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Tel: (302) 661-7000
(302) 661-1804

## DISTRICT OF COLUMBIA

DRINKER BIDDLE PITNEY HARDEN
1500 K Street, N.W.
Suite 110
Washington, DC 20005
Tel: (202) 842-8857
Contact: Jennifer Smith, Esq.

PATTON BOGGS LLP
2550 M Street, N.W.
Washington, DC 20037
Tel: (202) 457-6000
Contact: Douglas B. Mishkin, Esq. or
Sally D. Garr, Esq.
*Class Action Approved*

JACKSON LEWIS SCHNITZLER & KRUPMAN
13501 I Street, NW
Suite 510
Washington, DC 20005
Tel: (202) 347-5200
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved*

WILSON ELSER MOSKOWITZ EDELMAN & DICKER
1341 G. Street NW
Washington, DC 20005
Tel: (202) 626-7660
Contact: Paul D. Krausse, Esq.
Robert B. Wallace, Esq.
*Class Action Approved*

JORDON COYNE & SAVITS, LLP
1100 Connecticut Avenue, NW
Washington, DC 20036
Tel: (202) 496-2810
Contact: Deborah Murrell Whelihan, Esq.
*Class Action Approved*

FORD & HARRISON
1300 19th Street NW
Suite 700
Washington, DC 20036
Tel: (202) 719-2012
(202) 719-2000
Contact: David Rosenberg, Esq.

GREENBERG TRAURIG
800 Connecticut Avenue, NW Ste 500
Washington, DC 20036
Tel: (202) 331-3100
Contacts: C. Allen Foster, Esq., Eric C. Rowe, Esq., & Joe Reeder, Esq.
*Class Action Approved*

## FLORIDA

AKERMAN SENTERFITT
Suntrust International Center
One Southeast 3rd Ave, 28th FL
Miami, FL 33131-1714
Tel: (305) 982-5543
Contact: Michael Marsh, Esq.
*Class Action Approved*

JACKSON LEWIS SCHNITZLER & KRUPMAN
First Union Financial Center
200 South Biscayne Boulevard
Suite 2600
Miami, FL 33131
Tel: (305) 577-7600
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved-All Locations*

390 North Orange Avenue
Suite 1285
Orlando, FL 32801-1641
Tel: (407) 246-8440
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.

# APPENDIX A
# EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

VERNIS & BOWLING
517 Northlake Blvd
North Palm Beach, FL 33408
Tel: (561) 845-8781
Contact: G. Jeffrey Vernis, Esq.

CARLTON FIELDS WARD EMMANUAL SMITH & CUTLER PA
100 S.E. 2nd Street
Suite 4000
Miami, FL 33131
Tel: (305) 539-7225
Contact: Nancy H. Henry, Esq.

KUBICKI DRAPER
25 West Flagler Street Penthouse
Miami, Florida 33130
Tel: (305) 374-1212
Contact: Gene Kubicki
**Class Action Approved*

GREENBERG TRAURIG
515 East Las Olas Boulevard
Ft. Lauderdale, FL 33301
Tel: (954) 765-0500
Contact: Frank Scruggs, Esq.
**Class Action Approved-All Locations*

1221 Brickell Avenue
Miami, FL 33131
Tel: (305) 579-0500
Contact: Ron Rosengarten, Esq.

KATZ BARRON SQUITERO FAUST
2699 So. Bayshore Drive
7th Floor
Miami, FL 33133-5408
Tel: (305) 856-2444
Contact: Todd Boyd, Esq.

## GEORGIA

ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
Tel: (404) 881-7000
Contact: Peter O. Bassett, Esq. or Robert P. Riordan, Esq.
**Class Action Approved*

FISHER & PHILLIPS LLP
1500 Resurgens Plaza
945 East Paces Ferry Road
Atlanta, GA 30326
Tel: (404) 240-4235
Contact: D. Albert Brannen, Esq. or Ilene W. Berman, Esq.

JACKSON LEWIS SCHNITZLER & KRUPMAN
1900 Marquis One Tower
245 Peachtree Center Avenue, NE
Atlanta, GA 30303-1226
Tel: (404) 525-8200
Tel: (202) 328-0404
Contact: Steven D. Baderian, Esq.
**Class Action Approved*

LONG ALDRIDGE & NORMAN
One Peachtree Center
5300
Atlanta, GA 30308
Tel: (404) 527-8312
Contact: Phillip A. Bradley, Esq.

## HAWAII

LOVE YAMAMOTO & MOTOOKA
1000 Bishop Street
Honolulu, HI 96813
Tel: (808) 532-7900
Contact: Chad Love, Esq.
**Class Action Approved*

## IDAHO

QUANE SMITH LLP
US Bank Plaza, Suite 1600
101 South Capital Blvd
Boise, ID 83702
Tel: (208) 345-0960
Contact: Jeremiah A. Quane, Esq.
**Class Action Approved*

## ILLINOIS

CLAUSEN MILLER PC
10 South La Salle Street
Suite 1600
Chicago, IL 60603-1098
Tel: (312) 855-1010
Contact: James S. Barber, Esq. or James Nolan, Esq.

**APPENDIX A**
**EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL**

FREEBORN & PETERS
311 South Wacker Drive
Suite 3000
Chicago, IL 60606-6677
Tel: (312) 360-6000
Contact: David H. Kistenbroker, Esq. or
Steven M. Hartmann, Esq.

JACKSON LEWIS SCHNITZLER & KRUPMAN
320 West Ohio Street
Suite 500
Chicago, IL 60610
Tel: (312) 787-4949
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
**Class Action Approved*

SIDLEY & AUSTIN
One First National Plaza
Chicago, IL 60603
Tel: (312) 853-7000
Contact: James S. Whitehead, Esq.,
Julie O. Allen, Esq., Lawrence
Lawrence I. Kipperman, Esq.,
Thomas A. Roberts, Esq.
**Class Action Approved*

SONNENSCHEIN NATH & ROSENTHAL
800 Sears Towers
Chicago, IL 60601-1692
Tel: (312) 876-3112
Contact: Roger T. Brice, Esq.
**Class Action Approved*

VEDDER PRICE KAUFMAN & KAMMHOLZ
222 N. La Salle Street
Chicago, IL 60601-1003
Tel: (312) 609-7745
Contact: Barry Hartstein, Esq.
**Class Action Approved*

**INDIANA**

KIGHTLINGER & GRAY
Market Square Center, Suite 660
151 North Delaware
Tel: (317) 638-4521
Contact: Donald L. Dawson, Esq.
**Class Action Approved*

**IOWA**

NYEMASTER GOODE VOIGTS WEST HANSELL & O'BRIEN
700 Walnut Street
Des Moines, IA 50309
Tel: (515) 283-3100
Contact: Hayward Draper, Esq.
**Class Action Approved*

**KENTUCKY**

BOEHL STOPHER & GRAVES
400 West Market Street
Suite 2300
Louisville, KY 40222
Tel: (502) 589-5980
Contact: Ed Stopher, Esq.
**Class Action Approved*

HARLIN, PACKER ALCOTT & SHOULDOIN
519 East Tenth Street
PO Box 390
Bowling Green, KY 42102-0390
Tel: (270) 842-5611
Contact: William J. Parker, Esq.
**Class Action Approved*

**LOUISIANA**

ADAMS & REESE
4500 One Shell Square
New Orleans, LA 70139
Tel: (504) 581-3234
Contact: Janis VanMeerveld, Esq.
**Class Action Approved*

DEUTSCH KERRIGAN & STILES LLP
755 Magazine Street
New Orleans, LA 70130
Tel: (504) 581-5141
Contact: Ellis B. Muorv, Esq.

LOCKE LIDDLE & SAPP LLP
Pan American Life Center
601 Poydras Street, Suite 2400
New Orleans, LA 70130-6036
Tel: (504) 558-5106
Contact: Amelia W. Koch, Esq.

## APPENDIX A
## EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

MCGLINCHEY STAFFORD
643 Magazine Street
New Orleans, LA 70130
Tel: (504) 586-1200
Contact: E. Frederick Preis, Jr., Esq.

THE JUNEAU FIRM
The Harding Center
1018 Harding Strret, Suite 202
Lafayette, LA 70503-2412
Tel: (337) 269-0052
Contact: Mike Juneau

**MAINE**

MOON MOSS MCGILL & BACHELDER PA
10 Free Street
PO Box 7250
Portland, ME 04112-7250
Tel: (207) 228-1526
Contact: Richard O. Moon, Esq.

**MARYLAND**

WHITEFORD TAYLOR & PRESTON LLP
Seven St. Paul Street
Baltimore, MD 21202
Tel: (410) 347-8700
Contact: William Ryan, Jr., Esq.

JORDAN COYNE & SAVITS, LLP
33 Wood Lane
Rockville, MD 20850
Tel: (301) 424-4161
Contact: Deborah Murrell Whelihan

**MASSACHUSETTS**

FOLEY HOAG & ELIOT LLP
One Post Office Square
Boston, MA 02109
Tel: (617) 832-1000
Contact: Peter M. Rosenblum

HUTCHINS WHEELER & DITTMAR PC
101 Federal Street
Boston, MA 02110
Tel: (617) 951-6624
Contact: David S. Rosenthal, Esq.
**Class Action Approved*

JACKSON LEWIS SCHNITZLER & KRUPMAN
One Beacon Street
33rd Floor
Boston, MA 02108
Tel: (617) 367-0025
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
**Class Action Approved*

MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO, PC
One Financial Center
Boston, MA 02110
Tel: (617) 542-6000
Contact: Patrick Sharkey, Esq. & Robert Gault, Esq.
**Class Action Approved*

GETMAN, STACEY, TAMPOSI, SCHULTESS & STEERE, PA
163 South River Road
Bedford, NH 03110
Tel: (603) 634-4300
Contact: Laurence W. Getman, Esq. or Dona Feeney, Esq.
**Western Mass. Only*

NIXON PEABODY LLP
101 Federal Street
Boston, Ma. 02110
Tel: (516) 832-7584
Contact: Joseph J. Ortego, Esq.
**Class Action Approved*

MURPHY HESSE TOOMEY & LEHANE
300 Crown Colony, Suite 410
Quincy, MA 02269
Tel: (617) 479-5467
Contact: James Toomey, Esq.

PEABODY & ARNOLD
50 Rowes Wharf
Boston, MA 02110
Tel: (617) 951-2100
Contact: William A. Cotter, Esq.

**MICHIGAN**

DYKEMA GOSSETT, LLP
1577 N. Woodward Avenue
Bloomfield Hills, MI 48304
Tel: (248) 203-0705
Contact: Robert L. Duty, Esq.

# APPENDIX A
# EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

MADDIN HOUSER WARTELL ROTH
28400 Northwestern Highway
PO Box 215
Southfield, MI 48034
Tel: (248) 354-4030
Contact: Harvey Heller, Esq.

MILLER CANFIELD PADDOCK AND STONE PLC
1200 Campau Square Plaza
99 Monroe Avenue, NW
Grand Rapids, MI 49503
Tel: (616) 454-8656
Contact: Charles S. Mishkind, Esq.
*Class Action Approved-All Locations*

150 West Jefferson, Suite 2500
Detroit, MI 48226
Tel: (313) 963-6420
Contact: Charles S. Mishkind, Esq. or
Carl H. Von Ende, Esq.

PLUNKETT & COONEY
505 N. Woodward Avenue
Suite 3000
Bloomfield Hills, MI 48304
Tel: (248) 901-4005
Contact: Teresa Smith Lloyd, Esq.

BRADY HATHAWAY & BRETZ
1330 Buhl Building
Detroit, MI 48226-3602
Tel: (313) 965-3700
Contact: Dannel Bertz

**MINNESOTA**

DORSEY & WHITNEY LLP
Pillsbury Center South
220 South Sixth Street
Minneapolis, MN 55402
Tel: (612) 340-2600
Contact: Robert R. Reinhart, Esq., or
Peter S. Hendrickson, Esq.
*Class Action Approved*

JACKSON LEWIS SCHNITZLER & KRUPMAN
150 Fifth Street Towers
150 South Fifth Street, Suite 2800
Minneapolis, MN 55402
Tel: (612) 341-8131
Tel: (516) 364-0404
Contact: Steven D. Baderian, Esq.
*Class Action Approved*

MEAGHER & GEER LLP
4200 Multifoods Tower
Minneapolis, MN 55402
Tel: (612) 338-0661
Contact: James F. Roegge, Esq.

**MISSOURI**

ARMSTRONG & TEASDALE LLP
2345 Grand Blvd
Suite 2000
Kansas City, MO 64108
Tel: (816) 221-3420
Contact: Lynn W. Hursh, Esq.
*Class Action Approved*

BROWN & JAMES, PC
705 Olive Street
Suite 1100
St. Louis, MO 63101-2270
Tel: (314) 421-3128
Contact: Charles E. Reis, IV, Esq.

GALLOP JOHNSON & NEUMAN LC
Interco Corporate Tower
101 South Hanley
St. Louis, MO 63105
Tel: (314) 862-1200
Contact: Ron Hack, Esq.

LEWIS RICE & FINGERSH, L.C.
500 N. Broadway, Suite 2000
St. Louis, MO 63102-2147
Tel: (314) 444-7600
Contacts: Robert J. Golterman, Esq.
Neal F. Perryman, Esq.
*Class Action Approved*

**MISSISSIPPI**

BUTLER SNOW O'MARA STEVENS & CANNADA PLLC
210 East Capitol Street
Jackson, MS 39201
Tel: (601) 948-5711
Contact: Jeffrey Walker, Esq.
*Class Action Approved*

WATKINS & EAGER PLLC
400 East Capitol Street
Jackson, MS 39201
Tel: (601) 948-6470
Contact: Kenneth E. Milan, Esq.

# APPENDIX A
# EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

**MONTANA**

MATOVICH AND KELLER PC
225 First Citizens Bank
2812 First Avenue N.
Billings, MT 59101
Tel: (406) 252-5500
Contact: E. Matovich, Esq.

**NEBRASKA**

KUTAK ROCK
1630 Farnam Street
Omaha, NE 68102
Tel: (402) 346-6000
Contact: Gregory Hurley, Esq.

**NEW HAMPSHIRE**

GETMAN STACEY TAMPOSI SCHULTESS & STEERE, PA
163 South River Road
Bedford, NH 03110
Tel: (603) 634-4300
Contact: Laurence W. Getman, Esq. or Dona Feeney, Esq.

**NEW JERSEY**

DRINKER BIDDLE PITNEY HARDEN
105 College Road
Suite 300
Princeton, NJ 08542
Tel: (609) 716-6500
Contact: Jon Epstein, Esq.

EPSTEIN BECKER & GREEN PC
One Riverfront Plaza, 7th Floor
Newark, NJ 07102
Tel: (973) 639-8262
Contact: Howard Pianko, Esq.
**Class Action Approved*

HARWOOD LLOYD
130 Main Street
Hackensack, NJ 07601
Tel: (201) 487-1080
Contact: Frank Lloyd, Esq.
Elizabeth Lorell, Esq.

JACKSON LEWIS SCHNITZLER & KRUPMAN
60 Washington Street
Morristown, NJ 07960-6844
Tel: (973) 538-6890
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
**Class Action Approved*

LINDABURY MCCORMICK & ESTABROOK
53 Cardinal Drive
PO Box 2369
Westfield, NJ 07091
Tel: (908) 233-6800
Contact: Richard Cino, Esq.

SAIBER, SCHLESINGER, SATZ & GOLDSTEIN
One Gateway Center, 13th Floor
Newark, NJ 07102-5311
Tel: (973) 622-3333
Contact: Jeffrey Lorell, Esq.

THOMPKINS MCGUIRE WACHENFELD & BARRY
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102-4070
Tel: (973) 622-3000
Contact: William B. McGuire, Esq.

**NEVADA**

BARKER BROWN BUSBY CHRISMAN & THOMAS
300 South Fourth Street
Suite 800
Las Vegas, NV 89101
Tel: (702) 386-1086
Contact: James P. Chrisman, Esq.

**NEW MEXICO**

BUTT THORNTON & BAEHR PC
4101 Indian School Road NE
Suite 3005
Albuquerque, NM 87110
Tel: (505) 884-0777
Contact: Agnes Fuentevilla Padilla, Esq.

# APPENDIX A
# EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

**NEW YORK**

D'AMATO & LYNCH
70 Pine Street
New York, NY 10270
Tel: (212) 269-0927
Contact: Luke Lynch Jr., Esq.

EPSTEIN BECKER & GREEN PC
250 Park Avenue, 12th Floor
New York, NY 1010019
Tel: (212) 351-4500
Contact: Howard Planko, Esq.
**Class Action Approved*

GARBARINI & SCHER PC
1114 Avenue of the Americas
New York, NY 10036
Tel: (212) 764-4000
Contact: James Kachadoorian, Esq.

JACKSON LEWIS SCHNITZLER & KRUPMAN
101 Park Avenue
37th Floor
New York, NY 10178
Local Tel: (212) 697-8200, (212) 545-4000
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
**Class Action Approved-All Locations*

1000 Woodbury Road
Suite 402
Woodbury, NY 11797
Tel: (516) 364-0404
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.

One North Broadway
White Plains, NY 10601-2305
Contact: Steve Baderian, Esq.
Tel: (914) 328-0404

JONES HIRSCH CONNORS BULL
101 East 52nd Street
New York, NY 10022
Tel: (212) 507-1000
Contact: Richard Steer

KAUFMAN BORGEEST & RYAN
747 Third Avenue
New York, NY 10017
Tel: (212) 980-9600
Contact: Julianna Ryan

KRAMER LEVIN NAFTALIS & FRANKEL
919 Third Avenue
New York, NY 10022
Tel: (212) 715-9100
Contact: Kevin LeBlang, Esq.

OHRENSTEIN & BROWN LLP
One World Trade Center
85th Floor
New York, NY 10048
Tel: (212) 682-4500
Contact: Michael D. Brown, Esq.

WILLKIE FARR & GALLAGHER
787 Seventh Avenue
New York, NY 10019-6099
Tel: (212) 728-8000
Contact: Stephen Greiner, Esq.
**Class Action Approved*

HODGSOM, RUSS, ANDREWS, WOODS & GOODYEAR, LLP
One M&T Plaza, Suite 2000
Buffalo, NY 14203-2391
Tel: (716) 848-1496
Contact: Patrick J. Tomovic, Esq

NIXON PEABODY LLP
990 Stewart Avenue
Garden City, NY 11530
Tel: (516) 832-7564
Contact: Joseph J. Ortego, Esq
**Class Action Approved-All Locations*

Omni Plaza
300 South Pearl St.
Albany NY 12207
Tel: (518) 427-2650
Contact: Joseph J. Ortego, Esq

437 Madison Avenue
New York NY 10022
Tel: (212) 940-3000
Contact: Joseph J. Ortego, Esq

# APPENDIX A
# EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

Clinton Square, PO Box 31051
Rochester, NY 14603
Tel: (716) 263-1000
Contact: Joseph J. Ortego, Esq

## NORTH CAROLINA

COZEN & O'CONNOR
2100 One First Union Center
301 South College St. Suite 2100
Charlotte, NC 28202
Tel: (704) 376-3400
Contact: Jay Goldstein, Esq.

PARKER POE ADAMS & BERNSTEIN
401 S. Tyon Street, Suite 3000
Charlotte, NC 28202
Tel: (704) 372-9000
Contact: Jonathan M. Crotty

## OHIO

DINSMORE SHOAL
175 South 3rd Street
10th Floor
Columbus, OH 43215
Tel: (614) 628-6220

GALLAGHER SHARP FULTON & NORMAN
Seventh Floor Bulkley Building
1501 Euclid Avenue
Cleveland, OH 44115
Tel: (216) 241-5310
Contact: Alton Stephens, Esq.
*Class Action Approved*

JANIK & DORMAN
Building Two
8223 Brecksville Road
Cleveland, OH 44141
Tel: (440) 838-7600
Contact: Steven G. Janik, Esq.
*Class Action Approved*

## OKLAHOMA

RHODES HIERONYMUS JONES TUCKER & GABLE PLLC
P.O. Box 21100
Tel: (918) 582-1173
Contact: Chris L. Rhodes, III, Esq.

## OREGON

BULLIVANT HOUSER BAILEY
300 Pioneer Tower
888 SW Fifth Avenue
Portland, OR 97204-2089
Tel: (503) 228-6351
Contact: Chrys A. Martin, Esq.

LANE POWELL SPEARS LUBERSKY LLP
601 SW Second Avenue
Suite 2100
Portland, OR 97204
Tel: (206) 223-7019
Contact: James B. Stoetzer, Esq.
*Class Action Approved*

LINDSAY HART NEIL & WEIGLER LLP
1300 West Fifth Avenue
Suite 3400
Portland, OR 97201-5696
Tel: (503) 226-7677
Contact: Lisa F. Rackner, Esq.
Jerard S. Weigler, Esq.

## PENNSYLVANIA

COZEN AND O'CONNOR
1900 Market Street
Philadelphia, PA 19103
Tel: (215) 665-2000
Contact: Jeffrey Pasek, Esq.

JACKSON LEWIS SCHNITZLER & KRUPMAN
One PPG Place
29th Floor
Pittsburgh, PA 15222-5414
Tel: (412) 232-0404
Tel: (814) 328-0404
Contact: Steven D. Bederian, Esq.
*Class Action Approved*

MARSHALL DENNEHY
1845 Walnut Street
Philadelphia, PA 19103
Tel: (215) 575-2600
Contact: Phil Torin, Esq.
Jay Rothman, Esq.

# APPENDIX A
## EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-4000
Contact: Anthony B. Haller, Esq.
*Class Action Approved*

WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
The Curtis Center
Suite 1130 East
Philadelphia, PA 19106
Tel: (215) 627-6900
Contact: Lou Isaacsohn, Esq.
*Class Action Approved*

WOLF BLOCK SCHORR & SOLIS - COHEN LLP
1650 Arch Street
Philadelphia, PA 19103 - 2097
Tel: (215) 977-2588
Contact: Alan Kessler, Esq.
*Class Action Approved*

HAMBURG & GOLDEN
1601 Market Street, Suite 565
Philadelphia, PA 19103-1443
Tel: (215) 255-8590
Contact: Neil Hamburg, Esq.

**RHODE ISLAND**

ROPES & GRAY
30 Kennedy Plaza
Providence, RI 02903-2328
Tel: (401) 455-4400
Contact: William S. Eggeling, Esq.
*Class Action Approved*

NIXON PEABODY LLP
One Citizens Plaza
Providence, RI 02903
Tel: (516) 832-7564
Contact: Joseph J. Ortego, Esq
*Class Action Approved*

**SOUTH CAROLINA**

JACKSON LEWIS SCHNITZLER & KRUPMAN
2100 Daniel Building
301 S. Main Street
Greenville, SC 29601
Tel: (914) 328-0404
Contact: Steve Baderian, Esq.
*Class Action Approved*

YOUNG CLEMENT RIVERS & TISDALE LLP
P.O. Box 993
28 Boad Street
Charleston, SC 29402
Tel: (864) 557-4000
Contact: Shawn D. Wallace, Esq.

**SOUTH DAKOTA**

COSTELLO PORTER HILL HEISTERKAMP BUSHNELL & CARPENTER LLP
200 Security Building
P.O. Box 290
Rapid City, SD 57709
Tel: (605) 343-2410
Contact: Robert L. Lewis, Esq.

DAVENPORT EVANS HURWITZ & SMITH LLP
P.O. Box 1030
513 South Main Avenue
Sioux Falls, SD 57101-1030
Tel: (605) 336-2880
Contact: Susan Brunick Simons, Esq.
Jean H. Bender, Esq.

**TENNESSEE**

LEITNER WILLIAMS DOOLEY & NAPOLITAN PLLC
Pioneer Building
3rd Floor
Chattanooga, TN 37402
Tel: (423) 265-0214
Contact: Paul R. Leitner, Esq.

# APPENDIX A
# EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

WEINTRAUB, STOCK BENNETT
GRISHAM & UNDERWOOD
One Commerce Square
Suite 2560
Memphis, TN 38103
Tel: (901) 526-0431
Contact: James H. Stock, Esq.

**TEXAS**

CLARK WEST KELLER BUTLER & ELLIS LLP
4800 Renaissance Tower
1201 Elm Street
Dallas, TX 75270-2146
Tel: (214) 741-1001
Contact: Mark Shank, Esq.

FULBRIGHT & JAWORSKI LLP
2200 Ross Avenue
Suite 2800
Dallas, TX 75201
Tel: (214) 855-8188
Contact: Bob Herrell, Esq.
A.J. Harper, Esq.
*Class Action Approved-All Locations*

1301 McKinney
Suite 5100
Houston, TX 77101-3095
Tel: (713) 651-5442
Contact: Frank Jones, Esq.

JACKSON LEWIS SCHNITZLER & KRUPMAN
3811 Turtle Creek Boulevard
Suite 500
Dallas, TX 75219
Tel: (214) 520-2400
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
*EPLI Class*

LOCKE LIDDELL & SAPP LLP
2200 Ross Avenue
Suite 2200
Dallas, TX 75201-6776
Tel: (214) 740-8000
Contact: John McElhaney, Esq.

MILLS SHIRLEY ECKEL & BASSETT, LLP
400 Washington Building
2228 Mechanic, P.O. Box 1943
Galveston, TX 77553
Tel: (409) 763-2341
Contact: Carla Cotropia, Esq.

PATTON BOGGS LLP
2626 Cole Avenue
Suite 700
Dallas, TX 75204
Tel: (214) 871-2141
Contact: D. Patrick Long, Esq.
*Class Action Approved*

THOMPSON & KNIGHT LLP
1700 Pacific Avenue
Suite 3300
Dallas, TX 75201-4693
Tel: (214) 969-1700
Contact: Timothy R. McCormick, Esq.

**UTAH**

CHRISTENSON & JENSEN PC
50 South Main Street
Suite 1500
Salt Lake City, UT 84101
Tel: (801) 355-3431
Contact: Phillip S. Ferguson, Esq.

**VERMONT**

CLEARY SHAHI ASSOCIATES
110 Merchants Row
P.O. Box 6740
Rutland, VT 05702
Tel: (802) 775-8800
Contact: David L. Cleary, Esq.

**VIRGINIA**

GENTRY LOCKE RAKES & MOORE
P.O. Box 40013
Roanoke, VA 24022-0013
Tel: (540) 983-9300
Contact: W. David Paxton, Esq.
*Class Action Approved-All Locations*

305 Harrison Street, SE
LeeBurg, VA 20175
Tel: (202) 496-2810
Debra M. Whelihan, Esq

# APPENDIX A
# EMPLOYMENT PRACTICES CLAIM PANEL COUNSEL

MCGUIRE WOODS BATTLE & BOOTHE LLP
901 East Cary Street
Richmond, VA 23219
Tel: (804) 775-4376
Contact: Stephen D. Busch, Esq.

**WASHINGTON**

COZEN AND O'CONNOR
1201 Third Avenue
Suite 5200
Seattle, WA 98101
Tel: (206) 340-1000
Contact: Thomas M. Jones, Esq.

JACKSON LEWIS SCHNITZLER & KRUPMAN
1420 Fifth Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 405-0404
Tel: (914) 328-0404
Contact: Steven D. Baderian, Esq.
**Class Action Approved*

LANE POWELL SPEARS LUBERSKY LLP
1420 Fifth Avenue
Suite 4100
Seattle, WA 98101-2338
Tel: (206) 223-7019
Contact: James B. Stoetzer, Esq.
**Class Action Approved*

**WEST VIRGINIA**

STEPTOE & JOHNSON LLP
Bank One Center
P.O. Box 2190
Clarksburg, WV 26302-2190
Tel: (304) 624-8000
Contact: C. David Morrison, Esq.
**Class Action Approved*

**WISCONSIN**

MELLI WALKER PEASE & RUHLY SC
19 Martin Luther King Blvd
Madison, WI 53701
Tel: (608) 257-4812
Contact: Jack D. Walker, Esq.

**WYOMING**

HIRST & APPLEGATE
1720 Carey Avenue
Suite 200
Cheyenne, WY 82001
Tel: (307) 632-0541
Contact: Thomas A. Nicholas, Esq.

**ENDORSEMENT# 1**

This endorsement, effective 12:01 am September 13, 2002 forms a part of policy number 669-77-00 issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by National Union Fire Insurance Company of Pittsburgh, Pa.

**Private Edge Conversion Endorsement**

**DIRECTORS, OFFICERS AND CORPORATE REIMBURSEMENT INSURANCE POLICY CONVERSION TO PRIVATE EDGE POLICY**

In consideration of the premium charged, it is hereby understood and agreed that the policy is hereby amended as follows:

**I.**

**DECLARATIONS**

1. The third paragraph of the Declaration page is deleted in its entirety and replaced with the following:

   NOTICE: THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND. HOWEVER THE INSUREDS MAY UNDER CERTAIN CONDITIONS TENDER THE DEFENSE OF A CLAIM. IN ALL EVENTS, THE INSURER MUST ADVANCE DEFENSE COSTS PAYMENTS PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM.

2. Items 1 and 2 of the Declaration page are deleted in their entirety and replaced with the following:

   ITEM 1. NAMED ENTITY: **INTERNATIONAL RADIOLOGY GROUP, L.L.C.**

   MAILING ADDRESS: **1909 HI LINE DRIVE**
   **DALLAS, TX 75207**

   STATE OF INCORPORATION OR STATE OF FORMATION OF THE NAMED ENTITY: **DELAWARE**

   ITEM 2. SUBSIDIARY COVERAGE: any past, present or future Subsidiary of the Named Entity

3. Items 5 and 6 of the Declaration page are deleted in their entirety and replaced with the following:

   ITEM 5. RETENTION:

   Judgments, Settlements and Defense Costs (non-Indemnifiable Loss) None

**END 1**

 **COPY**

**ENDORSEMENT# 1** (C nued)

This endorsement, effective *12:01 am* *September 13, 2002* forms a part of policy number *569-77-00* issued to *INTERNATIONAL RADIOLOGY GROUP, L.L.C.*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

| | |
|---|---|
| **Employment Practices Claims**<br>Judgments, Settlements and Defense Costs<br>(Company and Indemnifiable Loss) | 50,000<br>for Loss arising from Claims alleging the same Wrongful Act or Related Wrongful Acts (waivable under Clause 6 in certain circumstances) |
| **Securities Claims (other than private placements)**<br>Judgments, Settlements and Defense Costs<br>(Company and Indemnifiable Loss) | 50,000<br>for Loss arising from Claims alleging the same Wrongful Act or Related Wrongful Acts (waivable under Clause 6 in certain circumstances) |
| **All Other Claims (including private placements)**<br>Judgments, Settlements and Defense Costs<br>(Company and Indemnifiable Loss) | 50,000<br>for Loss arising from Claims alleging the same Wrongful Act or Related Wrongful Acts (waivable under Clause 6 in certain circumstances) |

ITEM 6. PREMIUM: $59,597

ADDITIONAL PREMIUM FOR PUNITIVE, EXEMPLARY AND MULTIPLED DAMAGES: $0
(included in above)
(No Punitive damages coverage provided: Ý ")

4. The following items are hereby added to the Declaration page of this policy

*END 1*

(2/90) *COPY*

**ENDORSEMENT# 1 (Continued)**

This endorsement, effective *12:01 am September 13, 2002* forms a part of policy number *569-77-00* issued to *INTERNATIONAL RADIOLOGY GROUP, L.L.C.*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

ITEM 7. CONTINUITY DATES:

| | | |
|---|---|---|
| A. | Coverages A and B(ii): | 3/13/1998 |
| B. | Coverage B(i): | 3/13/1998 |
| C. | Outside Entity Coverage: Per Outside Entity: | 3/13/1998 |

ITEM 8. (This policy is issued only by the insurance company indicated below.)

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA
175 WATER STREET
NEW YORK, NY 10038

II.

**INSURING AGREEMENTS**

5. Insuring Clauses A and B are deleted in their entirety and replaced by the following:

COVERAGE A: INDIVIDUAL INSURED INSURANCE

This policy shall pay the Loss of each and every Director, Officer or Employee of the Company ("Individual Insured") arising from a Claim first made against such Insureds during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act in their respective capacities as Directors, Officers or Employees of the Company except when and to the extent that the Company has indemnified such Insureds. The Insurer shall, in accordance with and subject to Clause 9, advance Defense Costs of such Claim prior to its final disposition.

COVERAGE B: PRIVATE COMPANY INSURANCE

This policy shall pay the Loss of the Company arising from a:

(i) Claim first made against the Company; or

(ii) Claim first made against an Individual Insured,

during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act, but, in the case of (ii) above, only when and to the extent that the Company has indemnified the Individual Insured for such Loss pursuant to law, common or

This endorsement, effective 12:01 am September 13, 2002 forms a part of policy number 569-77-00
issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by National Union Fire Insurance Company of Pittsburgh, Pa.

statutory, or contract, or the Charter or By-laws of the Company duly effective under such law which determines and defines such rights of indemnity. The Insurer shall, in accordance with and subject to Clause 9, advance Defense Costs of such Claim prior to its final disposition.

DEFENSE PROVISIONS

The Insurer does not assume any duty to defend, provided, however, the Named Entity may at its sole option tender to the Insurer the defense of a Claim for which coverage is provided by this policy in accordance with Clause 9 of the policy. Regardless of whether the defense is so tendered, the Insurer shall advance Defense Costs (excess of the applicable retention amount) of such Claim prior to its final disposition. Selection of counsel to defend a "Designated Claim" shall be made in accordance with Clause 7 of the policy.

III.

DEFINITIONS

6. Clause 2. DEFINITIONS 2(a), 2(b), 2(c), 2(d), 2(e), 2(f), 2(g) are modified as follows:

(a) "Company" means the Named Entity and any Subsidiary thereof.

(b) "Defense Costs" means reasonable and necessary fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and appeal of a Claim against the Insureds, but excluding salaries of officers or Employees of the Company.

(c) "Insured(s)" means:
(1) an Individual Insured; and
(2) the Company.

(d) "Loss" means damages (including back pay and front pay), judgments, settlements, pre- and post-judgment interest, and Defense Costs; however, Loss shall not include: (1) civil or criminal fines or penalties imposed by law; (2) taxes; (3) any amount for which the Insureds are not financially liable or which are without legal recourse to the Insureds; (4) employment-related benefits, stock options, perquisites, deferred compensation or any other type of compensation other than salary, wages or bonus compensation; (5) any liability or costs incurred by any Insured to modify any building or property in order to make said building or property more accessible or accommodating to any disabled person, or any liability or costs incurred in connection with

This endorsement, effective *12:01 am September 13, 2002* forms a part of policy number *569-77-00*
issued to *INTERNATIONAL RADIOLOGY GROUP, L.L.C.*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

any educational, sensitivity or other corporate program, policy or seminar relating to an Employment Practices Claim; (6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

If an additional premium is stated in Item 6 of the Declarations page, then Loss shall specifically include, (subject to the policy's other terms, conditions and exclusions, including but not limited to exclusions relating to personal profit or advantage, deliberate fraud, criminal acts or willful violation of any statute, rule or regulation) punitive, exemplary and multiple damages (including the multiple or liquidated damages awards under the Age Discrimination in Employment Act and the Equal Pay Act). It is further understood and agreed that the enforceability of the foregoing coverage shall be governed by such applicable law which most favors coverage for punitive, exemplary and multiple damages. If an additional premium is not stated in Item 6 of the Declaration page then Loss shall not include punitive, exemplary damages or the multiplied portion of multiple damages.

(e) "Policy Period" means the period of time from the inception date shown in Item 3 of the Declarations to the earlier of the expiration date shown in Item 3 of the Declarations or the effective date of cancellation of this policy.

(f) "Subsidiary" means:

(1) any for-profit organization which, on or before the inception of the Policy Period, is more than 50% owned by the Named Entity, either directly, or indirectly through one or more of its Subsidiaries;

(2) automatically any for-profit organization whose securities are not publicly traded and whose assets total less than 25% of the total consolidated assets of the Company as of the inception date of this policy and which becomes a Subsidiary during the Policy Period. The Named Entity shall provide the Insurer with full particulars of the new Subsidiary before the end of the Policy Period; or

(3) an organization which becomes a Subsidiary during the Policy Period (other than a for-profit organization described in paragraph (2) above), but only upon the condition that within 90 days of its becoming a Subsidiary, the Named Entity shall have provided the Insurer with full particulars of the new Subsidiary and agreed to any additional premium or amendment of the provisions of this policy required by the Insurer relating to such new Subsidiary. Further, coverage as shall be afforded to the new Subsidiary is conditioned upon the Named Entity paying when due any additional premium required by the Insurer relating to such new Subsidiary.

This endorsement, effective *12:01 am September 13, 2002* forms a part of policy number *589-77-00*
issued to *INTERNATIONAL RADIOLOGY GROUP, L.L.C.*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

An organization becomes a Subsidiary when the Named Entity owns more than a 50% ownership interest in such Subsidiary, either directly, or indirectly through one or more of its Subsidiaries. An organization ceases to be a Subsidiary when the Named Entity ceases to own more than a 50% ownership in such Subsidiary, either directly, or indirectly through one or more of its Subsidiaries.

In all events, coverage as is afforded under this policy with respect to a Claim made against Individual Insureds or a Claim made against any Subsidiary, shall only apply to Claims for Wrongful Acts committed or allegedly committed after the effective time that such Subsidiary became a Subsidiary and prior to the time that such Subsidiary ceased to be a Subsidiary.

(g) "Wrongful Act" means:

(1) with respect to Individual Insureds, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by such Insureds in their respective capacities as such, or any matter claimed against such Insured solely by reason of their status as directors, officers or Employees of the Company;

(2) with respect to the Company, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Company;

(3) with respect to service on an Outside Entity, any matter claimed against an Individual Insured as defined in definition (n)(2) arising out of his or her serving as a director, officer, trustee or governor of an Outside Entity in such capacity, but only if such service is at the specific written request or direction of the Company.

With respect to an Employment Practices Claim, the term "Wrongful Act" shall include any Employment Practices Violation.

7. The Section of the policy entitled DEFINITIONS is hereby amended by adding the following definitions to the end thereof:

(h) "Affiliate" means: (i) any person or entity that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is in common control with, another person or entity; or (ii) any person or entity that directly, or indirectly through one or more intermediaries, is a successor in interest to another person or entity.

This endorsement, effective 12:01 am September 13, 2002 forms a part of policy number 569-77-00 issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by National Union Fire Insurance Company of Pittsburgh, Pa.

(i) "Claim" means:

(1) a written demand for monetary or non-monetary relief (including any request to toll or waive any statute of limitations); or

(2) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary or non-monetary relief which is commenced by:

(i) service of a complaint or similar pleading; or

(ii) return of an indictment (in the case of a criminal proceeding); or

(iii) receipt or filing of a notice of charges;

(3) an administrative or regulatory investigation when conducted by the Equal Employment Opportunity Commission ("EEOC") (or similar state, local or foreign agency) which is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to the Insured. However, in no event, shall the term "Claim" include any labor or grievance proceeding which is subject to a collective bargaining agreement.

The term "Claim" shall include an Employment Practices Claim and a Securities Claim.

(j) "Continuity Date" means the date set forth in:

(1) Item 7A of the Declarations with respect to Coverages A and B(ii); or
(2) Item 7B of the Declarations with respect to Coverage B(i);
(3) Item 7C of the Declarations with respect to a Claim made against an Individual Insured(s) arising out of such Insured's service as a director, officer, trustee or governor of an Outside Entity.

(k) "Employee(s)" means any past, present or future employee, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any part-time, seasonal and temporary employee in his or her capacity as such. An individual who is leased to the Company shall also be an Employee, but only if the Company provides indemnification to such leased individual in the same manner as is provided to the Company's employees. Any other individual who is contracted to perform work for the Company, or who is an independent contractor for the Company shall also be an Employee, but only if the Company provides indemnification to such individual in the same manner as that provided to the Company's employees, and such individual is scheduled by written endorsement attached hereto and the Company pays any additional premium required by the Insurer relating to such individual.

This endorsement, effective *12:01 am September 13, 2002* forms a part of policy number *589-77-00*
issued to *INTERNATIONAL RADIOLOGY GROUP, L.L.C.*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

(l) "Employment Practices Claim" means a Claim alleging an Employment Practices Violation.

(m) "Employment Practices Violation(s)" means any actual or alleged:

(1) wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of an implied contract;
(2) harassment (including sexual harassment whether "quid pro quo", hostile work environment or otherwise);
(3) discrimination, (including but not limited to discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy, or disability);
(4) Retaliation (including lockouts);
(5) employment-related misrepresentation(s) to an Employee or applicant for employment with the Company;
(6) employment-related libel, slander, humiliation, defamation, invasion of privacy;
(7) wrongful failure to employ or promote;
(8) wrongful deprivation of career opportunity, wrongful demotion or negligent employee evaluation, including the giving of negative or defamatory statements in connection with an employee reference;
(9) wrongful discipline;
(10) failure to grant tenure;
(11) failure to provide or enforce adequate or consistent corporate policies and procedure relating to any Employment Practices Violation;
(12) violation of an individual's civil rights relating to any of the above,

but only if the Employment Practices Violation relates to an Employee(s), or applicant for employment with the Company or an Outside Entity, whether direct, indirect, intentional or unintentional.

With respect to any customer or client of the Company, whether individually or as a class or group, Employment Practices Violation shall mean only any actual or alleged discrimination, sexual harassment or violation of an individual's civil rights relating to such discrimination or sexual harassment, whether direct, indirect, intentional or unintentional.

(n) "Individual Insured(s)" means:

(1) any past, present or future duly elected or appointed directors, officers, management committee members or members of the Board of Managers of the Company, but only in their capacities as such. Coverage will automatically apply to all new directors, officers,

This endorsement, effective 12:01 am September 13, 2002 forms a part of policy number 669-77-00 issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by National Union Fire Insurance Company of Pittsburgh, Pa.

management committee members or members of the Board of Managers of the Company after the inception date of this policy;

(2) any past, present or future duly elected or appointed directors, officers, management committee members or members of the Board of Managers of the Company serving in the capacity as director, officer, trustee or governor of an Outside Entity, but only if such service is at the specific written request or direction of the Company;

(3) in the event the Company operates outside the United States, then the terms director, officer, management committee member or member of the Board of Managers shall also mean those titles, positions or capacities in such foreign Company which are equivalent to such positions in an organization incorporated or formed within the United States; and

(4) any Employee(s) of the Company.

(o) "Named Entity" means the organization stated in Item 1 of the Declarations, as amended by this endorsement, whether a corporation, association, limited liability company or other type of business organization.

(p) "No Liability" means: (1) a final judgment of no liability obtained prior to trial, in favor of all Insureds, by reason of a motion to dismiss or a motion for summary judgment, after the exhaustion of all appeals; or (2) a final judgment of no liability obtained after trial, in favor of all Insureds, after the exhaustion of all appeals. In no event shall the term "No Liability" apply to a Claim made against an Insured for which a settlement has occurred.

(q) "Outside Entity" means:

(1) a not-for-profit organization under section 501(c)(3) of the Internal Revenue Code of 1986 (as amended); or

(2) any other corporation, partnership, joint venture or other organization listed by endorsement to this policy.

(r) "Related Wrongful Acts" shall mean Wrongful Acts which are the same, related or continuous, or Wrongful Acts which arise from a common nucleus of facts. Claims can allege Related Wrongful Acts regardless of whether such Claims involve the same or different claimants, Insureds or legal causes of action

(s) "Retaliation" means a Wrongful Act of an Insured relating to or alleged to be in response to any of the following activities: (1) the disclosure or threat of

This endorsement, effective *12:01 am* *September 13, 2002* forms a part of policy number *669-77-00* issued to *INTERNATIONAL RADIOLOGY GROUP, L.L.C.*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

disclosure by an Employee to a superior or to any governmental agency of any act by an Insured which act is alleged to be a violation of any federal, state, local or foreign law, common or statutory, or any rule or regulation promulgated thereunder; (2) the actual or attempted exercise by an Employee of any right that such Employee has under law, including rights under worker's compensation laws, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to employee rights; (3) the filing of any claim under the Federal False Claims Act or any other federal, state, local or foreign "whistle-blower" law; or (4) Employee strikes.

(t) "Securities Claim" means a Claim (including a civil lawsuit or criminal proceeding brought by the Securities & Exchange Commission) made against an Insured anywhere in the world alleging a violation of any law, regulation or rule, whether statutory or common law, which is:

(1) brought by any person or entity alleging, arising out of, based upon or attributable to, in part or in whole, the purchase or sale, or offer or solicitation of an offer to purchase or sell, any securities of the Company; or

(2) brought by a securities holder of the Company, whether directly, by class action, or derivatively on the behalf of the Company, or otherwise, alleging any Wrongful Act of an Insured.

IV.

EXTENSIONS

8. The Clause of the policy entitled EXTENSIONS is deleted in its entirety and replaced with the following:

Subject otherwise to the terms hereof, this policy shall cover Loss arising from any Claims made against the estates, heirs, or legal representatives of deceased Individual Insureds, and the legal representatives of Individual Insureds in the event of incompetency, insolvency or bankruptcy, who were Individual Insureds at the time the Wrongful Act upon which such Claims are based were committed.

Subject otherwise to the terms hereof, this policy shall cover Loss arising from all Claims made against the lawful spouse (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world) of an Individual Insured for all Claims arising solely out of his or her status as the spouse of an Individual Insured, including a Claim that seeks damages recoverable from marital community property, property jointly held by the individual

This endorsement, effective *12:01 am* *September 13, 2002* forms a part of policy number *689-77-00* issued to *INTERNATIONAL RADIOLOGY GROUP, L.L.C.*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

Insured and the spouse, or property transferred from the Individual Insured to the spouse; provided, however, that this extension shall not afford coverage for any Claim for any actual or alleged Wrongful Act of the spouse, but shall apply only to Claims arising out of any actual or alleged Wrongful Acts of an Individual Insured, subject to the policy's terms, conditions and exclusions.

V.

**EXCLUSIONS**

9. Clause 4. EXCLUSIONS is amended as follows:

The first sentence thereof is deleted in its entirety and replaced with the following:

The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against an Insured:

Exclusions 4(b), 4(g), 4(h), 4(i), 4(j), 4(k), 4(l), and 4(m) are modified as follows:

(b) arising out of, based upon or attributable to the committing in fact of any criminal, fraudulent or dishonest act, or willful violation of any statute, rule or law;

"The Wrongful Act of an Insured shall not be imputed to any other Insured for the purpose of determining the applicability of the following exclusions 4(a) through 4(d)."

(g) alleging, arising out of, based upon or attributable to the facts alleged, or to the same or Related Wrongful Act alleged or contained in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(h) alleging, arising out of, based upon or attributable to as of the Continuity Date, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an Insured had notice, or alleging any Wrongful Act which is the same or Related Wrongful Act to that alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

(i) which is brought by any Insured or by the Company; or which is brought by any security holder of the Company, whether directly or derivatively, unless such security holder's Claim is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active

This endorsement, effective 12:01 am September 13, 2002 forms a part of policy number 569-77-00
issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by National Union Fire Insurance Company of Pittsburgh, Pa.

participation of, or intervention of, any Insured; provided, however, this exclusion shall not apply to:

(1) any Claim brought by an Individual Insured where such Claim is in the form of a cross-claim or third-party claim for contribution or indemnity which is part of and results directly from a Claim which is not otherwise excluded by the terms of this policy; or

(2) an Employment Practices Claim brought by an Employee of the Company other than an Employee who is or was a director, member of the Board of Managers or management committee member of the Named Entity;

(j) for any actual, alleged or threatened discharge, dispersal, release or escape of pollutants; or for any direction or request to test, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants; provided, however this exclusion shall not any Claim brought by a securities holder of the Company in its capacity as such or to any Employment Practices Claim;

(k) for any Wrongful Act arising out of an Individual Insured serving in a capacity as a director, officer, trustee or governor of an Outside Entity if such Claim is brought by the Outside Entity or a director, officer, trustee or governor thereof;

(l) for violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules and regulations of the foregoing promulgated thereunder, and amendments thereto or any similar provisions of any federal, state, local or foreign statutory law, or common law; provided; however, that this exclusion shall not apply to Loss arising from a Claim for Retaliation;

(m) alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof; provided, however, that this exclusion shall not apply to Securities Claims;

10. Clause 4. EXCLUSIONS (e), (f) and (n) are deleted in their entirety and replaced with the following:

This endorsement, effective 12:01 am September 13, 2002 forms a part of policy number 569-77-00 issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by National Union Fire Insurance Company of Pittsburgh, Pa.

(e) alleging, arising out of, based upon or attributable to any actual or alleged act or omission of an Insured serving in any capacity, other than a director, officer, management committee member, member of the Board of Managers or Employee of the Company, or as a director, officer, trustee or governor of an Outside Entity;

(f) alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or any other Insured under any express contract or agreement; provided, however, that with respect to Employment Practice Claims, this exclusion shall not apply to the extent any liability does not arise under such express employment contract or agreement;

(n) alleging, arising out of, based upon or attributable to public offering of securities by the Company, an Outside Entity or an Affiliate or alleging a purchase or sale of such securities subsequent to such public offering;

provided, however, that this exclusion will not apply to:

(1) any purchase or sale of securities exempted pursuant to section 3 (b) of the Securities Act of 1933. Coverage for such purchase or sale transaction shall not be conditioned upon payment of any additional premium; however, the Named Entity shall give the Insurer written notice of any public offering exempted pursuant to section 3 (b), together with full particulars and as soon as practicable, but not later than 30 days after the effective date of the public offering;

(2) to any public offering of securities (other than a public offering described in paragraph (1) above), as well as any purchase or sale of such subsequent to such public offering, in the event that within 30 days prior to the effective time of such public offering: (i) the Named Entity shall give written notice of such public offering together with full particulars and underwriting information required thereto and (ii) the Named Entity accepts such terms, conditions and additional premium required by the Insurer for such coverage. Such coverage is also subject to the Named Entity paying when due any such additional premium. In the event the Company gives written notice and full particulars and underwriting information pursuant to (i) above, then the Insurer must offer a quote for coverage under this paragraph.

11.Clause 4. EXCLUSIONS is further amended by the addition of the following Exclusions:

(o) for emotional distress, or for injury from libel or slander, or defamation or disparagement, or for injury from a violation of a person's right of privacy;

**ENDORSEMENT# 1** (Continued)

This endorsement, effective *12:01 am* *September 13, 2002* forms a part of policy number *669-77-00*
issued to *INTERNATIONAL RADIOLOGY GROUP, L.L.C.*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

provided, however, this exclusion shall not apply to any Securities Claim or Employment Practices Claim;

(p) alleging, arising out of, based upon or attributable to any obligation pursuant to any worker's compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law; provided, however, this exclusion shall not apply to a Claim for Retaliation;

(q) alleging, arising out of, based upon or attributable to the purchase by the Company of securities of a "publicly traded entity" in a transaction which resulted, or would result, in such entity becoming an Affiliate or Subsidiary of the Company; provided, however, this exclusion shall not apply in the event that within 30 day prior to it becoming an Affiliate or Subsidiary, the Named Entity gives written notice of the transaction to the Insurer together with full particulars and underwriting information required and agrees to any additional premium or amendment of the provisions of this policy required by the Insurer relating to the transaction. Further, coverage as shall be afforded to the transaction is conditioned upon the Named Entity paying when due any additional premium required by the Insurer relating to the transaction. An entity is a "publicly traded entity" if any securities of such entity have been previously subject to a public offering;

(r) with respect to Coverage B(i) only:

(1) for any actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, trademark, trade secret or any other intellectual property rights;

(2) for any actual or alleged violation of any law, whether statutory, regulatory or common law, respecting any of the following activities: anti-trust, business competition, unfair trade practices or tortuous interference in another's business or contractual relationships;

(3) for the rendering or failure to render any service to a customer or client of the Insured provided, however, that this exclusion shall not apply to any:

(i) Claim solely alleging Employment Practices Violations;

(ii) Securities Claim; or

(iii) Claim for the rendering or failure to render any professional service to the extent such professional services errors and omissions coverage has been added to this policy by written endorsement attached hereto;

(4) seeking fines or penalties or non-monetary relief against the Company; provided, however, that this exclusion shall not apply to any Securities Claim or Employment Practices Claim.

This endorsement, effective 12:01 am September 13, 2002 forms a part of policy number 569-77-00 issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by National Union Fire Insurance Company of Pittsburgh, Pa.

VI.

Clauses 5, 6, 8, 9,10,11,12,13,14,15,17 are deleted in their entirety and replaced with the following:

12. Clause 5. LIMIT OF LIABILITY and REINSTATED LIMIT OF LIABILITY (FOR ALL LOSS - INCLUDING DEFENSE COSTS)

Defense Costs are not payable by the Insurer in addition to the limit of liability. Defense Costs are part of Loss and as such are subject to the applicable Limit of Liability for Loss.

A. General Terms

The Limit of Liability stated in Item 4 of the Declaration page is the limit of the Insurer's liability for all Loss, under Coverage A and Coverage B combined, arising out of all Claims first made against the Insureds during the Policy Period and the Discovery Period (if applicable); however, the Limit of Liability for the Discovery Period shall be part of, and not in addition to, the Limit of Liability for the Policy Period, or the Reinstated Limit as described below (if elected). Further, a Claim which is made subsequent to the Policy Period or the Discovery Period (if applicable) which pursuant to Clause 8(b) or 8(c) is considered made during the Policy Period or Discovery Period shall also be subject to the one applicable aggregate Limit of Liability stated in Item 4 of the Declaration page, or subject to the one aggregate Reinstated Limit if such Reinstated Limit is applicable to such Claim.

B. Reinstated Limit of Liability

In the event of a Claim under this policy, the Named Entity shall have the right to purchase a Reinstated Limit equal to the Limit of Liability stated in Item 4 of the Declarations. The Reinstated Limit shall be subject to the following conditions:

1. The right to elect the Reinstated Limit commences on the date a Claim is reported to the Insurer and expires on the last day of the Policy Period; provided, that in all events only one reinstatement is permitted under this policy. The effective date of the reinstatement shall be the date on which the Insurer acknowledges receipt of the written notice of the Insured's election to exercise the reinstatement.
2. If the Policy Period of this policy is more than one year, then the additional premium to elect the Reinstated Limit at any time after one

This endorsement, effective *12:01 am* *September 13, 2002* forms a part of policy number *569-77-00* issued to *INTERNATIONAL RADIOLOGY GROUP, L.L.C.*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

year from the inception date of this policy shall be fixed at 150% of the premium set forth in Item 6 of the Declarations. Regardless of the length of the Policy Period of this policy, the additional premium to elect the Reinstated Limit within one year from the inception date of this policy shall be an amount determined by the Insurer at the time of the election of the Reinstated Limit unless otherwise indicated by written endorsement to this policy.

3. The Reinstated Limit shall only apply to Claims made against an Insured after the effective date of the reinstatement and prior to the end of the Policy Period or the Discovery Period, if applicable, ("Reinstatement Claims"); provided, however, that the Reinstated Limit shall not apply to Claims which allege a Related Wrongful Act to Claim(s) reported to the Insurer prior to the effective date of the reinstatement.
4. The Reinstated Limit shall be the maximum liability of the Insurer for all Reinstatement Claims. The Limit of Liability described in clause 5A as applicable to claims made against the Insureds prior to effective date of the reinstatement shall not apply to any Reinstatement Claim.
5. Upon exercise of the Reinstated Limit, the entire premium set forth in Item 6 of the Declarations shall be deemed fully earned; the Insureds shall not be entitled to any return premium as a result of the exercise of the Reinstated Limit nor shall any of the premium paid for the policy be credited toward the additional premium required to exercise the Reinstated Limit.
6. In no event shall the right to a reinstatement apply if prior to the effective date of the reinstatement, this policy has been cancelled, is otherwise not in effect, or the Discovery Period has been elected.
7. Other than as stated above, coverage for Reinstatement Claims shall be subject to the same terms, conditions and exclusions of the policy applicable to other Claims under this policy. The Insurer cannot otherwise modify any terms, conditions or exclusions of this policy as a condition of providing the reinstatement.

13. Clause 6. RETENTION CLAUSE

The Insurer shall only be liable for the amount of Loss arising from a Claim which is in excess of the Retention amount stated in Item 5 of the Declarations, such Retention amount to be borne by the Company or the Insureds and shall remain uninsured with regard to all Loss under: (1) Coverage A or B(ii) for which the Company has indemnified or is permitted or required to indemnify the Individual Insured(s) ("Indemnifiable Loss"), or (2) Coverage B(i). A single Retention amount shall apply to Loss arising from all Claims alleging the same Wrongful Act or Related Wrongful Act.

This endorsement, effective 12:01 am September 13, 2002 forms a part of policy number 589-77-00 issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by National Union Fire Insurance Company of Pittsburgh, Pa.

Subject to the above paragraph, the Retention amounts stated in Item 5 of the Declarations shall apply. In the event a Claim triggers more than one amount stated in Item 5 of the Declarations, only the highest such amount shall apply, which amount shall apply to the entire Claim.

The retention amount shall be reduced in the event that an Insured consents to the first "Settlement Opportunity", as defined in Clause 9, by the percentage described in Clause 9, subject to the conditions described in Clause 9.

No Retention shall apply to a Claim which is in the form of a civil action for monetary relief and the Insurer shall thereupon reimburse the Defense Costs paid by the Insured, in the event of:

(1) a determination of No Liability of all Insureds; or
(2) a dismissal or a stipulation to dismiss the civil litigation Claim without prejudice and without the payment of any consideration by any Insured;

provided, however, that in the case of (2) above, such reimbursement shall occur ninety (90) days after the date of dismissal or stipulation as long as the Claim is not re-brought (or any other Claim which is subject to the same single retention by virtue of Clause 6 is not brought) within that time, and further subject to an undertaking by the Company in a form acceptable to the Insurer that such reimbursement shall be paid back by the Company to the Insurer in the event the Claim (or any other Claim which is subject to the same single retention by virtue of Clause 6) is brought after such 90 day period and before the expiration of the statute of limitations for such Claim.

14. Clause 8. NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the Insurer named in Item 8 of the Declaration page at the address indicated in Item 8 of the Declaration page.

If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice. A Claim shall be considered to have been first made against an Insured when written notice of such Claim is received by any Insured, by the Company on the behalf of any Insured or by the Insurer, whichever comes first.

(a) The Company or the Insureds shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of any Claim made against an Insured as soon as practicable and either:
 (1) anytime during the Policy Period or during the Discovery Period (if applicable); or

This endorsement, effective *12:01 am* *September 13, 2002* forms a part of policy number *569-77-00*
issued to *INTERNATIONAL RADIOLOGY GROUP, L.L.C.*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

(2) within 30 days after the end of the Policy Period or the Discovery Period (if applicable), as long as such Claim is reported no later than 30 days after the date such Claim was first made against an Insured.

(b) If written notice of a Claim has been given to the Insurer pursuant to Clause 8(a) above, then any Claim which is subsequently made against the Insureds and reported to the Insurer alleging an Related Wrongful Act to the Claim for which such notice has been given, shall be considered made at the time such notice was given.

(c) If during the Policy Period or during the Discovery Period (if applicable) the Company or the Insureds shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against the Insureds and shall give written notice to the Insurer of the circumstances and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, then any Claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Related Wrongful Act to such circumstances, shall be considered made at the time such notice of such circumstances was given.

15. Clause 9. DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)

The Insurer does not assume any duty to defend. The Insureds shall defend and contest any Claim made against them.

Notwithstanding the foregoing, the Insureds shall have the right to tender the defense of the Claim to the Insurer, which right shall be exercised in writing by the Named Entity on behalf of all Insureds to the Insurer pursuant to the notice provisions of Clause 8 of this policy. This right shall terminate if not exercised within 30 days of the date the Claim is first made against an Insured, pursuant to Clause 8 of the policy. Further, from the date the Claim is first made against the Insureds to the date when the Insurer accepts the tender of the defense of such Claim, the Insureds shall take no action, or fail to take any required action, that prejudices the rights of the Insureds or the Insurer with respect to such Claim. Provided that the Insureds have complied with the foregoing, the Insurer shall be obligated to assume the defense of the Claim, even if such Claim is groundless, false or fraudulent. The assumption of the defense of the Claim shall be effective upon written confirmation sent thereof by the Insurer to the Named Entity. Once the defense has been so tendered, the Insured shall have the right to effectively associate with the Insurer in the defense and the negotiation of any settlement of any Claim, subject to the provisions of this Clause 9. However, the Insurer shall not be obligated to defend such Claim after the Limit of Liability has been

**ENDORSEMENT# 1** (Continued)

This endorsement, effective 12:01 am September 13, 2002 forms a part of policy number 569-77-00
issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by National Union Fire Insurance Company of Pittsburgh, Pa.

exhausted, or after an Insured's rejection of a Settlement Opportunity as defined in this Clause 9.

When the Insurer has not assumed the defense of a Claim pursuant to Clause 9, the Insurer shall advance nevertheless, at the written request of the Insured, Defense Costs prior to the final disposition of a Claim. Such advanced payments by the Insurer shall be repaid to the Insurer by the Insureds or the Company, severally according to their respective interests, in the event and to the extent that the Insureds or the Company shall not be entitled under the terms and conditions of this policy to payment of such Loss.

The Insureds shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defense Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy. The Insurer's consent shall not be unreasonably withheld, provided that the Insurer, when it has not assumed the defense of a Claim pursuant to this Clause 9, shall be entitled to effectively associate in the defense and the negotiation of any settlement of any Claim, and provided further that in all events the Insurer may withhold consent to any settlement, stipulated judgment or Defense Costs, or any portion thereof, to the extent such Loss is not covered under the terms of this policy.

The Insurer shall have the right to effectively associate with the Company in the defense of any Claim that appears reasonably likely to involve the Insurer, including but not limited to negotiating a settlement. The Company and the Insureds shall give the Insurer full cooperation and such information as it may reasonably require.

If the Insurer recommends a settlement within the policy's applicable Limit of Liability which is acceptable to the claimant (a "Settlement Opportunity"), and the Insureds consent to such settlement, then the Insured's applicable retention amount shall be retroactively reduced by ten percent (10%) for such Loss. It shall be a condition to such reduction that the Insureds must consent to such settlement within thirty (30) days of the date the Insureds are first made aware of the Settlement Opportunity, or in the case of a Settlement Opportunity which arises from a settlement offer by the claimant, then within the time permitted by the claimant to accept such settlement offer, but in all events no later than thirty (30) days after the settlement offer was made.

However, if a Settlement Opportunity arises and the Insureds do not consent to the settlement within the time prescribed above, the retention amount shall remain the applicable amount set forth in Item 5 of the Declarations even if consent is given to a subsequent Settlement Opportunity.

***END 1***

 ***COPY***

This endorsement, effective *12:01 am* *September 13, 2002* forms a part of policy number *669-77-00*
issued to *INTERNATIONAL RADIOLOGY GROUP, L.L.C.*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

Furthermore, in the event the Insureds do not consent to the first Settlement Opportunity within the time prescribed, then, subject to the applicable limit of liability, the Insurer's liability for all Loss on account of such Claim shall not exceed: (1) the amount for which the Insurer could have settled such Claim plus Defense Costs incurred as of the date such settlement was proposed in writing by the Insurer, ("Settlement Opportunity Amount") plus (2) 50% of covered Loss in excess of such Settlement Opportunity Amount, it being a condition of this insurance that the remaining 50% of such Loss excess of the Settlement Opportunity Amount shall be carried by the Company and the Insureds at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the Settlement Opportunity Amount exceeds the Retention amount stated in Item 5 of the Declaration page.

16. Clause 10. DISCOVERY CLAUSE

Except as indicated below, if the Named Entity shall cancel or the Named Entity or the Insurer shall refuse to renew this policy, the Named Entity shall have the right to a period of either one, two or three years following the effective date of such cancellation or nonrenewal upon payment of the respective "Additional Premium Amount" described below (herein referred to as the "Discovery Period") in which to give to the Insurer written notice of Claims first made against the Insureds during said Discovery Period for any Wrongful Act occurring prior to the end of the Policy Period and otherwise covered by this policy. The rights contained in this paragraph shall terminate, however, unless written notice of such election together with the additional premium due is received by the Insurer within 30 days of the effective date of cancellation or nonrenewal. The Additional Premium for the Discovery Period shall be fully earned at the inception of the Discovery Period. The Discovery Period is not cancelable. This clause and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

The Additional Premium Amount for: (1) one year shall be 75% of the "full annual premium"; (2) two years shall be 150% of the "full annual premium"; (3) three years shall be a reasonable premium amount to be mutually agreed upon by the Insured and the Insurer. As used herein, "full annual premium" means the premium level in effect immediately prior to the end of the Policy Period.

In the event of a Transaction, as defined in Clause 12, the Named Entity shall have the right, within 30 days before the end of the Policy Period, to request an offer from the Insurer of a Discovery Period (with respect to Wrongful Acts occurring prior to the effective time of the Transaction) for a period of no less than three years or for such longer or shorter period as the Named Entity may request. The Insurer shall offer such Discovery Period pursuant to such terms, conditions and premium as the Insurer may reasonably decide. In the event of a Transaction, the

This endorsement, effective *12:01 am* *September 13, 2002* forms a part of policy number *569-77-00*
issued to *INTERNATIONAL RADIOLOGY GROUP, L.L.C.*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

right to a Discovery Period shall not otherwise exist except as indicated in this paragraph.

17. Clause 11. CANCELLATION CLAUSE

This policy may be canceled by the Named Entity at any time only by mailing written prior notice to the Insurer or by surrender of this policy to the Insurer or its authorized agent.

This policy may be canceled by or on the behalf of the Insurer only in the event of nonpayment of premium by the Named Entity. In the event of non-payment of premium by the Named Entity, the Insurer may cancel this policy by delivering to the Named Entity or by mailing to the Named Entity, by registered, certified, or other first class mail, at the Named Entity's address as shown in Item 1 of the Declarations, written notice stating when, not less than 30 days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The Policy Period terminates at the date and hour specified in such notice, or at the date and time of surrender. The Insurer shall have the right to the premium amount for the portion of the Policy Period during which the policy was in effect.

If this policy shall be canceled by the Named Entity, the Insurer shall retain the customary short rate proportion of the premium herein.

If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

18. Clause 12. CHANGE IN CONTROL OF NAMED ENTITY

If during the Policy Period:

a. the Named Entity shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

b. any person or entity or group of persons or entities acting in concert shall acquire an amount of the outstanding securities representing more than 50% of the voting power for the election of directors of the Named Entity, or acquires the voting rights of such an amount of such securities;

This endorsement, effective *12:01 am* *September 13, 2002* forms a part of policy number *569-77-00*
issued to *INTERNATIONAL RADIOLOGY GROUP, L.L.C.*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

(either of the above events herein referred to as the "Transaction"),

then this policy shall continue in full force and effect as to Wrongful Acts occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged Wrongful Act occurring after the effective time of the Transaction. This policy may not be canceled after the effective time of the Transaction and the entire premium for this policy shall be deemed earned as of such time. The Named Entity shall also have the right to an offer by the Insurer of a Discovery Period described in Clause 10 of the policy.

The Named Entity shall give the Insurer written notice of the Transaction as soon as practicable, but not later than 30 days after the effective date of the Transaction.

19. Clause 13. SUBROGATION

In the event of any payment under this policy, the Insurer shall be subrogated to the extent of such payment to all the Company's and the Insured's right of recovery thereof, and the Company and the Insureds shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Insurer to effectively bring suit in the name of the Company or the Insureds. In no event, however, shall the Insurer exercise its rights of subrogation against an Insured under this policy unless such Insured has been convicted of a criminal act, or been determined to have committed a dishonest, fraudulent act or willful violation of any statute, rule or law, or obtained any profit or advantage to which such Insured was not legally entitled.

20. Clause 14. OTHER INSURANCE AND INDEMNIFICATION

Such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance. This policy specifically shall be excess of any other policy pursuant to which any other insurer has a duty to defend a Claim for which this policy may be obligated to pay Loss.

In the event of a Claim against an Insured arising out of his or her service as a director, officer, trustee or governor of an Outside Entity or an Employment Practices Claim against a leased Employee as described in definition (k) of Clause 2, coverage as is afforded by this policy shall be specifically excess of indemnification provided by such Outside Entity or such leasing company and any insurance provided to such Outside Entity or such leasing company.

This endorsement, effective *12:01 am* *September 13, 2002* forms a part of policy number *569-77-00*
issued to *INTERNATIONAL RADIOLOGY GROUP, L.L.C.*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

Further, in the event other insurance is provided to the Outside Entity or leasing company referenced in the above paragraph, or is provided under any pension trust or employee benefit plan fiduciary liability insurance policy, and such other insurance is provided by the Insurer or any member company of American International Group, Inc. (AIG) (or would be provided but for the application of the retention amount, exhaustion of the limit of liability or failure to submit a notice of a Claim) then the Insurer's maximum aggregate Limit of Liability for all Losses combined in connection with a Claim covered, in part or in whole, by this policy and such other insurance policy issued by AIG shall not exceed the greater of the Limit of Liability of this policy or the limit of liability of such other AIG insurance policy.

21. Clause 15. NOTICE AND AUTHORITY

It is agreed that the Named Entity shall act on behalf of the Subsidiaries and all Insureds with respect to the giving of notice of a Claim, the giving and receiving of notice of cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy, the exercising or declining of the right to tender the defense of a Claim to the Insurer and the exercising or declining of any right to a Discovery Period or Reinstated Limit.

22. Clause 17. ACTION AGAINST INSURER

Except as provided in Clause 18 of the policy, no action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the Insureds' obligation to pay shall have been finally determined either by judgment against the Insureds after actual trial or by written agreement of the Insureds, the claimant and the Insurer.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the Insurer as a party to any action against the Insureds or the Company to determine the Insureds' liability, nor shall the Insurer be impleaded by the Insureds or the Company or their legal representatives. Bankruptcy or insolvency of the Company or the Insureds or of their estates shall not relieve the Insurer of any of its obligations hereunder.

VII.

23. Clause 7. COINSURANCE CLAUSE, is deleted in its entirety and replaced with the following:

This endorsement, effective 12:01 am September 13, 2002 forms a part of policy number 589-77-00
issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by National Union Fire Insurance Company of Pittsburgh, Pa.

Clause 7. PRE-AUTHORIZED DEFENSE ATTORNEYS FOR DESIGNATED CLAIMS

This clause applies only to an Employment Practices Claim or a Securities Claim (each of the foregoing hereinafter referred to as a "Designated Claim").

Affixed as Appendix A hereto and made a part of this policy is a list or lists of Panel Counsel law firms ("Panel Counsel Firms") from which a selection of legal counsel shall be made to conduct the defense of any Designated Claim against an Insured pursuant to the terms set forth below.

In the event the Insurer has assumed the defense pursuant to Clause 9 of this policy, then the Insurer shall select a Panel Counsel Firm to defend the Insureds. In the event the Insureds are already defending a Designated Claim, then the Insureds shall select a Panel Counsel Firm to defend the Insureds.

The selection of the Panel Counsel Firm, whether done by the Insurer or the Insureds, shall be from the list of Panel Counsel Firms designated for the type of Claim and be from the jurisdiction in which the Designated Claim is brought. In the event a Designated Claim is brought in a jurisdiction not included on the appropriate list, the selection shall be made from a listed jurisdiction which is the nearest geographic jurisdiction to either where the Designated Claim is maintained or where the corporate headquarters or state of formation of the Named Entity is located. In such instance, however, the Insurer shall, at the written request of the Named Entity, assign a non-Panel Counsel Firm of the Insurer's choice in the jurisdiction in which the Designated Claim is brought to function as "local counsel" on the Designated Claim to assist the Panel Counsel Firm which will function as "lead counsel" in conducting the defense of the Designated Claim.

With the express prior written consent of the Insurer, an Insured may select (in the case of the Insured defending the Claim), or cause the Insurer to select (in the case of the Insurer defending the Claim), a Panel Counsel Firm different from that selected by other Insured defendants if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The list of Panel Counsel Firms may be amended from time to time by the Insurer. However, no change shall be made to the specific list attached to this policy during the Policy Period without the consent of the Named Entity.

VIII.

The following Clauses are hereby added to the policy:

24. Clause 18. DISPUTE RESOLUTION PROCESS

This endorsement, effective 12:01 am September 13, 2002 forms a part of policy number 569-77-00
issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by National Union Fire Insurance Company of Pittsburgh, Pa.

The Insured shall have the option, in its sole discretion, to submit all disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of Loss, to the alternative dispute resolution process ("ADR") set forth in this clause.

The Insureds may elect the type of ADR discussed below. The Insurer agrees to submit to the ADR process chosen by the Insured. Once elected, the ADR cannot be terminated prior to a determination without consent of the Insured and the Insurer.

There shall be two choices of ADR: (1) non-binding mediation administered by the American Arbitration Association, in which the Insurer and Insureds shall try in good faith to settle the dispute by mediation under or in accordance with its then-prevailing Commercial Mediation Rules; or (2) arbitration submitted to the American Arbitration Association under or in accordance with its then-prevailing Commercial Arbitration Rules, in which the arbitration panel shall be composed of three disinterested individuals. In either mediation or arbitration, the mediator(s) or arbitrators shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute. The mediator(s) or arbitrators shall also give due consideration to the general principles of the law of the state where the Named Entity is incorporated or formed in the construction or interpretation of the provisions of this policy; provided, however, that the terms, conditions, provisions and exclusions of this policy are to be construed in an even-handed fashion in the manner most consistent with the relevant terms, conditions, provisions or exclusions of the policy. In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the arbitrators' award shall not include attorneys fees or other costs. In the event of mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until the mediation shall have been terminated and at least 120 days shall have elapsed from the date of the termination of the mediation. In all events, each party shall share equally the expenses of the ADR.

Either choice of ADR may be commenced in New York, New York; Atlanta, Georgia; Chicago, Illinois; Denver, Colorado; or in the state indicated in Item 1 of the Declarations page as the mailing address for the Named Entity. The Named Entity shall act on behalf of all Insureds in deciding to proceed with ADR under this clause.

25. Clause 19. REPRESENTATIONS AND SEVERABILITY

In granting coverage under this Policy, it is agreed that the Insurer has relied upon the statements and representations contained in the application for this policy

This endorsement, effective *12:01 am* *September 13, 2002* forms a part of policy number *589-77-00*
issued to *INTERNATIONAL RADIOLOGY GROUP, L.L.C.*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

(including materials submitted thereto and, if this is a renewal application, all such previous policy applications for which this policy is a renewal) as being accurate and complete. All such statements and representations shall be deemed to be material to the risk assumed by the Insurer, are the basis of this policy and are to be considered as incorporated into this policy.

With respect to such statements and representations, no knowledge or information possessed by any Individual Insured, except for those person or persons who executed the application, shall be imputed to any other Individual Insured. If any person who executed the application knew that such statement or representation was inaccurate or incomplete, then this policy will be void as to all Insureds other than Individual Insureds who are "non-employee Directors" of the Company and who did not personally know the statement or representation to be inaccurate or incomplete. The term "non-employee Director" shall have the meaning described in Securities & Exchange Commission rules or regulations promulgated pursuant to section 16 of the Securities Exchange Act of 1934).

26. Clause 20. WORLDWIDE TERRITORY

This policy shall apply to Claims made against an Insured anywhere in the world.

27. Clause 21. CONVERSION

This policy shall automatically convert to the policy form entitled DIRECTORS, OFFICERS AND PRIVATE COMPANY LIABILITY INSURANCE ("PrivateEdge") bearing policy form number 68462 (8/97). It is expressly understood that the Insured's consent is not required as a condition precedent to such conversion. Such conversion shall occur on the date and time the DIRECTORS, OFFICERS AND PRIVATE COMPANY LIABILITY INSURANCE ("PrivateEdge") form is approved by the appropriate insurance department in the state of domicile of the Named Entity as stated in Item 1. of the Declarations. The Insurer is hereby authorized to replace this policy with the DIRECTORS, OFFICERS AND PRIVATE COMPANY LIABILITY INSURANCE ("PrivateEdge") bearing policy form numbers 68462 (8/97) upon such approval as soon as practicable. The physical re-issuance of the policy form shall not be a condition precedent to the effectiveness of this Clause.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

*END 1*

AUTHORIZED REPRESENTATIVE

*COPY*

**ENDORSEMENT# 2**

This endorsement, effective 12:01 am September 13, 2002 forms a part of policy number 569-77-00 issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by National Union Fire Insurance Company of Pittsburgh, Pa.

**ARC PRIVATE EDGE[SM] AMENDATORY ENDORSEMENT**

In consideration of the premium charged, it is understood and agreed that unless modified by another endorsement to this policy, coverage as is afforded by this policy is amended as follows:

1. **Automatic new acquisitions coverage**

Definition of "Subsidiary", paragraph (2) is amended to read as follows:

(2) automatically any for-profit organization, whose securities are not publicly traded and which becomes a Subsidiary during the Policy Period but only if:

(i) its assets total less than 25% of the total consolidated assets of the Company as of the inception date of this policy; or

(ii) its Employees total less than the lesser of: (A) 20% of the total Employees of the Company as of the inception date of this policy; or (B) two thousand (2000); or

(iii) such for-profit organization, whose securities are not publicly traded, becomes a Subsidiary during the last ninety (90) days of the Policy Period;

The Definition of "Subsidiary," is further amended by adding the following new paragraph at the end thereof:

Notwithstanding the above, solely with respect to coverage afforded under this policy for Employment Practices Claims, this policy shall apply to Employment Practices Violations committed or allegedly committed prior to the time it was a Subsidiary as defined in paragraph (2)(ii) with respect to a Claim made against any such Subsidiary or made against any individual Insured of such Subsidiary for which such Subsidiary has indemnified with respect to the Claim; provided, however, that the foregoing shall not apply if such Subsidiary or any Director or executive Officer of the Company or such Subsidiary knew of the Employment Practices Violation.

2. **Definitions of Insured and Employee amended; Director and Officer added**

Definition of "Employee" is hereby deleted in its entirety and replaced with the following:

"Employee(s)" mean any past, present or future employee, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any part-time, seasonal and temporary Employee in his or her capacity as such. An individual who is leased to the Company or is a volunteer for the Company shall also be an Employee. Any other individual who is contracted to perform work for the Company, or who is an independent contractor for the Company shall also be an Employee.

**ENDORSEMENT# 2 (continued)**

Subparagraph (4) of the Definition of "Individual Insured(s)" is hereby deleted in its entirety and replaced with the following:

(4) any Insured Employee of the Company.

The following Definition of "Insured Employee" is hereby added to the policy:

"Insured Employee" means any past, present or future employee, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any part-time, seasonal and temporary Employee in his or her capacity as such. An individual who is leased to the Company or is a volunteer for the Company shall also be an Employee, but only if the Company provides indemnification to such leased individual in the same manner as is provided to the Company's Employees. Any other individual who is contracted to perform work for the Company, or who is an independent contractor for the Company shall also be an Employee, but only if the Company provides indemnification to such individual in the same manner as that provided to the Company's Employees.

Solely for the purposes of the coverage afforded hereunder, the term "Director or Officer" means an Individual Insured as defined in Definition (I)(1), (2) and (3).

3. **Punitive, Exemplary and Multiple Damages Coverage**

The Definition of "Loss" is amended as follows:

Subparagraph (6) is hereby deleted in its entirety and replaced with the following:

(6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed. It is further understood and agreed that a determination as to whether or not matters are "deemed uninsurable" for the purposes of this subparagraph (6) shall be governed by such applicable law which most favors the Insured.

The final paragraph thereof is deleted in its entirety and replaced with the following:

Notwithstanding the foregoing, Loss shall specifically include (subject to the policy's other terms, conditions and exclusions) punitive, exemplary and multiple damages (including the multiple or liquidated damages' awards under the Age Discrimination in Employment Act and the Equal Pay Act). It is further understood and agreed that the enforceability of the foregoing coverage shall be governed by such applicable law which most favors coverage for punitive, exemplary and multiple damages.

4. **Third Party Sexual Harassment and Discrimination Coverage**

The Definition of "Employment Practices Violation", is amended by deleting the last paragraph thereof in its entirety and replacing it with the following:

With respect to any customer(s), client(s), supplier(s), distributor(s), or any other individual or group of individuals, Employment Practices Violation shall mean any actual or alleged discrimination, sexual harassment or violation of an individual's civil rights relating to such discrimination or sexual harassment, whether direct, indirect, intentional or unintentional.

5. **Definition of Employment Practices Violation**

END

COPY

**ENDORSEMENT# 2 (continued)**

**Definition of "Employment Practices Violation" is amended to read as follows:**

(2) harassment (including sexual harassment, whether "quid pro quo", hostile work environment or otherwise, including "same sex" sexual harassment);

6. **Limitations to Exclusions**

**Conduct Exclusions**

(1) Exclusion (a) is deleted in its entirety and replaced with the following:

(a) arising out of, based upon or attributable to the gaining of any profit or advantage to which a final adjudication adverse to the Insured(s) or an alternative dispute resolution proceeding establishes the Insured(s) were not legally entitled; provided however that the foregoing exclusion shall not apply to Employment Practices Claims;

(2) Exclusion (c) is hereby deleted in its entirety and replaced with the following:

(c) arising out of, based upon or attributable to the committing of any deliberate criminal, deliberate fraudulent or dishonest act, or any willful violation of any statute, rule or law, if a final adjudication adverse to the Insured(s) or an alternative dispute resolution proceeding establishes that such deliberate criminal, deliberate fraudulent or dishonest act or any willful violation of any statute, rule or law occurred;

**Bodily Injury**

Exclusion (i) is deleted in its entirety and replaced with the following:

(i) with respect to Coverages A and B(ii) only: for bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof; and with respect to Coverage B(i): alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof. Provided, however, that this Exclusion (i) shall not apply to Securities Claims; and with respect to coverage afforded to Employment Practices Claims, shall only apply to Employment Practices Claims alleging, arising out of, or in any way involving directly or indirectly, sexual abuse, sexual assault or battery;

**Insured v. Insured**

Exclusion (l)(2) is deleted in its entirety and replaced with the following:

(2) an Employment Practices Claim;

**Retaliation**

Notwithstanding Exclusions (o) and (p), this policy shall provide coverage (subject to the policy's other terms, conditions and exclusions) for Loss arising from a Claim for Retaliation against an Employee in response to such Employee's attempt to exercise his or her rights under law including any of the following laws or benefit rights:

(i) Employee Retirement Income Security Act of 1974 (ERISA), specifically including Claims against an Insured brought under Section 510 of ERISA,

**ENDORSEMENT# 2 (continued)**

(ii) Fair Labor Standards Act (except the Equal Pay Act),

(iii) National Labor Relations Act (NLRA),

(iv) Worker Adjustment and Retraining Notification Act (WARN),

(v) Consolidated Omnibus Budget Reconciliation Act (COBRA),

(vi) Occupational Safety and Health Act (OSHA),

(vii) worker's compensation,

(viii) disability benefits,

(ix) unemployment compensation,

(x) unemployment insurance,

(xi) retirement benefits or social security benefits, or

(xii) any rules or regulations of the foregoing promulgated the reunder.

Breach of Contract

Exclusion (h) is deleted in its entirety and replaced with the following:

(h) alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or any other Insured under any express contract or agreement; provided, however, that this exclusion shall not apply to:

(1) the extent any liability does not arise under such express contract or agreement; or

(2) a Director or Officer, provided that this exception for Directors or Officers shall not apply to a Claim alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or any other Insured under any express employment contract or agreement.

Provided further however, that solely with respect to coverage afforded by this policy for Employment Practices Claims, this exclusion shall not apply to:

(i) Loss constituting Defense Costs;

(ii) Loss arises out of mental anguish or emotional distress; or

(iii) the extent any liability does not arise under such express contract or agreement; or

(iv) liability of the Insured which has been assumed under an indemnification provision with a leasing company or temporary help employment agency, but only if such liability arises from an Employment Practices Violation by an Employee leased or hired by such company or agency, and does not arise from any act, error or omission solely by the leasing company or temporary help agency;

alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or any other Insured under any written or expressed employment contract or agreement;

It is further understood and agreed that with respect to (A) Defense Costs jointly incurred by, (B) any joint settlement made by and/or (C) any judgment of joint and several liability against the Company and any Individual Insured in connection with a Claim, the Company and the Individual Insured and the Insurer agree to use their best efforts to determine a fair and proper allocation of the amounts as between the Company and the Individual Insureds and the Insurer, taking into account the relative legal and financial exposures, and the relative benefits obtained by the Individual Insureds and the Company.

7. **Notice Provisions**

Clause 7(a) is deleted in its entirety and replaced with the following:

(a) The Company or the Insureds shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of a Claim as soon as practicable after the Claim is reported to or first becomes known by the human resources department or office of general counsel (or if no such office or department exists, then the equivalent office or department) and upon the earliest occurrence of the following:

(1) The Claim is or is sought to be certified as a class action; or

(2) The Claim is brought by more than one claimant or is sought to be consolidated with another Claim brought by another claimant; or

(3) The Claim alleges sexual harassment by a duly elected or appointed corporate Director or Officer of the Company; or

(4) Total Loss (including Defense Costs) of the Claim is reasonably estimated by the human resources department or office of general counsel (or if no such office or department exists, then the equivalent office or department) to exceed 50% of the applicable Retention amount stated in Item 5. of the Declarations;

but in all events no later than:

(i) anytime during the Policy Period or during the Discovery Period (if applicable); or

(ii) within thirty (30) days after the end of the Policy Period or the Discovery Period (if applicable), as long as such Claim is reported no later than thirty (30) days after the date such Claim was first made against an Insured.

It is further understood and agreed that at the Named Entity's option, the Insureds may submit to the Insurer a quarterly bordereau of Claims to which coverage under this policy may apply, including any documentation and all relevant pleadings, letters and other information descriptive of such Claims, such Claims shall be subject to all of the terms and conditions of this policy including but not limited to Clause 7(c).

8. **Defense Provisions**

Clause 8 of the policy is amended as follows:

Settlements within Retention Amount (inclusive of Defense Costs): Insurer waives consent

Notwithstanding the above, if all Insured defendants are able to dispose of all Claims, which are subject to one Retention amount for an amount (inclusive of Defense Costs) not exceeding such Retention amount, then the Insurer's consent shall not be required for such Claims.

Choice of Counsel/Duty to Defend: Mutual Consent Provisions

Subject to the provisions of Clause 8, the Named Entity may choose on behalf of all Insureds whether to defend a Claim themselves or tender the Claim over to the Insurer to defend.

Settlement Clause

The last paragraph of Clause 8 is deleted in its entirety and replaced with the following:

END

COPY

Furthermore, in the event the Insureds do not consent to the first Settlement Opportunity within the time prescribed, then, subject to the applicable limit of liability, the Insurer's liability for all Loss on account of such Claim shall not exceed: (1) the amount for which the Insurer could have settled such Claim plus Defense Costs incurred as of the date such settlement was proposed in writing by the Insurer, ("Settlement Opportunity Amount") plus (2) 80% of covered Loss in excess of such Settlement Opportunity Amount, it being a condition of this insurance that the remaining 20% of such Loss excess of the Settlement Opportunity Amount shall be carried by the Company and the Insureds at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the Settlement Opportunity Amount exceeds the Retention amount stated in Item 5. of the Declarations.

**9. Clause 9 Panel Counsel Amendment applicable to certain Employment Practices Claims**

Clause 9 is hereby amended by adding the following at the end thereof:

Notwithstanding the foregoing, solely with respect to an Employment Practices Claim, other than a Claim described in paragraph (4) below, Clause 9 shall not apply to a single plaintiff action Employment Practices Claim alleging discrimination or sexual harassment against an Insured if the total Loss (including Defense Costs) of such Claim does not exceed, or is not reasonably estimated by the human resources department or office of general counsel (or if no such office or department exists, then the equivalent office or department) to exceed, 300% of the applicable Retention amount stated in Item 5. of the Declarations (hereinafter "Non-Designated Claim"), subject to the following conditions.

(1) The Insured or the Company shall select either a Panel Counsel Firm, pursuant to the terms and conditions of Clause 9, or a law firm listed below ("Non-Panel Counsel Firm") to conduct the defense of such Non-Designated Claims. A Non-Panel Counsel Firm may only be selected for a Non-Designated Claim brought in the jurisdiction indicated below. In the event a Non-Designated Claim is brought in a jurisdiction not indicated below, then the Insured shall select a Panel Counsel Firm, pursuant to the terms and conditions of Clause 9, to conduct the defense of such Claim.

(2) If at any time either: (i) the total Loss (including Defense Costs) of such Non-Designated Claim exceeds, or becomes reasonably estimated by the Human Resources Department or Office of General Counsel to exceed, 300% of the applicable Retention amount stated in Item 5. of the Declarations, or (ii) the Defense Costs incurred in the defense of such Non-Designated Claim exceeds $100,000, then a Panel Counsel Firm shall be selected by the Insurer, pursuant to the terms and conditions of Clause 9, to conduct the defense of such Non-Designated Claim as lead counsel. In such an event, however, the Insurer may, at its sole discretion, maintain the Non-Panel Counsel Firm in the jurisdiction in which the Non-Designated Claim is brought to function as "local counsel" on the Non-Designated Claim to assist the Panel Counsel Firm which will function as "lead counsel" in such Claim.

(3) In all events, Defense Costs may not be incurred by or at the direction of any Non-Panel Counsel Firm for any Non-Designated Claim without the prior written consent of the Insurer, such consent not to be unreasonably withheld, subject to all the terms and conditions of Clause 8.

***END***

***COPY***

(4) This exception to Clause 9 herein does not, in any way, apply to a Claim: (i) for which the Insurer has assumed the defense pursuant to Clause 8 of this policy; (ii) alleging Retaliation; (iii) brought in the form of a class action or multiple plaintiff action; or (iv) alleging discrimination or sexual harassment conduct by a duly elected or appointed Director or Officer of the Company.

| ADDITIONAL FIRM | JURISDICTION |
| --- | --- |

10. **Extended Reporting Provision**

Subject to Clause 10. DISCOVERY CLAUSE, the Named Entity may elect a Discovery Period of one, two or three years. The Additional Premium Amount for:

(1) one year shall be 75% of the "full annual premium";

(2) two years shall be 150% of the "full annual premium"; and

(3) three years shall be 200% of the "full annual premium".

As used herein, "full annual premium" means the premium level in effect immediately prior to the end of the Policy Period.

11. **Alternative Dispute Resolution ("ADR")**

Clause 17. DISPUTE RESOLUTION PROCESS, is amended by adding the following at the end thereof:

Either choice of ADR may be commenced in any of the following locations which relate to the Named Entity:

(1) the state of incorporation of the Named Entity; or

(2) the state indicated in Item 1. of the Declarations page as the mailing address for the Named Entity;

OR any of the following locations (regardless of whether they relate to the Named Entity):

(3) New York, New York;

(4) Boston, Massachusetts;

(5) Atlanta, Georgia;

(6) Chicago, Illinois;

(7) Denver, Colorado.

The Named Entity shall act on behalf of all Insureds in deciding to proceed with ADR under this clause.

12. **Named Parent Coverage**

The term Company shall include the Named Parent of the Named Entity, subject to the following terms and conditions.

Coverage as is afforded under this policy solely with respect to Employment Practices Claims made against the Named Parent or any individual Insured thereof shall only apply if: (1) such Claim relates to an Employment Practices Violation committed by an Insured (other than the Named Parent or an individual Insured thereof); and (2) an Insured (other than the Named Parent or an individual Insured thereof) is and remains a defendant in the action along with such Named Parent or any individual Insured thereof.

*END*

*COPY*

**ENDORSEMENT# 2 (continued)**

(4) This exception to Clause 9 herein does not, in any way, apply to a Claim: (i) for which the Insurer has assumed the defense pursuant to Clause 8 of this policy; (ii) alleging Retaliation; (iii) brought in the form of a class action or multiple plaintiff action; or (iv) alleging discrimination or sexual harassment conduct by a duly elected or appointed Director or Officer of the Company.

| ADDITIONAL FIRM | JURISDICTION |
|---|---|

10. **Extended Reporting Provision**

Subject to Clause 10. DISCOVERY CLAUSE, the Named Entity may elect a Discovery Period of one, two or three years. The Additional Premium Amount for:

(1) one year shall be 75% of the "full annual premium";

(2) two years shall be 150% of the "full annual premium"; and

(3) three years shall be 200% of the "full annual premium".

As used herein, "full annual premium" means the premium level in effect immediately prior to the end of the Policy Period.

11. **Alternative Dispute Resolution ("ADR")**

Clause 17. DISPUTE RESOLUTION PROCESS, is amended by adding the following at the end thereof:

Either choice of ADR may be commenced in any of the following locations which relate to the Named Entity:

(1) the state of incorporation of the Named Entity; or

(2) the state indicated in Item 1. of the Declarations page as the mailing address for the Named Entity;

OR any of the following locations (regardless of whether they relate to the Named Entity):

(3) New York, New York;

(4) Boston, Massachusetts;

(5) Atlanta, Georgia;

(6) Chicago, Illinois;

(7) Denver, Colorado.

The Named Entity shall act on behalf of all Insureds in deciding to proceed with ADR under this clause.

12. **Named Parent Coverage**

The term Company shall include the Named Parent of the Named Entity, subject to the following terms and conditions.

Coverage as is afforded under this policy solely with respect to Employment Practices Claims made against the Named Parent or any individual Insured thereof shall only apply if: (1) such Claim relates to an Employment Practices Violation committed by an Insured (other than the Named Parent or an individual Insured thereof); and (2) an Insured (other than the Named Parent or an individual Insured thereof) is and remains a defendant in the action along with such Named Parent or any individual Insured thereof.

*END*

**COPY**

In all events coverage as is afforded under this policy with respect to an Employment Practices Claim made against the Named Parent or any Individual Insured thereof shall only apply to Employment Practices Violations committed or allegedly committed after the time that such Named Parent became a Named Parent and prior to the time such Named Parent ceases to be a Named Parent.

The term Named Parent means any organization incorporated outside the United States, its territories or possessions that owns more than a 50% ownership interest in the Named Entity, either directly, or indirectly through one or more of its subsidiaries.

A foreign organization becomes the Named Parent when it owns more than a 50% ownership interest in the Named Entity, either directly, or indirectly through one or more of its subsidiaries. Such organization ceases to be the Named Parent when the organization ceases to own more than a 50% ownership in the Named Entity, either directly, or indirectly through one or more of its subsidiaries.

**13. Liberalization Clause**

In the event that the Insurer shall announce either: (1) a new Private Company Directors and Officers and Employment Practices Insurance policy form; or (2) an enhancement of coverage endorsement to this policy form, which is to be made available to all Insureds and for which no additional premium is required, then the Named Entity shall have the right to such new policy or such new coverage enhancement endorsement subject to all underwriting information or particulars as the Insurer may require for such new policy or enhanced coverage.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS UNCHANGED.

AUTHORIZED REPRESENTATIVE

**ENDORSEMENT# 3**

This endorsement, effective 12:01 am September 13, 2002 forms a part of policy number 669-77-00
issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by National Union Fire Insurance Company of Pittsburgh, Pa.

## TEXAS LIABILITY INSURANCE AMENDATORY ENDORSEMENT CANCELLATION AND NONRENEWAL

Wherever used in this endorsement: 1) "Insurer" means the insurance company which issued this policy; and 2) "Insured" means the Named Corporation, Named Entity, Named Organization, Named Sponsor, or Named Insured stated in the declarations page; and 3) "Liability Insurance" means the following types of insurance: general liability, professional liability other than medical professional liability, commercial multi-peril coverage, and any other types of lines of liability insurance designated by the State Board of Insurance.

It is hereby agreed that the cancellation provision of this policy is deleted in its entirety and replaced by the following:

**CANCELLATION AND NONRENEWAL**

A. Cancellation

1. This policy may be canceled by the Insured by surrender thereof to the Insurer or any of its authorized agents or by mailing to the Insurer written notice stating when thereafter the cancellation shall be effective.

2. Except as provided by subsection A.3. below, the Insurer may not cancel this policy after the 60th day following the date on which the policy was issued, or if it is a renewal or continuation of a policy issued by the Insurer.

   a) a policy of liability insurance that is a renewal or continuation policy; or

   b) a policy of liability insurance that is in its initial policy period after the 60th day following the date on which the policy was issued.

3. The Insurer may cancel this policy at any time during the term of the policy for the following reasons:

   a) fraud in obtaining coverage;

   b) failure to pay premiums when due;

   c) an increase in hazard within the control of the Insured or Other Insured(s) which would produce an increase in rate;

   d) loss of the Insurer's reinsurance covering all or part of the risk covered by the policy; or

   e) the Insurer being placed in supervision, conservatorship, or receivership, if the cancellation or nonrenewal is approved or directed by the supervisor, conservator, or receiver.

4. The Insurer shall deliver or mail to the Insured first named in the Declarations written notice of cancellation at the address shown on the policy not less than the 10th day before the date on which the cancellation takes effect. Such written notice shall state the reason(s) for cancellation.

5. The Insurer may not cancel this policy based solely on the fact that the insured is an elected official.

B. Nonrenewal

1. The insurer may refuse to renew this policy by delivering or mailing to the Insured first named in the Declarations written notice of nonrenewal at the address shown on the policy. Such written notice shall state the reason(s) for nonrenewal. The notice must be delivered or mailed not later than the 60th day before the date on which the policy expires. If the notice is delivered or mailed later than the 60th day before the date on which the policy expires, the coverage shall remain in effect until the 61st day after the date on which the notice is delivered or mailed. If notice is delivered or mailed, proof of delivery or mailing will be sufficient proof of notice. Earned premium for any period of coverage that extends beyond the expiration date of the policy shall be computed pro rata based on the previous year's rates.

2. The transfer of a policyholder between admitted companies within the same insurance group is not considered a refusal to renew.

3. The insurer may not refuse to renew this policy based solely on the fact that the insured is an elected official.

All other terms and conditions shall remain unchanged.

AUTHORIZED REPRESENTATIVE

**ENDORSEMENT# 4**

This endorsement, effective 12:01 am September 13, 2002 forms a part of policy number 589-77-00
issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by National Union Fire Insurance Company of Pittsburgh, Pa.

**TEXAS AMENDATORY**
**BROAD FORM NUCLEAR ENERGY LIABILITY EXCLUSION**
**DEFINITION OF WASTE**

In consideration of the premium charged, it is hereby understood and agreed that the definition of "Waste" contained in the Nuclear Energy Liability Exclusion (Broad Form) endorsement attached to the policy is deleted in its entirety and replaced with following:

"Waste" means any Waste Material:

(a) containing by-product material other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content, and

(b) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED

AUTHORIZED REPRESENTATIVE

END 004

62802 (6/95) COPY

**ENDORSEMENT# 5**

This endorsement, effective 12:01 am September 13, 2002 forms a part of policy number 569-77-00
issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by National Union Fire Insurance Company of Pittsburgh, Pa.

**CAPTIVE INSURANCE COMPANY EXCLUSION**

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payments for Loss in connection with any claim(s) made against any Insured(s) alleging, arising out of, based upon, attributable to the ownership, management, maintenance and/or control by the Company of any captive insurance company or entity including but not limited to any claim(s) alleging the insolvency or bankruptcy of the Named Corporation as a result of such ownership, operation, management and control.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

END 005

COPY

**ENDORSEMENT# 8**

This endorsement, effective *12:01 am* *September 13, 2002* forms a part of policy number *589-77-00*
issued to *INTERNATIONAL RADIOLOGY GROUP, L.L.C.*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

## COMMISSIONS EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any claim made against the Directors and Officers, alleging, arising out of, based upon or attributable to:

(i) Payments, commissions, gratuities, benefits or any other favors to or for the benefit of any full or part-time domestic or foreign governmental or armed services officials, agents, representatives, employees or any members of their family or any entity with which they are affiliated; or

(ii) Payments, commissions, gratuities, benefits or any other favors to or for the benefit of any full or part-time officials, directors, agents, partners, representatives, principal shareholders, or owners or employees, or affiliates (as that term is defined in The Securities Exchange Act of 1934, including any of their officers, directors, agents, owners, partners, representatives, principal shareholders or employees) of any customers of the
company or any members of their family or any entity with which they are affiliated; or

(iii) Political contributions, whether domestic or foreign.

**END 6**

AUTHORIZED REPRESENTATIVE

(2/90) **COPY**

**ENDORSEMENT# 7**

This endorsement, effective *12:01 am September 13, 2002* forms a part of policy number *569-77-00* issued to *INTERNATIONAL RADIOLOGY GROUP, L.L.C.*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

**Discovery amended to one year @ 150%;all other TBD**

In consideration of the premium charged, it is hereby understood and agreed that the policy (and any endorsement amending Clause 10. DISCOVERY CLAUSE) is hereby amended to the extent necessary for the policy to provide the following:

Clause 10. DISCOVERY CLAUSE is hereby deleted in its entirety and replaced with the following:

**10. DISCOVERY CLAUSE**

Except as indicated below, if the **Named Entity** shall cancel or the **Named Entity** or the **Insurer** shall refuse to renew this policy, the **Named Entity** shall have the right to a period of either one, two or three years following the effective date of such cancellation or nonrenewal (the " **Discovery Period**") upon payment of the respective " **Additional Premium Amount**" described below, in which to give to the **Insurer** written notice pursuant to Clause 7(a) and 7(c) of the policy of: (i) **Claims** first made against an **Insured**; and (ii) circumstances of which an **Organization** or an **Insured** shall become

y **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covere this policy.

The **Additional Premium Amount** for: (1) one year shall be no more than 150% o **Full Annual Premium**; and (2) two and three years shall be a premium amount t mutually agreed upon by the **Insured** and the **Insurer** at the time of the election o **Discovery Period**. As used herein, " **Full Annual Premium**" means the premium le effect immediately prior to the end of the **Policy Period**.

In the event of a **Transaction** as defined in Clause 12(a), the **Named Entity** shall the right to request an offer from the Insurer of a Discovery Period (with respe

**ENDORSEMENT# 8**

This endorsement, effective *12:01 am* *September 13, 2002* forms a part of policy number *569-77-00* issued to *INTERNATIONAL RADIOLOGY GROUP, L.L.C.*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

**FAILURE TO MAINTAIN INSURANCE EXCLUSION**

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable for any Loss in connection with any Claim(s) made against any Insured alleging, arising out of, based upon, attributable to any failure or omission on the part of the Insureds or the Company to effect or maintain adequate insurance.

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

**END 8**

(2/90) **COPY**

AUTHORIZED REPRESENTATIVE

**ENDORSEMENT# 9**

This endorsement, effective 12:01 am September 13, 2002 forms a part of policy number 589-77-00 issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by National Union Fire Insurance Company of Pittsburgh, Pa.

**MAJOR SHAREHOLDER EXCLUSION**

In consideration of the premium charged it is hereby understood and agreed that the Insurer shall not be liable for any Loss in connection with any claim(s) made against any Insured(s) which are brought by any individual(s) or entity/iesthat own or control (whether beneficially, directly or indirectly) 5 % or more of the outstanding voting stock (hereinafter "Major Shareholder"); or by any security holder of the Company whether directly or derivatively, unless such security holder's claim(s) is instigated and continued totally independent of, and totally without the solicitation of, or assistance of any Major Shareholder.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

END 009

COPY

**ENDORSEMENT# 10**

This endorsement, effective 12:01 am September 13, 2002 forms a part of policy number 569-77-00 issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by National Union Fire Insurance Company of Pittsburgh, Pa.

**MEDICAL MALPRACTICE EXCLUSION**

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any Claim(s) made against any Insured(s) alleging, arising out of, based upon or attributable to medical or professional malpractice including, but not limited to, the rendering or failure to render of medical or professional service or treatment.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

END 10

AUTHORIZED REPRESENTATIVE

(2/90) COPY

**ENDORSEMENT# 11**

This endorsement, effective *12:01 am* *September 13, 2002* forms a part of policy number *569-77-00*
issued to *INTERNATIONAL RADIOLOGY GROUP, L.L.C.*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

**NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT (BROAD FORM)**

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any claim or claims made against the Directors or Officers:

A. alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly the hazardous properties of nuclear material, including but not limited to:

(1) nuclear material located at any nuclear facility owned by, or operated by or on behalf of, the Company, or discharged or dispersed therefrom; or

(2) nuclear material contained in spent fuel or waste which was or is at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of the Company; or

(3) the furnishing by an insured or the Company of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility; or

(4) claims for damages to the company or its shareholders which alleges, arises from, is based upon, is attributed to or in any way involves, directly or indirectly, the hazardous properties of nuclear material.

B. (1) which is insured under a nuclear energy liability policy issued by the Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability underwriters or Nuclear Insurance Association of Canada or would be insured under any such policy but for its termination or exhaustion of its Limit of Liability; or

(2) with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the Company or any insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or byproduct material;

*END 011*

**ENDORSEMENT# 11 (continued)**

"source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means

(a) any nuclear reactor,

(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

AUTHORIZED REPRESENTATIVE

*END 011*

**ENDORSEMENT# 12**

This endorsement, effective 12:01 am September 13, 2002 forms a part of policy number 589-77-00 issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by National Union Fire Insurance Company of Pittsburgh, Pa.

**OUTSIDE ENTITY ENDORSEMENT**

In consideration of the premium charged, it is hereby understood and agreed that the following entities shall be deemed an "Outside Entity" with respect to its corresponding Continuity Date below:

| | OUTSIDE ENTITY | CONTINUITY DATE |
|---|---|---|
| 1) | a not-for-profit organization under section 501 (c)(3) of the Internal Revenue Code of 1986 (as amended). | March 13, 1998 |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

END 012

COPY

**ENDORSEMENT# 13**

This endorsement, effective 12:01 am September 13, 2002 forms a part of policy number 569-77-00 issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by National Union Fire Insurance Company of Pittsburgh, Pa.

**"NO LIABILITY " PROVISION DELETED**

In consideration of the premium charged, it is hereby understood and agreed that the policy is hereby amended as follows:

(1) The Definition of "No Liability" is hereby deleted in its entirety; and

(2) The last paragraph of Clause 6. RETENTION CLAUSE is hereby deleted in its entirety.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

**END 13**

AUTHORIZED REPRESENTATIVE

 **COPY**

**ENDORSEMENT# 14**

This endorsement, effective 12:01 am September 13, 2002 forms a part of policy number 569-77-00
issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by National Union Fire Insurance Company of Pittsburgh, Pa.

**PRIOR ACTS EXCLUSION – FOR LISTED SUBSIDIARY**

In consideration of the premium charged, it is hereby understood and agreed that the term Company, is amended to include the following subsidiaries, but only for any Wrongful Act(s) which occur subsequent to the acquisition or creation date thereof as listed on the schedule below. Losses arising from the same or related Wrongful Act(s) shall be deemed to arise from the first such same or related Wrongful Act(s).

| NAMED SUBSIDIARY | DATE |
|---|---|
| American Imaging Management Inc. | March 31, 2000 |

ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

END 014

COPY

**ENDORSEMENT# 15**

This endorsement, effective *12:01 am* *September 13, 2002* forms a part of policy number *569-77-00* issued to *INTERNATIONAL RADIOLOGY GROUP, L.L.C.*

by *National Union Fire Insurance Company of Pittsburgh, Pa.*

**PRESUMPTIVE INDEMNIFICATION**

In consideration of the premium charged, it is hereby understood and agreed that, for the purposes of the applicability of this policy to Loss, the Company will be conclusively deemed to have indemnified the Individual Insureds to the maximum extent that the Company is permitted or required to grant such indemnification pursuant to law, common or statutory, or contract or by the charter or by-laws of the Company (which are hereby deemed to adopt the broadest provisions of the law which determines or defines such rights of indemnity). The Company hereby agrees to indemnify the Individual Insureds to the fullest extent permitted by law including the making in good faith of any required application for court approval.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

**END 15**

AUTHORIZED REPRESENTATIVE

## II. COMPANY INFORMATION

13. Stock Ownership

(a) Are any of the Applicant's securities or those of its Subsidiaries publicly traded or the subject of the "shelf registration"? ☐ Yes ☒ No

If "Yes", please state which securities are publicly traded or the subject of the "shelf registration":

☐ Equity ☐ Debt ☐ Mixed (attach explanation)

Exchange(s) ________ Ticker Symbol(s) ________

(If included as an attachment, check here: ☐.)

(b) Total number of voting shares outstanding: Class A = 105,937 Class C = 100

(c) Total number of voting shareholders: 18

(d) Total number of voting shares owned by its Directors (direct and beneficial): 0

(e) Total number of voting shares owned by its Officers (direct and beneficial) who are not Directors: 0

(f) Does any share holder own five percent (5%) or more of the voting shares directly or beneficially? If so, designate name and percentage of holdings. Yes, see attached, Exhibit 1

(If no such shareholders, please check here: ☐ "none".)

(g) Are there any other securities convertible to voting stock? If so, describe fully.

(If none, please check here: ☐ "none".) There are currently available management options that have not yet been issued

14. (a) Attach a complete list of all Directors of the Applicant by name and affiliation with other corporations. See exhibit 2

(b) Attach a complete list of all Officers of the Applicant by name and affiliation with other corporations. See exhibit 2

15. Please list all direct and indirect Subsidiaries. If included as an attachment herein, check here ☐. (Attached

| | Name | Business or Type of Operation | Percentage of Ownership | Date Acquired or Created | Domestic or Foreign and Country of Incorporation |
|---|---|---|---|---|---|
| 1. | American Imaging Management Inc. | Diagnostic Imaging Utilization Management | 100% | 3/31/00 | Domestic |
| 2. | American Imaging Mgmt. Services, LLC | Inactive | 100% | 7/28/00 | Domestic |
| 3. | American Imaging Mgmt East, LLC | Diagnostic Imaging Utilization Mgmt | 100% (owned by #1 above) | 7/28/00 | Domestic |
| 4. | Utilimed IPA, Inc. | Diagnostic Imaging Utilization Mgmt | 100% (owned by #1 above) | 3/31/00 | Domestic |
| 5. | National Radiology Group-DFW, P.A. | Professional Radiology Services | 100% beneficial ownership | 5/15/92 | Domestic |

  American International Companies®

569-77-00

Name of Insurance Company to which Application is made
(herein called the "Insurer")

# DIRECTORS, OFFICERS AND PRIVATE COMPANY LIABILITY INSURANCE POLICY

**Including Employment Practices and Securities Liability**

***PrivateEdge℠ Application***

**NOTICE: THE POLICY PROVIDES THAT THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. FURTHER NOTE THAT AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.**

**IF A POLICY IS ISSUED, IT WILL BE ON A CLAIMS-MADE BASIS.**

---

## I. GENERAL INFORMATION

1. Name and Address of Applicant:
   International Radiology Group, LLC
   1909 Hi Line Drive
   Dallas, Texas 75207

2. State of Incorporation: Delaware

3. Date of Incorporation: 11/2/95

4. Type of Business Entity (please check applicable description):

   ☐ Corporation

   ☒ Limited Liability Company

   ☐ Sole Proprietorship

   ☐ Other (please specify: ______________________ )

5. Years of Operation: Approximately 11 years

6. Nature of Business: Professional radiology services

7. Principal Products or Services: Professional radiology services

8. Primary SIC Code(s):

9. Number of Locations: Domestic (within the U.S., Canada or territories): 1

   Foreign: 0

10. Does the Applicant operate any retail outlets? ☐ Yes ☒ No. (If "Yes", total number of retail outlets: ________.)

11. Name and Address of Parent Corporation (If not Applicant): N/A

12. (a) Amount of insurance requested: $ ____________

    (b) Self-insured retention desired (each loss): $____________

  American International Companies® 

Name of Insurance Company to which Application is made
(herein called the "Insurer")

# DIRECTORS, OFFICERS AND PRIVATE COMPANY LIABILITY INSURANCE POLICY

Including Employment Practices and Securities Liability

*PrivateEdge℠ Application*

**NOTICE: THE POLICY PROVIDES THAT THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. FURTHER NOTE THAT AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.**

**IF A POLICY IS ISSUED, IT WILL BE ON A CLAIMS-MADE BASIS.**

## I. GENERAL INFORMATION

1. Name and Address of Applicant:
   International Radiology Group, LLC
   1909 Hi Line Drive
   Dallas, Texas 75207

2. State of Incorporation: Delaware

3. Date of Incorporation: 11/2/95

4. Type of Business Entity (please check applicable description):
   - ☐ Corporation
   - ☒ Limited Liability Company
   - ☐ Sole Proprietorship
   - ☐ Other (please specify: ______________________ )

5. Years of Operation: Approximately 11 years

6. Nature of Business: Professional radiology services

7. Principal Products or Services: Professional radiology services

8. Primary SIC Code(s):

9. Number of Locations: Domestic (within the U.S., Canada or territories): 1
   Foreign: 0

10. Does the Applicant operate any retail outlets? ☐ Yes ☒ No. (If "Yes", total number of retail outlets: ________.)

11. Name and Address of Parent Corporation (if not Applicant): N/A

12. (a) Amount of insurance requested: $ ____________
    (b) Self-insured retention desired (each loss): $____________

## II. COMPANY INFORMATION

13. Stock Ownership

(a) Are any of the Applicant's securities or those of its Subsidiaries publicly traded or the subject of the "shelf registration"? ☐ Yes ☒ No

If "Yes", please state which securities are publicly traded or the subject of the "shelf registration":
☐ Equity ☐ Debt ☐ Mixed (attach explanation)

Exchange(s) ____________ Ticket Symbol(s) ____________

(If included as an attachment, check here: ☐.)

(b) Total number of voting shares outstanding: Class A = 105,937
Class C = 100

(c) Total number of voting shareholders: 18

(d) Total number of voting shares owned by its Directors (direct and beneficial): 0

(e) Total number of voting shares owned by its Officers (direct and beneficial) who are not Directors: 0

(f) Does any share holder own first percent (5%) or more of the voting shares directly or beneficially? If so, designate name and percentage of holdings Yes, see attached, Exhibit 1

(If no such shareholders, please check here: ☐ "none".)

(g) Are there any other securities convertible to voting stock? If so, describe fully. (If none, please check here: ☐ "none".) There are currently available management options that have not yet been issued

14. (a) Attach a complete list of all Directors of the Applicant by name and affiliation with other corporations. See exhibit 2

(b) Attach a complete list of all Officers of the Applicant by name and affiliation with other corporations. See exhibit 2

15. Please list all direct and indirect Subsidiaries. If included as an attachment herein, check here ☐. (Attached

| | Name | Business or Type of Operation | Percentage of Ownership | Date Acquired or Created | Domestic or Foreign and Country of Incorporation |
|---|---|---|---|---|---|
| 1. | American Imaging Management Inc. | Diagnostic Imaging Utilization Management | 100% | 3/31/00 | Domestic |
| 2. | American Imaging Mgmt. Services, LLC | Inactive | 100% | 7/28/00 | Domestic |
| 3. | American Imaging Mgmt East, LLC | Diagnostic Imaging Utilization Mgmt | 100% (owned by #1 above) | 7/28/00 | Domestic |
| 4. | Utilimed IPA, Inc. | Diagnostic Imaging Utilization Mgmt | 100% (owned by #1 above) | 3/31/00 | Domestic |
| 5. | National Radiology Group-DFW, P.A. | Professional Radiology Services | 100% beneficial ownership | 5/15/92 | Domestic |

Is coverage to be extended to all Subsidiaries? ☒ Yes ☐ No

If "Yes", include complete list of Directors and Officers of each Subsidiary. If "No", include complete of list of Directors and Officers of each Subsidiary for which coverage is requested. If included as an attachment herein, check here ☒. (Attached) See exhibit 3

16. Is the Applicant or any of its Subsidiaries involved in any joint ventures, general partnerships or limited partnerships? (If "Yes", please give details.) ☐ Yes ☒ No

17. Are there any plans for a merger, acquisition or consolidation of or by the Applicant or any of its Subsidiaries? ☐ Yes ☒ No

(a) If "Yes", have these plans been approved by the board of directors? ☐ Yes ☐ No

Date of Approval ________________

(b) If "Yes", have these plans been approved by the shareholders? ☐ Yes ☐ No

Date of Approval ________________

18. (a) Does the Applicant or any of its Subsidiaries anticipate any registration of securities under the Securities Act of 1933 within the next year? ☐ Yes ☒ No
If "Yes", give details and submit any offering materials, if available.

(b) Has the Applicant or any of the Subsidiaries had any private placements or other offering of securities within the last 12 months, or anticipate having any private placements or other offering of securities within the next 12 months? ☐ Yes ☒ No
If "Yes", give details and submit any offering documents, if available.

(c) Does the Applicant or any of its Subsidiaries anticipate purchasing the securities of a "publicly traded entity" in a transaction which would result in such entity becoming an Affiliate or Subsidiary of the Applicant? ☐ Yes ☒ No
If "Yes", give details and submit any merger/acquisition documents, if available.

~~19. (a) There has not been nor is there now pending any claim(s) against any person proposed for insurance in his or her capacity of either Director or Officer of the named Applicant or any of its Subsidiaries, except as follows: (Attach complete details. If no such claim(s), check here: ☐ "none".)~~

~~(b) There has not been nor is there now pending any claim(s) against the Applicant or any of its Subsidiaries with regard to the securities of the Applicant or any of its Subsidiaries, except as follows: (Attach complete details. If no such claim(s), check here: ☐ "none".)~~

~~20. (a) No Director or Officer has knowledge or information of any act, error or omission which might give rise to a claim(s) under the proposed policy except as follows: (Attach complete details. If they have no such knowledge or information, check here: ☐ "none".)~~

~~(b) Neither the Applicant nor any of its Subsidiaries has knowledge or information of any act, error or omission which might give rise to a claim(s) under the proposed policy except as follows: (Attach complete details. If they have no such knowledge or information, check here: ☐ "none".)~~

21. Has the Applicant, any of its Subsidiaries or any Director or Officer:

(a) Been involved in any antitrust, copyright or patent litigation? ☐ Yes ☒ No

(b) Been charged in any civil or criminal action or administrative proceeding with a violation of any federal or state antitrust or fair trade law? ☐ Yes ☒ No

(c) Been charged in any civil or criminal action or administrative proceeding with a violation of any federal or state securities law or regulation? ☐ Yes ☒ No

(d) Been involved in any representative actions, class actions, or derivative suits? ☐ Yes ☒ No

IF ANY OF THE ABOVE, 21 (a) - 21 (d), IS "YES", ATTACH FULL DETAILS

It is agreed that with respect to Questions 19 and 21 above, if such knowledge, information or involvement exist, any claim or action arising therefrom is excluded from the proposed coverage.

## III. APPLICANT'S EMPLOYEE INFORMATION

22. Please provide the following information regarding Employees, including Directors and Officers:

(a) Total number of Employees: ________

| | Non union AIM | Non union TRG | Union (if applicable) |
|---|---|---|---|
| Full Time: | 87 | 18 | |
| Part Time: | 5 | 0 | |
| Seasonal: | 1 | 0 | |
| Temporary: | 3 | 1 | |
| Leased: | 0 | 0 | |
| Independent Contractors: | 12 | 6 | |
| Domestic (within the U.S., Canada and territories): | 108 | 25 | |
| Foreign: | NA | NA | |
| TOTAL: | 108 | 25 | |

(b) Number of Employees in Texas AIM 0 / TRG 18, California 0, Michigan 0.

(c) Is the Applicant or any of its Subsidiaries subject to a collective bargaining agreement? ☐ Yes ☒ No

If "Yes", how many Employees are also subject to this agreement? ________.

(d) Do the Applicant's or any of its Subsidiaries' Employees belong to a Union? ☐ Yes ☒ No

Please list the name of the Union that the largest number of Employees belongs to:

________________________________________

(e) Is the Applicant's or any of its Subsidiaries' Employees employed under a written employment contract? ☒ Yes ☐ No

If "Yes", how many are there? 1.

(f) For the past 3 years, what has been the annual percentage turnover rate of Employees (all locations):

Domestic: 46 % 16.6 % 11.2 % *Note: This information pertains to American Imaging Management, Inc. subsidiary

Year 1 2000 Year 2 2001 Year 3 2002 (to date)

Foreign: NA % ________ % ________ %

Year 1 ____ Year 2 ____ Year 3 ____

(g) How many Officers and other Employees have resigned, been terminated (with or without cause) or retired within the last 24 months (all locations)?

Officers 2 (TRG) 2 (AIM) Other Employees 21 (TRG) 30 (AIM)

## IV. HUMAN RESOURCES

23. Does the Applicant or any of its Subsidiaries have a Human Resources Department? ☒ Yes ☐ No
If "Yes", please answer the following questions regarding the Applicant's or any of its Subsidiaries' Human Resources Department. (If "No", how is this function handled? Please attach full details.)

(a) Number of human resources departments: 1

(b) Number of Employees: 2

24. Does the applicant have a human resources manual or equivalent written management guidelines? ☒ Yes ☐ No
(If no such manual exists, check here: ☐ "none") (If "Yes", does it address the following issues?)

Legally prohibited Discrimination ☒ Yes ☐ No

Sexual Harassment ☒ Yes ☐ No

Compliance with the Americans with Disabilities Act ☒ Yes ☐ No

Compliance with the 1991 Civil Rights Act ☒ Yes ☐ No

Compliance with the Family Medical Leave Act ☒ Yes ☐ No

Employee disciplinary actions ☒ Yes ☐ No

Terminations, layoffs and early retirements ☒ Yes ☐ No

Employee appraisals/reviews ☒ Yes ☐ No

(For all "No" answers, how are these issues handled and by whom? Please attach full details.)

25. Are all management and supervisory Employees provided with a copy of such manual? ☒ Yes ☐ No

26. Do these staff members receive training in the proper implementation of your personnel policies and procedures? ☒ Yes ☐ No
(informally)

27. (a) Are employment issues relating to terminations, discrimination, sexual harassment, layoffs, transfers, and promotions handled by the Human Resources Department? ☒ Yes ☐ No
(If "No", please provide details on how these issues are handled.)

(b) When does outside counsel become involved: (Please attach details.) After any formal complaint filing with a court or other administrative agency

(c) How frequently does outside counsel become involved?

Always ☐ Sometimes ☒ Never ☐

28. Is an application required for new Employees? ☒ Yes ☐ No
(If "Yes", please attach copies.)

29. (a) Does the Applicant have an Employee Handbook? ☒ Yes ☐ No
(If "Yes", please attach a copy.)

(b) Is the Employee Handbook distributed to all employees? ☒ Yes ☐ No

30. Is the Applicant currently undergoing or does the Applicant contemplate undergoing during the next 12 months any employee layoffs or early retirements (including ones resulting from any type of company restructuring or office, plant or store closing)? ☐ Yes ☒ No

(If "Yes", please attach full details.)

31. Please provide on a separate attachment full details of all wrongful termination, discrimination and sexual harassment claims, which amounted to $25,000 or greater payment, made against the Applicant or any of it Subsidiaries or any of its Directors, Officers or Employees during the last five years, including amounts of an judgments or settlements and costs of defense. (If no such claims, check here: ☐ "None".)
See exhibit 4

32. (a) Please provide on a separate attachment full details on all inquiries, investigations, grievance filings or other administrative hearings previously filed during the last five years or currently before any local, sta or federal agency governing employer responsibility to employees. (If none, check here: ☐.)
See exhibit 4

(b) Please provide on a separate attachment full details on a customer/client lawsuits previously filed during the last five years. (If none, check here ☐.)
See exhibit 4

33. Current Insurance (If none, most recent). If included as an attachment herein, check here ☐ (Attached).

| | D&O Insurance | EPL Insurance |
|---|---|---|
| (a) Name of insurance company | Illinois National Insurance Company | |
| (b) Limit of Liability | 3,000,000 | |
| (c) Self-insured retention | $50,000 | |
| (d) Policy expiration date | 9/13/02 | |
| (e) Premium (indicate one year or more) | $49,000/year | |

34. Has any insurance carrier refused, canceled or nonrenewed any Directors and Officers or Employment Practices insurance coverage? *** ☐ Yes ☒ No
(If "Yes", attach full details including when and reason(s).)

35. Name of Risk Manager and General Counsel (or equivalent position) and number of years in current position:
Timothy C. Dillon, General Counsel, 10 months

36. Name and Location (City) of outside law firm(s) for the following:
Security claims: N/A
Employment Practices claims: Foley & Lardner, Chicago, IL
Other (please specify): Arnstein & Lehr (Corporate/Litigation)

37. Attach copies of the following for the Applicant and, to the extent available, each of its Subsidiaries:

(a) Latest annual report or audited Financial Statement.

(b) Latest interim financial statement available.

(c) All proxy statements and Notices of Annual Meeting of Stockholders within the last twelve months.

(d) Copy (certified by Corporate Secretary) of the indemnification provisions of the charter and the by-laws Also attach copy of any corporate indemnification agreement.

(e) Latest CPA management letter along with applicant's responses to any recommendations made therein.

[***MISSOURI APPLICANTS NEED NOT REPLY.]

(f)   Employee Handbook.

(g)   Human Resources Manual/Guidelines.

(h)   Procedures respecting applicants for employment, employee discipline, termination, alleged harassment or discrimination.

(i)   Latest EEO-1 report.   N/A

THE UNDERSIGNED AUTHORIZED OFFICER OF THE APPLICANT DECLARES THAT THE STATEMENTS SET FORTH HEREIN ARE TRUE. THE UNDERSIGNED AUTHORIZED OFFICER AGREES THAT IF THE INFORMATION SUPPLIED ON THIS APPLICATION CHANGES BETWEEN THE DATE OF THIS APPLICATION AND THE EFFECTIVE DATE OF THE INSURANCE, HE/SHE (UNDERSIGNED) WILL, IN ORDER FOR THE INFORMATION TO BE ACCURATE ON THE EFFECTIVE DATE OF THE INSURANCE, IMMEDIATELY NOTIFY THE INSURER OF SUCH CHANGES, AND THE INSURER MAY WITHDRAW OR MODIFY ANY OUTSTANDING QUOTATIONS OR AUTHORIZATIONS OR AGREEMENTS TO BIND THE INSURANCE.

SIGNING OF THIS APPLICATION DOES NOT BIND THE APPLICANT OR THE INSURER TO COMPLETE THE INSURANCE, BUT IT IS AGREED THAT THIS APPLICATION SHALL BE THE BASIS OF THE CONTRACT SHOULD A POLICY BE ISSUED, AND IT WILL BE ATTACHED TO AND BECOME PART OF THE POLICY.

ALL WRITTEN STATEMENTS AND MATERIALS FURNISHED TO THE INSURER IN CONJUNCTION WITH THIS APPLICATION ARE HEREBY INCORPORATED BY REFERENCE INTO THIS APPLICATION AND MADE A PART HEREOF.

NOTICE TO ARKANSAS APPLICANTS:   "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT, OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

NOTICE TO COLORADO APPLICANTS:   "IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE, AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICYHOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICYHOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES."

NOTICE TO FLORIDA APPLICANTS:   "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY IN THE THIRD DEGREE."

NOTICE TO KENTUCKY APPLICANTS:   "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME."

NOTICE TO MINNESOTA APPLICANTS:   "ANY PERSON WHO SUBMITS AN APPLICATION OR FILES A CLAIM WITH INTENT TO DEFRAUD OR HELPS COMMIT A FRAUD AGAINST AN INSURER IS GUILTY OF A CRIME."

NOTICE TO NEW JERSEY APPLICANTS:   "ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES."

NOTICE TO NEW YORK APPLICANTS: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION."

NOTICE TO OHIO APPLICANTS: "ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD."

NOTICE TO PENNSYLVANIA APPLICANTS: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES."

NOTICE TO TENNESSEE APPLICANTS: "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS."

Signed [signature]
(Applicant)

Date 8/9/02

Title President
(must be signed by Chairman of the Board or President)

Corporation ____________________
(Corporate Seal)

Attest ____________________

Broker ____________________

Address ____________________

Please read the following statement carefully and sign where indicated. If a policy is issued, this signed statement will be attached to the policy.

The undersigned authorized officer of the Applicant hereby acknowledges that he/she is aware that the limit of liability contained in this policy shall be reduced, and may be completely exhausted, by the costs of legal defense and, in such event, the insurer shall not be liable for the costs of legal defense or for the amount of any judgment or settlement to the extent that such exceeds the limit of liability of this policy.

The undersigned authorized officer of the Applicant hereby further acknowledges that he/she is aware that legal defense costs that are incurred shall be applied against the retention amount.

Signed [signature]
(Applicant)

Date 8/9/02

Title President
(must be signed by Chairman of the Board or President)

02/21/2006 22:13 8475546588 PAGE 01

AIM
AMERICAN IMAGING MANAGEMENT

# facsimile transmittal

| | | | |
|---|---|---|---|
| To: | Dennis Ryan | Fax: | 214-659-4791 |
| From: | Nancy Armatas | Date: | 2/22/2006 |
| Phone: | 847-559-6527 | Fax: | 847-589-6606 |

☐ For Review ☐ Please Comment ☐ Please Reply ☐ Please Recycle


SB
Schwartz Brothers Insurance

July 11, 2005

Mr. Andy Fleming
American Imaging Management, Inc.
540 Lake Cook Road
Suite 300
Deerfield, IL 60015-5289

RE: International Radiology Group, LLC
Directors & Officers Liability
Run-Off Endorsement

Dear Andy:

Attached is the Run-Off Endorsement for your Directors & Officers Liability policy.

You have been previously billed for this premium.

The Run-Off Clause encompasses a period of 6 years.

If you have any questions or concerns please contact me directly.

Respectfully,

Bill

William J. Zimmermann, AU, ARM

Enclosure

One S. Wacker Drive, 36th Floor Chicago, Illinois [illegible] 312-[illegible] [illegible] Fax

ENDORSEMENT# 17

This endorsement, effective 12:01 a.m. June 27, 2006 forms a part of policy number 716-77-62 issued to INTERNATIONAL RADIOLOGY GROUP, L.L.C.

by Illinois National Insurance Company

RUN-OFF ENDORSEMENT

In consideration of the additional premium of $120,800, (which shall be fully earned at the inception date of this endorsement) it is hereby understood and agreed that as of June 27, 2006 (hereinafter the "Effective Time"), the following provisions shall apply and be added to the policy:

I.

The Section of the policy entitled DISCOVERY CLAUSE is deleted in its entirety and replaced with the following:

RUN-OFF COVERAGE CLAUSE

The Named Entity shall have the right to a period of six (6) years following the Effective Time (herein referred to as the Discovery Period or Run-off Coverage) in which to give written notice to the Insurer of any Claim(s) first made against any Insured(s) during said 6 year period for any Wrongful Act(s) occurring on or prior to the Effective Time and otherwise covered by this policy.

II.

The Section of the policy entitled CANCELLATION CLAUSE is deleted in its entirety and replaced with the following:

This policy may not be canceled by the Named Entity or by the Insurer except as indicated below.

Notwithstanding the foregoing, this policy may be canceled by or on the behalf of the Insurer only in the event of nonpayment of premium by the Named Entity. In the event of non-payment of premium by the Named Entity, the Insurer may cancel this policy by delivering to the Named Entity or by mailing to the Named Entity, by registered, certified, or other first class mail, at the Named Entity's address as shown in Item 1. of the Declarations, written notice stating when, not less than fifteen (15) days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The Policy Period terminates at the date and hour specified in such notice, or at the date and time of surrender.

END 017

ENDORSEMENT# 77 (continued)

If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

It is further understood and agreed that the premium charged for this policy and endorsement shall be fully earned as of the Effective Time.

III.

The Section of the policy entitled CHANGE IN CONTROL OF NAMED ENTITY is deleted in its entirety.

IV.

It is further understood and agreed that notwithstanding any other provision of this policy, this policy shall not provide coverage for any Claim(s) alleging any Wrongful Act(s) occurring after the Effective Time.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

AUTHORIZED REPRESENTATIVE

END 017

Affiliate.. Clinical Surgeons
1725 West Harrison Street
Suite 818
Chicago, Illinois 60612-3824

Tel 312.942.6511
Fax 312.942.6520
www.affiliatedclinicalsurgeons.com
www.rush.edu

RUSH UNIVERSITY MEDICAL CENTER

RUSH UNIVERSITY
COLLEGE OF NURSING
RUSH MEDICAL COLLEGE
COLLEGE OF HEALTH SCIENCES
THE GRADUATE COLLEGE

February 1, 2008

Richard A. Prinz, MD
*Helen Shedd Keith Professor and Chairman*
*Department of General Surgery*
*Rush University*

Constantine V. Godellas, MD
*Associate Professor*
*Department of General Surgery*
*Rush University*

James A. Madura II, MD
*Associate Professor*
*Department of General Surgery*
*Rush University*

Andrea Madrigrano, MD
*Assistant Professor*
*Department of General Surgery*
*Rush University*

United Healthcare
P.O. Box 740800
Atlanta, GA 30374-0800

Re: ID#854052068 Group#379023

To Whom It May Concern:

I am writing to explain some of the testing that was done on Ms. Adele Lampert. Ms. Lampert has a malignant paraganglioma that has metastasized. In order to determine the extent of disease she has had a number of tests. One of these was a meta-iodo benzyl guanidine nuclear medicine study [MIBG]. This determined that she had extensive metastatic disease when it was performed on October 17, 2007. This not only was important in the diagnosis but led us to determine that operative removal of her metastatic paraganglioma was not the appropriate therapy. On November 13, 2007 she had an octreotide scan. This was done to see if her tumor had receptors for octreotide. If they did she could be treated with radio labelled octreotide. Both of these tests were essential for not only determining the extent of her disease but also the type of therapy that should be employed. Together they allowed us to avoid an expensive operation and the type of hormonal therapy that in all likelihood would not have helped her and only put her at risk for complications. I think it is important that you realize these tests are needed when determining proper management for a very unusual tumor. If further information is required please do not hesitate to contact me.

Sincerely,

Richard A. Prinz, M.D.

RAP/ljw